2013-5039, -5040

UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT


SUFI NETWORK SERVICES, INC.,

Plaintiff-Cross Appellant,


v.


UNITED STATES,

Defendant-Appellant.

_____

Appeals from the United States Court of Federal Claims
in Case No. 1-CV-0804, Judge Thomas C. Wheeler
_____


SUFI'S BRIEF IN OPPOSITION TO THE GOVERNMENT'S
APPEAL AND IN SUPPORT OF SUFI'S CROSS-APPEAL

Frederick W. Claybrook, Jr.
Brian T. McLaughlin

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

Attorneys for SUFI Network Services, Inc.

June 26, 2013

## Certificate of Interest

Counsel for the Appellant certifies the following:

1.  The full name of every party or amicus represented by me is:

    SUFI Network Services, Inc.

2.  The name of the real party in interest (if the party named in the caption is not the real party in interest) represented by me is:

    Not applicable.

3.  All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

    None.

4.  The names of all law firms and the partners and associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

    Crowell & Moring LLP; Frederick W. Claybrook, Jr.;
    Brian T. McLaughlin.


     /s/ Frederick W. Claybrook, Jr.
    Frederick W. Claybrook, Jr.


June 26, 2013

# TABLE OF CONTENTS

Table of Authorities ............................................................................... iv

Statement of Related Cases.........................................................................1

Jurisdictional Statement ..............................................................................1

Counter-Statement of Issues .......................................................................1

Counter-Statement of Facts and Proceedings Below.................................2

Summary of Opposition Argument..............................................................8

Opposition Argument...................................................................................9

I.     SUFI Proved Its Lost Revenue Damages with Reasonable Certainty,
       But Also Rebutted the Government's Speculations .......................9

       A.     SUFI Proved Its *Prima Facie* Case .....................................10

       B.     SUFI Did Not Have to Disprove Potential, Hypothetical
              Reductions ...........................................................................12

       C.     The Record Belies the Government's Speculations............18

              1.     Reliance on Naked Market Theory Is Forbidden ....18

              2.     The Record Deconstructs the Government's Three-
                     Pronged Attack........................................................19

                     a.     Number and Duration of Calls………………...............20

                     b.     Other DSN Access…………………………………21

                     c.     Official Calls……………………………………..23

                            (1)     The Board Misread the Contract……………...23

                            (2)     The Contract Still Required the AF to
                                    Screen Out Non-Official, Off-Base Calls………25

                            (3)     SUFI's Conservative Calculations More
                                    Than Accounted for "Official" Calls, If Any…..27

D.    The CFC Properly Held That the Board's Awards Were
Grievously Low ........................................................................28

II.    Remand to the Board Is Waived and, in Any Event, Would Be
Improper.................................................................................32

A.    The Government Waived Its Remand Argument Because It Did
Not Assert It in the CFC........................................................33

B.    The Board Has Already Made Findings on a Full Record, and
So Administrative Remedies Are Exhausted ......................................35

C.    Remand on This Record Would Be a Forbidden Formality ..............40

1.    The Law Concerning Remand When the Board Has Not
Made Findings..........................................................................41

2.    The CFC Properly Applied the Rule........................................42

a.    Other Operator Numbers……………………………43

b.    Delta Squadron……………………………………..44

c.    Calling Cards……………………………………….45

d.    SIMS/LTS Interfaces…………………………………..45

e.    Change of AF Switches………………………………46

f.    Early DSN Abuse…………………………………....46

g.    Prime Knight Lodging………………………………47

h.    German Troops Housing……………………………47

i.    Lost Profits…………………………………………47

j.    Rates……………………………………………....48

Statement of Cross-Appeal Issues .........................................................50

Summary of Cross-Appeal Argument ....................................................51

Cross-Appeal Argument ……………………………………..…..51

ii

I.    The Kapaun Line Charge Claim States a Valid Estoppel ............................51

    A.    The First Estoppel ........................................................................52

    B.    The Second Estoppel ....................................................................55

    C.    The Law Mandates an Estoppel ....................................................56

II.   The CFC Made Two Hallway Phones Damages Errors ...............................60

    A.    SUFI Did Not Waive an Accurate Interest Computation ..................60

    B.    The CFC Erred by Not Applying Undisputed Corrections to the Hallway Phones Damages ....................................................................63

III.  SUFI Was Entitled to Service Added Lodgings ...........................................64

Conclusion .......................................................................................................72

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

C<small>ASES</small>

*Ace Constr. Co. v. U.S.*,
401 F.2d 816 (Ct. Cl. 1968) ............................................................................33

*Ace Constructors, Inc. v. U.S.*,
70 Fed. Cl. 253 (2006) .....................................................................................50

*Ace-Fed. Reporters, Inc. v. Barram*,
226 F.3d 1329 (Fed. Cir. 2000) .......................................................................13

*Am. Capital Corp. v. FDIC*,
472 F.3d 859 (Fed. Cir. 2006) .........................................................................15

*American Electronic Laboratories, Inc. v. U.S.*,
774 F.2d 1110 (Fed. Cir. 1985) ...................................................................57, 58

*Appleby v. Delaney*,
271 U.S. 403 (1926)..........................................................................................70

*Baltimore Contractors, Inc. v. U.S.*,
643 F.2d 729 (Ct. Cl. 1981) .............................................................................40

*Bigelow v. RKO Radio Pictures, Inc.*,
327 U.S. 251 (1946)....................................................................................14, 26

*Bluebonnet Sav. Bank v. U.S.*,
266 F.3d 1348 (Fed. Cir. 2001) ....................................................................8, 10

*Boyce v. Soundview Tech. Grp., Inc.*,
464 F.3d 376 (2d Cir. 2006) .............................................................................14

*Briscoe v. U.S.*,
442 F.2d 953 (Ct. Cl. 1971)...................................................................34, 37, 38

*Burbank v. Bodman*,
464 F.3d 1280 (Fed. Cir. 2006) .......................................................................65

*Centre Mfg. Co. v. U.S.*,
392 F.2d 229 (Ct. Cl. 1968)..............................................................................59

iv

*Citizens Fed. Bank v. U.S.*,
    474 F.3d 1314 (Fed. Cir. 2007) ........................................................10

*Coast Fed. Bank v. U.S.*,
    323 F.3d 1035 (Fed. Cir. 2003) ........................................................66

*ConocoPhillips v. U.S.*,
    501 F.3d 1374 (Fed. Cir. 2007) ...................................................33, 70

*Costa Cty. Flood Control Dist. v. U.S.*,
    512 F.2d 1094 (Ct. Cl. 1975) ...........................................................70

*Cruz-Martinez v. DHS*,
    410 F.3d 1366 (Fed. Cir. 2005) ........................................................66

*David Nassif Assocs. v. U.S.*,
    557 F.2d 249 (Ct. Cl. 1977) .............................................................68

*Energy Nw. v. U.S.*,
    641 F.3d 1300 (Fed. Cir. 2011) ........................................................17

*Fredericks v. Comm'r of Internal Revenue*,
    126 F.3d 433 (3d Cir. 1997) .............................................................60

*General Dynamics Corp. v. U.S.*,
    558 F.2d 985 (Ct. Cl. 1977) .............................................................57

*Golden Bridge Tech., Inc. v. Nokia, Inc.*,
    527 F.3d 1318 (Fed. Cir. 2008) ...................................................33, 43

*Hercules, Inc. v. U.S.*,
    292 F.3d 1378 (Fed. Cir. 2002) ........................................................65

*Hoel-Steffen Constr. Co. v. U.S.*,
    684 F.2d 843 (Ct. Cl. 1982) ...............................................38, 39, 59

*Home Sav. of Am. v. U.S.*,
    399 F.3d 1341 (Fed. Cir. 2005) ...................................................32, 37

*HPI/GSA-3C, LLC v. Perry*,
    364 F.3d 1327 (Fed. Cir. 2004) ........................................................66

*Janowsky v. U.S.*,
  133 F.3d 888 (Fed. Cir. 1998) ........................................................... 59

*K-Con Bldg. Sys., Inc. v. U.S.*,
  106 Fed. Cl. 652 (2012) .................................................................... 17

*Lam, Inc. v. Johns-Manville Corp.*,
  718 F.2d 1056 (Fed. Cir. 1983) ............................................. 11, 17, 26

*LaSalle Talman Bank v. U.S.*,
  317 F.3d 1363 (Fed. Cir. 2003) .................................................. 14, 15

*Locke v. U.S.*,
  283 F.2d 521 (Ct. Cl. 1960) ........................................................ 14, 26

*Mabus v. General Dynamics C4 Systems, Inc.*,
  633 F.3d 1356 (Fed. Cir. 2011) ........................................................ 56

*Macke Co. v. U.S.*,
  467 F.2d 1323 (Ct. Cl. 1972) ................................................. 12, 13, 18

*Manloading & Mgmt. Assocs., Inc. v. U.S.*,
  461 F.2d 1299 (Ct. Cl. 1972) ............................................................ 58

*Max Drill, Inc. v. U.S.*,
  427 F.2d 1233 (Ct. Cl. 1970) ............................................................ 58

*Maxwell Dynamometer Co. v. U.S.*,
  386 F.2d 855 (Ct. Cl. 1967) ............................................................. 41

*Mech-Con Corp. v. West*,
  61 F.3d 883 (Fed. Cir. 1995) ............................................................ 42

*Medlin Constr. Grp. Ltd. v. Harvey*,
  449 F.3d 1195 (Fed. Cir. 2006) ........................................................ 64

*Micron Tech., Inc. v. Rambus Inc.*,
  645 F.3d 1311 (Fed. Cir. 2011) ........................................................ 17

*Nager Electric Co. v. U.S.*,
  442 F.2d 936 (Ct. Cl. 1971) ............................................................. 38

*Northrop Grumman Corp. v. Goldin*,
  136 F.3d 1479 (Fed. Cir. 1998) .........................................................42

*OAO Corp. v. U.S.*,
  17 Cl. Ct. 91 (1989) ............................................................................59

*Ordnance Research, Inc. v. U.S.*,
  609 F.2d 462 (Ct. Cl. 1979) ..........................................................41, 42

*Owens-Corning Fiberglas Corp. v. U.S.*,
  419 F.2d 439 (Ct. Cl. 1969) ................................................................43

*Pac. Gas & Electric Co. v. U.S.*,
  536 F.3d 1282 (Fed. Cir. 2008) .....................................................70, 71

*Perry & Wallis, Inc. v. U.S.*,
  427 F.2d 722 (Ct. Cl. 1970) ................................................................66

*Rumsfeld v. Applied Cos.*,
  325 F.3d 1328 (Fed. Cir. 2003) ...........................................................13

*S. Nuclear Operating Co. v. U.S.*,
  637 F.3d 1297 (Fed. Cir. 2011) .....................................................15, 16

*S.W. Electronics & Mfg. Corp. v. U.S.*,
  655 F.2d 1078 (Ct. Cl. 1981) ..............................................................37

*S&E Contractors, Inc. v. U.S.*,
  406 U.S. 1 (1972).................................................................................37

*Sherwin v. U.S.*,
  436 F.2d 992 (Ct. Cl. 1971) ..........................................................42, 44

*Shockley v. Arcan, Inc.*,
  248 F.3d 1349 (Fed. Cir. 2001) ...........................................................18

*Silvestri v. Gen. Motors Corp.*,
  271 F.3d 583 (4th Cir. 2001) ...............................................................17

*Sims v. Apfel*,
  530 U.S. 103 (2000)......................................................................34, 35

*Singleton v. Wulff*,
   428 U.S. 106 (1976)...............................................................................33

*Stein Bros. Mfg. Co. v. U.S.*,
   337 F.2d 861 (Ct. Cl. 1963) ...............................................................36

*Stockton E. Water Dist. v. U.S.*,
   583 F.3d 1344 (Fed. Cir. 2009) .........................................................13

*Story Parchment Co. v. Paterson Parchment Paper Co.*,
   282 U.S. 555 (U.S. 1931)...........................................................11, 14

*Stratos Mobile Networks USA, LLC v. U.S.*,
   213 F.3d 1375 (Fed. Cir. 2000) .........................................................70

*Sylvania Electric Prods., Inc. v. U.S.*,
   458 F.2d 994 (Ct. Cl. 1972) ...............................................................68

*Teledyne McCormick-Selph v. U.S.*,
   588 F.2d 808 (Ct. Cl. 1978) ........................................................29, 41

*Tex. Instruments, Inc. v. U.S.*,
   922 F.2d 810 (Fed. Cir. 1990) ...........................................................41

*Tip Top Constr., Inc. v. Donahoe*,
   695 F.3d 1276 (Fed. Cir. 2012) ...................................................13, 42

*U.S. v. Anthony Grace & Sons, Inc.*,
   384 U.S. 424 (1966)...............................................35, 36, 37, 38

*U.S. v. Carlo Bianchi & Co.*,
   373 U.S. 709 (1963)...................................................37, 41, 63

*U.S. v. Purcell Envelope Co.*,
   249 U.S. 313 (1919)...............................................................59

*U.S. v. Utah Constr. & Mining Co.*,
   384 U.S. 394 (1966)...............................................................37

*U.S. v. Victoria Gin Co.*,
   48 C.C.P.A. 33 (1960) ...............................................18, 26

*U.S. v. Winstar Corp.*,
 518 U.S. 839 (1996)..................................................................................70

*U.S. v. Wunderlich*,
 342 U.S. 98 (1951)................................................................................38, 39

*U.S. v. Zannino*,
 895 F.2d 1 (1st Cir. 1990)...........................................................................33

*USA Petroleum Corp. v. U.S.*,
 821 F.2d 622 (Fed. Cir. 1987) .....................................................................60

*Vann v. U.S.*,
 420 F.2d 968 (Ct. Cl. 1970)....................................................................29, 41

*Veridyne Corp. v. U.S.*,
 107 Fed. Cl. 762 (2012) ..............................................................................50

*W. Alaska Contractors*,
 95-1 BCA ¶27,392 (ASBCA 1994) ...............................................................50

*WRB Corp. v. U.S.*,
 177 Ct. Cl. 909 (1966) ................................................................................34

*Zubulake v. UBS Warburg LLC*,
 220 F.R.D. 212 (S.D.N.Y. 2003) ..................................................................17

*Zubulake v. UBS Warburg LLC*,
 229 F.R.D. 422 (S.D.N.Y. 2004) ..................................................................17

## STATUTES AND REGULATIONS

48 C.F.R. § 52.217-6...................................................................................69

28 U.S.C. § 1295(a)(3).................................................................................1

41 U.S.C. § 321 (2006) ...............................................................................38

## OTHER AUTHORITIES

11 Joseph M. Perillo, *Corbin on Contracts* (2005 rev. ed.)

 § 56.7.......................................................................................................10

§ 57.10...........................................................................................15

Fed. R. App. P.

25...................................................................................................1

28.................................................................................................33

32...................................................................................................1

*Restatement (Second) of Contracts* (1979)

§ 89...............................................................................................57

§ 150.............................................................................................57

§ 201(1).........................................................................................66

§ 212 cmt.b....................................................................................66

§ 352........................................................................................11, 15

## Statement of Related Cases

The following case  may be affected by this Court's decision in the pending appeal and cross-appeal:  *SUFI Network Services, Inc. v. U.S.*, No. 11-453C (Fed. Cl.).  The CFC's decision that is the subject of these appeals is now reported at 108 Fed. Cl. 287 (2012) and is appended in that format to this brief.

## Jurisdictional Statement

28 U.S.C. §1295(a)(3) provides jurisdiction of SUFI's cross-appeal.  SUFI filed its cross-appeal within 14 days of the government's appeal.  (JA48.)

## Counter-Statement of Issues

1.      Whether the Court of Federal Claims ("CFC") properly held that SUFI had proven its "lost revenues" damages with reasonable certainty by using actual call records and subtracting its costs to have carried the diverted traffic.

2.      Whether the government, by not raising it in the CFC, waived its appeal argument that the CFC should have remanded to the ASBCA after finding error or, in any event, whether SUFI had exhausted its administrative remedy and the CFC properly made its own findings on the undisputed and overwhelming evidence of record.

## Counter-Statement of Facts and Proceedings Below

In the annals of government contracting, few cases, if any, rival the number and severity of the willful breaches by the Air Force ("AF") here.[1]  While the ASBCA found the AF in material breach and SUFI entitled to damages on 22 out of its 28 monetary claims (with the CFC adding two more), the Board avoided any discussion of the willfulness of the breaches and, when it came to damages, it consistently chopped down or discarded altogether SUFI's proven, unrebutted calculations, often *sua sponte*.  After a "full and careful review of the  Board's record for each of the individual claims," the CFC showed how the Board had "harshly reduced SUFI's damages at every opportunity"; it corrected the award to be consistent with the law, the record, and the size and duration of the program. (JA3-4.)

SUFI and an AF NAFI formed a cooperative business arrangement to solve a major problem for the AF at eight air bases in Germany.  In the early 1990s, the guest lodgings at those bases were considered among the worst.  The "#1" complaint of guests was the lack of phones in the guest rooms, as the only way guests could call their loved ones back home or place other calls was by lining up

---

[1]    SUFI will refer to the "AF" when discussing Contract activities and the agency's position before the Board.  It will refer to the "government" when discussing DOJ's positions at the CFC and this Court.  An acronym dictionary (JA3475) and list of personnel (JA3476-78) are provided.

to use a government phone located in the hallway or lounge of their lodging.  On top of the lack of privacy, guest demand for telephone time led to frequent, two-hour-or-longer waits.  (JA191-91C, 208, 277, 283-84, 290, 1405, 1429, 1458.)

SUFI solved the problem for the AF in a manner that was to create a mutually beneficial partnership.  SUFI bought telephone equipment, laid trenched cabling, wired lodging facilities, and installed a phone in each guest room at <u>no cost</u> to the AF.  To recoup its investment, offset the cost of carrying the phone traffic, and turn a profit, SUFI was to be the <u>sole</u> phone service provider, providing free on-base service and collecting toll charges for all <u>off-base</u> calling.  Under a revenue sharing agreement, the AF would receive a portion of those charges; thus, by its agreement with SUFI, the AF had not only provided private phones for its guests but could also make money itself by doing so.  (JA416-17.)  As the ASBCA found, "the principal financial purpose of the contract was Air Force-SUFI sharing of revenues generated by outgoing long distance calls by lodging guests on SUFI's network."  (JA65-66.)  All the AF was required to do to make the Contract work was remove or disable the government DSN phones already in the lodgings and to cooperate with SUFI to prevent guests from circumventing SUFI's system.  As the government concedes (at 4), "the Air Force agreed that a SUFI telephone system . . . was to be the exclusive method available to a guest for placing telephone calls at the lodging."

3

SUFI did its job under the Contract, but, in the government's words (at 2), "difficulties" arose.  It was a lot worse than that.  The AF <u>consistently</u>, <u>repeatedly</u>, and <u>willfully</u> breached its express and its implied duties.  (JA3.)  The AF got its benefits of the bargain, but then it actively encouraged and helped guests circumvent SUFI's network to make free or reduced-rate phone calls from the lodgings, on both SUFI's phones and the government's free DSN phones, in multiple ways, ranging from the defiant to the clever, from the open to the stealthy.  For example, in claims addressed below:

- <u>Hallway and Lobby DSN Phones.</u>  The AF spurned the specific and plain Contract requirement that it remove the preexisting DSN phones, allowing guests to continue to make free phone calls directly within the lodgings, just steps from their rooms.  Not content with that, the AF later <u>added</u> <u>more</u> free DSN phones in the lodgings for guests to use and increased the direct-dial capability to worldwide access.  (JA14-15, 114(¶91).)

- <u>Delta Squad.</u>  Similarly, the AF refused to remove government phones from the lounge of a lodging SUFI serviced, allowing guests to make free phone calls from there around the clock.  (JA21-22.)

- <u>Early DSN Abuse.</u>  The AF from the outset allowed the base operators to patch guests through to long-distance and other off-base numbers for free from SUFI's room phones, despite the Contract requiring it to control fraud and toll-skipping.  (JA31-32.)

- <u>Other Operator Numbers Patching.</u>  When SUFI blocked the DSN numbers providing direct access to the local base operators as a result of the early DSN abuse, the AF established and distributed to guests new numbers to circumvent SUFI's blocks and allow guests still to reach the government operators directly from their SUFI room phones.  The AF also informed guests of other numbers to call from which they could be forwarded to the operator to be patched to off-base numbers.  All the while, the AF refused to instruct the base operators not to patch guest calls to long-distance numbers.  (JA19-20.)

- <u>Prime Knight Lodgings.</u>  These were the only lodgings that already had phones in each room prior to SUFI's service.  But the AF told SUFI they were only intercom phones when, in fact, they had direct-dial, long-distance access.  When SUFI discovered the truth, the AF

still refused to remove them for two years, despite multiple requests. (JA33.)

- <u>Calling Cards.</u>  After years of contrary performance, the AF directed SUFI to allow guests to use competing long-distance carriers from the SUFI phones.  (JA23-24.)

The Board in all these instances found for SUFI on the merits.  But then the Board cut back or denied altogether SUFI's proven damages, in these and other claims.  Contrary to the government's assertions, the Board did so not on the basis of "findings" supported by substantial evidence, but, rather, on speculations unsupported by, and contrary to, the record—speculations concerning which the AF adduced no evidence and, in multiple instances, did not even argue.

The CFC analyzed each of SUFI's claims with particularity, after setting out the law of Wunderlich Act review and damages in great detail and with absolute accuracy.  (JA4-9.)  The government cannot show any error in the CFC's elucidation of this law, which provided the framework for its decision on each claim.  As the CFC explained in detail, in several instances the ASBCA improperly neglected SUFI's proven damages or shifted the burden to prove reductions to the innocent party; in others, the ASBCA cut proven damages without explanation; in some, the ASBCA *sua sponte* adopted misinterpretations of the Contract or the

law; in still others, the ASBCA acted inconsistently with its own findings and illogically.  The CFC, after finding error, then set damages per the record evidence.

Indeed, the CFC's lost revenues award in total is fully consistent with the parties' expectations when they formed their partnership.  As the ASBCA correctly found, "At the outset of the contract the parties expected SUFI to generate substantial profits, based on a 60 to 85% occupancy rate for lodging facilities . . . ." (JA160(¶317).)  Both parties' executives testified to that effect (*id.*), and the Contract's revenue sharing provisions prove it.  They set forth revenue estimates up to $572,138 per month based on 85% occupancy at just three bases, which would generate long-distance revenues alone of well over $100,000,000 for the full performance period.  (JA1361.)

During performance, the number of bases expanded to eight, more than doubling the rooms SUFI serviced.  (JA96(¶5).)  This alone adjusted the contractual expectations to well over $200,000,000 for just long-distance revenues. But occupancy rates were also consistently well over 90% at all the bases (and often over 100% when the AF doubled-up rooms (JA144(¶228)), driving specified revenue expectations still higher.  (JA160(¶317).)  The Contract identifies expected daily usage ranging up to **twenty** minutes per room (JA1361); SUFI's damages calculations equate to less than **eight**.  (JA2432(¶394).)

In short, SUFI's proven lost revenue and lost profits damages are on the <u>low</u> side of the parties' contractual expectations, especially considering the doubling of the number of rooms and greater-than-expected occupancy rates. "It is not the duty of courts," or the boards, "to second-guess the terms of a bargained-for exchange." *Bluebonnet Sav. Bank v. U.S.*, 266 F.3d 1348, 1357 (Fed. Cir. 2001). As the CFC held, "a contract is a contract," and "[t]he damages award simply reflects the magnitude of the program envisioned by the parties and the disaster it became following the Air Force's material breaches." (JA4.)

Other facts to support SUFI's cross-appeal issues or to respond to the government's arguments and misstatements[2] will be provided in the argument sections.

## Summary of Opposition Argument

The government's challenge to the CFC's lost revenues findings as "speculative" is wrongheaded, both legally and factually. SUFI proved its but-for world with reasonable certainty, but in the government's upside-down world, the fact that the AF breached by helping guests in multiple ways avoid paying for their calls "proves" that SUFI's damages are "speculative" because of the generic "law

---

[2]    For example, the government consistently refers to SUFI's rates as "$1 per minute," when the rate to the U.S., which was by far the most used, was $0.85. (JA1814(col. E).)

of supply and demand." Not only does binding precedent foreclose such an inequitable approach, but the uncontested evidence of the particular "market" at the AF bases explodes reliance on any such generic, unproven assumptions. aw, logic, and evidence fully rebut the government's arguments, as the CFC rightly held.

The government waived its second argument, that the CFC should have remanded to the Board once it found error, by not raising it in the CFC. SUFI exhausted its administrative remedy, and so the CFC was free to set damages itself once it found error. In any event, the evidence on which the CFC relied was uncontroverted and overwhelming.

Opposition Argument

II.   SUFI Proved Its Lost Revenue Damages with Reasonable
      <u>Certainty, But Also Rebutted the Government's Speculations</u>

The CFC correctly held that the Board's lost revenues awards violated the law and were inconsistent with the record. The government argues that SUFI has not shown a suitable "but-for" world, but it ignores precedent directly on point that establishes that SUFI proved its lost revenues damages for its but-for world without the existence of hallway phones and other AF breaches with reasonable certainty. In the government's view, SUFI is required to prove a but-for world that rebuts defenses the government suggests but does not prove, even when the

9

government's breaches preclude rebuttal proof.  The CFC properly rejected this contention.

A.    SUFI Proved Its *Prima Facie* Case

The essence of the law the government cites is that, when proving lost profits, a plaintiff (a) must not simply guess about, but show with reasonable certainty, the fact of damage and present a suitable approximation of what its revenue would have been, and (b) must subtract costs it would have incurred, absent the breach.  *E.g.*, *Bluebonnet*, 266 F.3d at 1356-57("If a reasonable probability of damage can be clearly established, uncertainty as to the amount will not preclude recovery . . . ."(quoting *Ace-Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1333 (Fed. Cir. 2000))); 11Joseph M. Perillo, *Corbin on Contracts* §56.7 at 108 (2005 rev. ed.)("What is required is . . . an amount that is not beyond the bounds of reasonable prediction.")(quoted in *Citizens Fed. Bank v. U.S.*, 474 F.3d 1314, 1321 (Fed. Cir. 2007)).  Here, as the CFC held, SUFI satisfied those standards.  (JA7-9.)

First, the fact of damage is uncontested:  "the existence of damage to SUFI is clear and certain."  (JA3, 16.)  And SUFI did not have to "guess" or "speculate" about how much the guests called.  For the large majority of calls, SUFI used existing records of guest usage; for two smaller claims, SUFI made reasonable, conservative computations from contemporaneous call records then existing.  As

this Court held in *Lam, Inc. v. Johns-Manville Corp.*, 718 F.2d 1056, 1068 (Fed. Cir. 1983), a lost profits award is not speculative or remote when "damages were not picked out by mere speculation or guess," but were "the result of an extrapolation of actual data." *See also Story Parchment Co. v. Paterson Parchment Paper Co.*, 282 U.S. 555, 562 (U.S. 1931)("The rule which precludes the recovery of uncertain damages applies to such as are not the certain result of the wrong, not to those damages which are definitely attributable to the wrong and only uncertain in respect of their amount.").

Second, as the government acknowledges (at 6n.2), SUFI subtracted what its carrying costs would have been for the diverted calls it claimed. (*E.g.*, JA1768(col.F).) This fully satisfied SUFI's burden to prove its damage with reasonable certainty. *See Restatement (Second) of Contracts* §352, illus. 7 (1979)(hereinafter, "*Restatement*").

The government argues this is not enough. It asserts that (a) the "law of supply and demand" dictates that guests would have used SUFI's phones less if they had had to pay more and (b) SUFI did not prove to the contrary. The government is wrong on both counts. As the CFC held, the burden to show any such reduction, with specific proof, fell on the government as the breaching party, a burden it concededly did not carry. (JA8-9.) As confused as the government's argument are, the facts are simple. SUFI proved its *prima facie* case. The

government's arguments that SUFI's proven damages are overstated suggest

potential defenses, but the AF failed to introduce proof to support them (and in

some cases, didn't even argue them).  (*E.g.*, JA18.)  In the absence of counter-

proof, SUFI was not required to do more.  Nevertheless, the record also

affirmatively rebuts the government's speculative assertions.

> B.    SUFI Did Not Have to Disprove
>        Potential, Hypothetical Reductions

*Macke Co. v. U.S.*, 467 F.2d 1323 (Ct. Cl. 1972), is on all fours with this

case and forecloses the government's argument.  *Macke* involved a no-cost,

exclusive food services contract under which a NAFI shared revenues with the

contractor.  The board found the NAFI in breach because it did not permit the

contractor to raise prices to the cafeteria customers.  However, the board denied

lost profit damages by reasoning that "customer resistance [to the higher food

prices] would have" depressed usage, including by customers using other cafeterias

or bringing their own meals.  *Id.* at 1329-30.  Although the Court found the board's

reasoning plausible in theory, noting that an outright boycott of the contractor's

cafeteria could have possibly resulted, it overturned the board because "there was

absolutely no evidence to that effect."  *Id.*

The government's argument here that guests may have used the phones less

if the price had been higher is exactly the same type of unsupported assumption the

Court rejected in *Macke*. As the CFC noted, the government "could have presented evidence to show the alleged effects of these damages reductions, but it did not." (JA9.) Similarly, this Court in *Tip Top Construction, Inc. v. Donahoe*, 695 F.3d 1276, 1284-85 (Fed. Cir. 2012), reversed the board when it based its damages rulings on government speculation, and in *Stockton East Water District v. U.S.*, 583 F.3d 1344, 1360, 1364 (Fed. Cir. 2009), it rejected the government's defenses when it did not put on proof of specific amounts.

SUFI need go no further, but the government's argument is also foreclosed by many other, reinforcing principles and precedents. First, the government admits (at 4), as it must, that SUFI had an <u>exclusive</u> for calls from the lodgings once a base was ordered. Each diversion from a requirements supplier is an independent breach, and proof of diverted requirements adequately supports a lost profits award. *Rumsfeld v. Applied Cos.*, 325 F.3d 1328, 1339 (Fed. Cir. 2003); *Ace-Fed.*, 226 F.3d at 1333. As the CFC put it, the "Air Force breached the contract each time it allowed lodging guests to circumvent SUFI's network." (JA7.) It is no defense for a requirements buyer to say it went to another supplier because it got a better price; that is a restatement of the breach. The government repeatedly tries to sidestep its culpability by focusing its arguments on the conduct of the guests, even suggesting (at 17) that some calls made on hallway/lobby phones were not in breach. But it is the <u>AF</u> whose breaching conduct is at issue here, and it is the <u>AF</u>

that assisted guests to place calls on the illicit government phones to circumvent SUFI's exclusive network.  Every one of those calls was in breach, and the AF owes damages for every one.

Second, as the CFC outlined in more detail (JA8-9), the wrongdoer bears the risk of the uncertainty which his own wrong has created.  In particular, "where [a defendant's] own wrongful action has made it impossible for the plaintiff to show in what proportions he and the defendant have contributed to the [damages]," the defendant must pay the full amount of the plaintiff's proven damage.  *Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 265 (1946); *accord LaSalle Talman Bank v. U.S.*, 317 F.3d 1363, 1374 (Fed. Cir. 2003)(quoting *Locke v. U.S.*, 283 F.2d 521, 524 (Ct. Cl. 1960)).  The government (at 27) calls this a "purported rule" of damages.  To the contrary, it is a controlling rule of law.  *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 391-92 (2d Cir. 2006)(reversing because the district court had instructed the jury that this rule is "disfavored," when it is always the rule).  "The wrongdoer is not entitled to complain that [damages] cannot be measured with the exactness and precision that would be possible if the case, which he alone is responsible for making, were otherwise."  *Story Parchment*, 282 U.S. at 563.

Third, the CFC properly held that the willfulness of these breaches reinforced that SUFI had met its burden and so the burden shifted to the AF to

prove any reduction. *See Restatement* §352 cmt. a; *Am. Capital Corp. v. FDIC*, 472 F.3d 859, 869 (Fed. Cir. 2006)(applying §352, cmt. a); *LaSalle*, 317 F.3d at 1372. As the CFC found on the undisputed record (*e.g.*, JA15, 19, 23), the AF actively assisted guests to circumvent SUFI's system by, e.g., adding hallway phones (JA115(¶99)), increasing the phones' direct dial access from local to worldwide (JA114(¶91)), setting up other numbers to reach the operator (JA111-12(¶80)), instructing guests what numbers to call to be patched to the operator for free calls (JA444-46, 457), lying about phone dialing access (JA120-21(¶¶121-23)), and refusing to remove admittedly improper phones (JA114(¶93),115(¶102), 121(¶¶124-26)). In such circumstances, it would be manifestly unjust to lay the burden of proof on SUFI. *See S. Nuclear Operating Co. v. U.S.*, 637 F.3d 1297, 1304 (Fed. Cir. 2011)(citing 11*Corbin* §57.10 (when it would be unfair to the plaintiff, "the burden of going forward with the evidence should be thrust on the defendant")).

The government has no meaningful response to the Board's error in ignoring this rule of law. The government suggests (at 28) that the willfulness of the breaches is only "alleged," but does not contest the CFC's holdings that they were willful. It then avers (at 28) that SUFI still retains its burden to prove its damages and that the CFC erred by shifting the burden to the government based on willfulness. This is not what the CFC did; rather, as required by law, it took the

willful nature of the breaches into account in assessing the reasonable certainty of SUFI's damages, and only then, in its informed discretion, did it properly shift the burden to the government to defend against SUFI's proven, *prima facie* model. (*E.g.*, JA18.)

Fourth, the government's hypothetical reduction is based on the conduct of AF guests, not on SUFI's actions. The burden of proof on an issue rests on the party "in the best position to adduce and establish such proof." 637 F.3d at 1304. It was the AF that had access to, and control of, its guests, not SUFI.

Fifth, with respect to the largest claim, Hallway Phones, the CFC properly relied upon the fact, as found but later ignored by the Board, that the AF lost its own switch call records (JA16-17, 116(¶109(b)(1st sent.)), even though SUFI had literally screamed from the outset about the Hallway Phones breach (JA114(¶93)) and even after SUFI counsel had reminded the AF of its duty to preserve call records. (JA1499-500, 727-29, c*ompare* JA1548(listing base switch call records produced and those missing) *with* JA1236(e-mail listing call records then available, many of which were not produced in the litigation).) Indeed, the AF custodian of the call records on the KMC bases when questioned, "Were you ever asked to make sure not to lose any of your call record data, to retain all of it for purposes of litigation," responded, "No." (JA730-33.)

16

"Once a party reasonably anticipates litigation, it must suspend its routine document retention/destruction policy and put in place a 'litigation hold' to ensure the preservation of relevant documents." *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 218 (S.D.N.Y. 2003), *cited with approval in Micron Tech., Inc. v. Rambus Inc.*, 645 F.3d 1311, 1320 (Fed. Cir. 2011). This duty "arises not only during litigation but also extends to that period before the litigation when a party reasonably should know that the evidence may be relevant to anticipated litigation." *Silvestri v. Gen. Motors Corp.*, 271 F.3d 583, 591 (4th Cir. 2001); *accord Micron Tech.*, 645 F.3d at 1320-21. "Counsel must take affirmative steps to monitor compliance so that all sources of discoverable information are identified and searched" and are under a "continuing duty to ensure preservation." *Zubulake v. UBS Warburg LLC*, 229 F.R.D. 422, 432 (S.D.N.Y. 2004); *accord K-Con Bldg. Sys., Inc. v. U.S.*, 106 Fed. Cl. 652, 665n.20 (2012). The AF and its counsel obviously fell woefully short of these duties to preserve and produce relevant evidence. This demands a negative inference to be drawn against the AF, as a matter of law. *Micron Tech.*, 645 F.3d at 1326-29; *see Energy Nw. v. U.S.*, 641 F.3d 1300, 1308 (Fed. Cir. 2011); *Lam*, 718 F.2d at 1065("[A]ny adverse consequences must rest on the [breacher] when the inability to ascertain lost profits is due to the [breacher's] own failure to keep accurate or complete records.").

17

Sixth, as will be discussed further in relation to the false dichotomy of "official and personal" calls on which the Board decimated SUFI's lost revenues awards, the Contract assigned any risk of difficulty of allocation to the AF. The Board made findings to that effect (JA113(¶¶84-85), 120), but then ignored them; the CFC corrected that error. (JA15.)

C.    The Record Belies the Government's Speculations

The government improperly relies on general market theory to hypothesize a reduction to SUFI's proven damages that were based on actual data. But beyond that, the record demolishes any generalized assumptions here.

1.    Reliance on Naked Market Theory Is Forbidden

The government for the first time in this appeal cites to a textbook and cases referencing the "law of supply and demand" to undergird its suggestion of a reduction. Putting *Macke* to one side, even the precedent cited by the government forecloses this approach. For example, in *Shockley v. Arcan, Inc.*, 248 F.3d 1349, 1362 (Fed. Cir. 2001), this Court required economic hypotheticals to include actual proof of the <u>particular</u> market involved, and in *U.S. v. Victoria Gin Co.*, 48 C.C.P.A. 33, 37 (1960), this court's predecessor noted the great variability of market conditions. In short, evidence of the <u>particular</u> marketplace is required, not simply general principles.

Economics texts teach the same lesson. Samuelson begins the chapter of his text the government cites (at 29) with Alfred Marshall's quote, "Every short statement about economics is misleading (with the possible exception of my present one)," and later cautions that his supply and demand curves "strictly apply only to a *perfectly competitive* market," which does not exist in the real world. Paul A. Samuelson, *Economics* 52, 61(11th ed. 1980). Another recent text puts it this way: "Supply and demand analysis is a useful, precisely formulated, conceptual tool that clever people have devised to help us gain an abstract understanding of a complex world. It does not—nor should it be expected to—give us in addition an accurate and complete description of any particular real-world market." Neva Goodwin *et al.*, *Microeconomics in Context* 100 (2009).

2.    The Record Deconstructs the
Government's Three-Pronged Attack

The government posits (at 21-22) three reasons why SUFI's but-for world is "implausible" and characterizes them as "realities" on which the Board properly relied when shrinking SUFI's damages. To the contrary, and as the CFC found, they are mere speculation without record evidence to support them, though the AF had full opportunity to introduce such evidence, if it had any. (JA9, 18.) But even if SUFI had had the burden to disprove these assertions, it did so.

a.    Number and Duration of Calls

The CFC properly rejected the government's first supposition that guests would have used SUFI's phones less than they did if they had paid SUFI's rates. That is because the government ignores several prominent record "realities" about this marketplace that the CFC properly cited:  "there were fewer hallway telephones than guest room telephones, there were often waiting times to use the hallway telephones, and there was little privacy on the hallway telephones." (JA18.)  Indeed, the basic purpose of the Contract was to solve the problems of too few phones for the guests and those phones lacking privacy.

In the absence of any hallway/lobby phones, the SUFI phones would have been the only ones in the lodgings.  In that setting, it is just as plausible that guests would have used SUFI's phones more, not less, than they did the hallway/lounge phones.  From the privacy of their rooms, there would not have been another person listening in to a call to a loved one, which would naturally extend the length of the call.  Moreover, taking just the KMC bases, over 1600 guest rooms were occupied at any given time (often with double occupancy)(JA1549-607), but, depending on the date, there were only between 40 to over 100 hallway and lobby DSN phones to "service" those guests, equating to guests-to-phone ratios of about 40:1 to 15:1.  (JA1899-900, 1904.)  This led to people waiting to use DSN phones (JA508-11, 532, 569-71)—which also has the natural tendency to shorten, not

lengthen, calls.

Abstract economic theory only goes so far when troops are calling loved ones, are far from home, and are headed to or from hostile lands.  The CFC properly held that "the Government's arguments, not SUFI's, amount to mere speculation."  (JA18.)

### b.    Other DSN Access

Similarly, the government posits (at 21) that guests might have "sought DSN access elsewhere on the base" to make calls.  This begs the question, on what other DSN phones?  The record is void of support for there being any phones available to lodging guests in the but-for world without hallway/lobby phones, with one exception:  SUFI's phones.  The CFC rightly found, "If not for the presence of the unauthorized hallway and lobby DSN telephones, guests would have had no other option but to use the SUFI telephones for long-distance calls."  (JA16.)  This, of course, was exactly the bargain that SUFI struck with the AF.  (JA14-15.)  There is simply no evidence that phones outside the lodgings were reasonably available to guests, and the government points to none.

Instead, the government relies (at 15) on what it says the Board "found" in its reconsideration decision in *SUFI IX*.  The Board there, citing no evidence, pronounced that SUFI had not shown that a guest would not have used "another DSN phone elsewhere on the air base."  (JA173-74.)  But what the evidence

actually showed was that such phones were neither physically nor permissibly available to guests.

Phones <u>outside</u> the lodgings obviously were not easily accessible when, prior to SUFI's phones being installed, guests often waited <u>inside</u> for two hours to use the hallway/ lobby phones. (JA1405.) And why did the AF add even <u>more</u> DSN phones inside the lodgings to subvert use of SUFI's phones if they were already easily accessible elsewhere on the base?

Moreover, AF policy <u>forbade</u> guests to search out DSN phones to make personal calls. (JA3972(§35.1)("The AF will not pay for unofficial calls placed from official [DSN] telephones.").) Instead, it <u>required</u> commands to set up procedures for <u>charging</u> guests for personal toll calls. (JA3982(§A3.1.1)("Host MAJCOMs set controls to ensure that the AF does not pay for unofficial or personal calls with appropriated funds . . . and set up direct toll billing procedures for transient residents.").)

In *SUFI VIII*, the ASBCA <u>rejected</u> testimony by the AF's proffered expert in part because he assumed, without proof, that guests would travel outside their own lodgings to use a phone in a nearby lodging. (JA118(¶114).) That rejection was for good reason and consistent with the record. The Board's contrary statement in *SUFI IX* on which the government relies was not.

c.    Official Calls

Finally, the government posits that guests might have made some official

calls. This fails on the record. First, there is no evidence that any of the breach

calls placed on the hallway/lobby phones were "official." In contrast, the record is

overflowing with evidence of personal calls being made on those illicit phones,

including testimony by both SUFI and AF personnel. (*E.g.*, JA621A("you're not

asking about the kids if you're calling . . . official"), 449A-B(argument with wife),

528.)

Second, guests had no reason to go out into the hallway for official, DSN

calling. For on-base calls, SUFI provided that service free of charge from the

room phone. (JA295.) Off-base official calls could be reimbursed using the call

printout on the guests' folios. (JA524, 3935(§18.1.2).) But the government's

argument about "official" calls also fails as a matter of law.

(1)    The Board Misread the Contract

The Board hinged its damages award in most of the lost revenue claims on

the distinction between "official" and "personal" calls. (JA132, 144, 174.) <u>The</u>

<u>Board cited no provision of the Contract to support this distinction, because no</u>

<u>such provision exists</u>. It is a fiction. Incredibly, the government attempts a

defense of this clear error by the Board, while ignoring, like the Board, <u>a</u>

<u>confirming Contract modification directly on point</u>.

23

The distinction the parties agreed to in the Contract was between <u>base-level</u> calling, which SUFI agreed to provide for free (including official calls), and <u>all</u> <u>off-base</u> calling, for which SUFI was to collect tolls.  In its proposal, which was incorporated into the Contract, SUFI <u>refused</u> to provide DSN access for <u>off-base</u> service.  To reinforce this, SUFI expressly provided that it would allow on-base DSN service from its own phones "once adequate controls are developed with safeguards against fraud and toll skipping." (JA1370(§4.1.3), 1425-26.)  When questioned about this language during pre-award negotiations, SUFI explained that this referred "mainly to attendant-extended calls," such as by the operators, and further elucidated that SUFI "intends to block any unauthorized network access which would result in unrecoverable toll charges, whether that access is <u>from DSN</u> or the public network." (JA1404(Q&A16)(emphasis added).)  Thus, as the Board repeatedly found, SUFI provided free <u>base-level</u> DSN phone service <u>only</u>. (JA121(¶128), 173-74.)  The parties reaffirmed this in Mod 5 in early 1999 because of AF abuse:

> THE CONTRACTOR SHALL PROVIDE DSN CONNECTIVITY FOR IN-ROOM USE.  <u>THE LEVEL OF DSN SERVICE SHALL BE LIMITED TO BASE LEVEL</u>.

(JA1450(underscoring added).)  This fully supports the CFC's observation that the "parties understood that guests would use long-distance carriers selected by SUFI, and that other methods of long-distance calling would be blocked." (JA2.)

In sum, SUFI was to carry <u>all</u> <u>off-base</u> traffic from the lodgings. The Contract made no exception for "official" calls, and Mod 5 cemented that <u>off-base</u> DSN calls were <u>not</u> a free service, as the Board itself found. SUFI <u>refused</u> to take the risk of guests making off-base calls on DSN phones in the lodgings and required those phones to be <u>removed</u>; it specifically limited its own DSN service to <u>on-base</u> calling. For the Board then to rule that official off-base calls from the lodgings were not compensable and that SUFI bore the risk of allocation between official and personal calls over the DSN network is legal error most obvious.

(2)    The Contract Still Required the AF to
<u>Screen Out Non-Official, Off-Base Calls</u>

Assuming *arguendo* the official/personal distinction had merit under the Contract, the ASBCA in its decision implicitly and correctly recognized that the AF would shoulder the burden of lack of proof on this issue if it had violated a duty to screen out personal calls over DSN. Thus, the Board put great stress on the proposition that, under then-current AF Instruction 33-111, the AF did not have a duty to verify that hallway/lobby DSN calls were for official business through a "booking" system.[3] (JA113(¶86), 120.) In so doing, however, the Board ignored

---

[3]    "Booking" involves getting advance approval and an authorization number to make an official, long-distance DSN call and the DSN operator making a record of the call. (JA113(¶85).)

its very own, accurate findings that <u>the Contract itself required booking</u>.

(JA113(¶84), 173-74.)

Q&A 29 promised that DSN phones would be "For Official Use Only" and

that all calls would be "booked through the DSN operator." (JA113(¶84).) The

Board expressly found this was how the parties intended the Contract to work:

"The foregoing SUFI condition and Q&A 29 were incorporated into the contract."

(*Id*.) SUFI was not content with just this, however, and <u>required the DSN phones</u>

<u>to be removed</u> altogether. But with the AF failing to do that, it <u>at least</u> had a

residual duty to honor its booking commitment. That the booking procedure in the

then-latest version of AFI 33-111 was no longer required (but not forbidden

(JA720-21)) was irrelevant. <u>It was still a commitment made by the AF in the</u>

<u>Contract</u>, and the Board was not permitted to toss it aside.

As a result of this breach by the AF, SUFI was left without the only means

by which to determine what few, if any, calls were official, because the AF did not

make a record of those calls. (*E.g.*, JA411-12.) Thus, even if SUFI did have the

burden to account for official calls, the AF's breach prevented it from doing so. In

such a situation, the law places the risk of inability to allocate on the breaching

party, not on the innocent party. *Bigelow*, 327 U.S. at 265; *Lam*, 718 F.2d at 1065;

*Locke*, 283 F.2d at 524.

(3)    SUFI's Conservative Calculations More
Than Accounted for "Official" Calls, If Any

Despite the AF's breach precluding it from obtaining evidence of any official calls, despite the lack of evidence that any of the breach calls were "official," and despite not having the legal burden to do so, SUFI nevertheless accounted for the AF's "speculative" defense in its damages methodologies.  For Hallway Phones, SUFI had available to it call records from three, separate phones that were the equivalent of the government's DSN phones—one phone SUFI had installed in a Landstuhl lobby and two in a Delta Squad lounge.  The latter two phones were expressly for personal use, and the records showed they were used 99.5% for that purpose.  (JA138-41, 1747.)  But despite significantly higher usage numbers for the Delta Squad phones, SUFI conservatively based its claim on the Landstuhl phone.  (JA17-18.)

The other lost revenue claims had similar conservative measures built in. For Other Operator Numbers, SUFI went overboard to assure it did not claim too much, as discussed further below and as the CFC held.  (JA20.)  For Prime Knight and Early DSN Abuse, SUFI's figures only took into account calls of thirty minutes or more, a highly conservative assumption in that the record showed that the average official call lasted two minutes.  (JA129(¶¶162,164).)  Thus, the record shows conclusively that SUFI's damages calculations were not overstated by including any "official" calls.

27

D.   The CFC Properly Held That the
     Board's Awards Were Grievously Low

The CFC observed the "odd[ity]" of the "wide gulf" between SUFI's proven

damages and the amount the Board awarded.  (JA3.)  The CFC was fully justified

in its conclusion that the amount it awarded properly "reflects the magnitude of the

program envisioned by the parties and the disaster it became following the AF's

material breaches."  (JA4.)  As set out in SUFI's Counter-Statement of Facts, the

parties in their Contract anticipated revenues of well over $200,000,000, even at

much lower occupancy rates than were experienced.  The Contract anticipated

usage of up to twenty minutes per room per day, while the CFC's total award

equates to less than eight.

For the Hallway Phones, two other factors are of note and, in and of

themselves, would require the Board's award to be set aside.  First, because the AF

lost or destroyed its own call records, all the AF could produce were "DISA"

records for these phones, a partial duplication of some of the original records

stored on a government server in Virginia.  But the DISA data was replete with

major gaps and, in any event, included only directly dialed long-distance calls and,

thus, did not record two of the principal ways guests circumvented SUFI's system,

i.e, by being patched by the operator and by using calling cards.  As the Board

correctly found, the government's remaining switch data and DISA call records

were wholly inadequate, and the AF's proffered testimony to try to account for

their inadequacies was "not competent, probative evidence . . . ."

(JA116(¶109(b)), 119(¶119).)  Even DCAA "rejected use of [the] incomplete

DISA call record data," as the Board also found.  (JA118(¶112).)

Despite these amply supported findings, the Board reversed field in its first

reconsideration decision and based its damage award on the DISA data.  This

arbitrariness needs no further comment.  SUFI's usage data was the <u>only</u>

competent, hard evidence of record.  Thus, the CFC's award was required by law.

*See Teledyne McCormick-Selph v. U.S.*, 588 F.2d 808, 809-10 (Ct. Cl. 1978)

(setting damages based on contractor's proof when the ASBCA had disallowed the

contractor's claimed damages based on discredited testimony and had applied the

wrong legal standard, leaving that proof as the only credible evidence of record);

*Vann v. U.S.*, 420 F.2d 968, 990-91 (Ct. Cl. 1970)(rejecting the Board's

discounting of the contractor's damages and then making its own findings based on

"the only credible evidence remaining in the record").

Second, under its faulty, "DISA" method, the Board eviscerated SUFI's

damages by arbitrarily speculating, without any factual support, that it was likely

that all calls placed during "normal duty hours" at the locations called were

official, a "finding" the ASBCA used to slash 87% of its already faulty award.

(JA174.)  To top it off, the Board's calculation of "off-duty" calls as 13% of the

total was itself grossly erroneous, as a correct figure under its own theory exceeded

29

50% (the math of which the AF did not contest at the Board or the government at the CFC).  (JA3197-99, 3215-18.)  Considering this and the manifold other errors of the Board, the CFC's skepticism of the Board's determinations was more than warranted.  (JA3.)

———————————————

In summary, the government's "speculative" argument fails on multiple levels.  SUFI satisfied its *prima facie* case by basing its calculations on conservative, hard data and subtracting what its costs would have been to carry the diverted traffic.  It was the AF's burden to prove any further reduction based on its hypothetical scenarios because, *inter alia*,

- It was the wrongdoer,

- It willfully breached on multiple occasions,

- Its breaches caused any alleged allocation problem,

- It was in the best position to prove its hypothetical,

- It breached its contractual duty to screen out personal calls,

- It failed to preserve the call records for the DSN phones.

Even if the burden had been SUFI's to prove no reduction to its proven damages was appropriate, it satisfied that burden because, *inter alia*,

- It was entitled to revenue from all off-base calling from lodgings, whether official or personal, as a matter of law;

- The evidence showed concretely that guests used hallway phones for personal calls, but did not show even one instance of an official call;

- Guests had no need to use hallway phones for official calls, because such calls were either free or reimbursable from their room phones;

- SUFI used conservative calculations that more than accounted for any legitimate official calling;

- The equivalent Delta Squad phones used for personal calls had higher usage rates than the Landstuhl phone SUFI used for the Hallway Phones calculation;

- The Hallway Phones usage was constrained, as there was at most one phone for every 15 guests, with guests waiting in lines to use them;

- Room phones provided more privacy and ease of use;

- The lost revenue damages are well below the revenue levels anticipated by the parties in the Contract.

And even if the government surmounted all these hurdles, the ASBCA's award would still have to be set aside because, *inter alia*,

- It based its award on the incomplete, incompetent DISA call records;

- Its computation under its own theory was incorrect.

It was the AF that rested its case on speculation, not SUFI. The CFC based its damages findings in accordance with law, the competent evidence of record, and substantiated Board findings. Thus, its lost revenues awards are entitled to deference and must be affirmed. *See Home Sav. of Am. v. U.S.*, 399 F.3d 1341, 1346-47 (Fed. Cir. 2005).

31

III.    Remand to the Board Is Waived and, in Any Event, Would Be Improper

The government's procedural challenge that the CFC should have remanded

to the ASBCA when it found the Board had committed legal error fails in three

respects.  First, the government did not assert this argument below, and so waived

it.  Second, the Board has already taken evidence on both liability and damages

and made findings, and so SUFI has exhausted administrative remedies.  The CFC,

while crediting that portion of Board fact-finding untainted by error, was free when

confronted with error to make its own damages determinations pursuant to its

general, Tucker Act jurisdiction, and those determinations are entitled to regular

appellate deference; they are not challenged here by the government as

unsupported by the record.  Third, in any event, the findings of the CFC were

based on uncontested and overwhelming record evidence, making remand a

forbidden formality.[4]

---

[4]    In the midst of its "remand" argument, which assumes the CFC decision is
correct, the government makes several "drive-by" assertions, often in
footnotes, that the CFC was also wrong on the merits.  The government did
not list these as issues for appeal and does not request relief concerning
them.  The "settled appellate rule," consistently followed by this Court, is
"that issues adverted to in a perfunctory manner . . . are deemed waived."
*U.S. v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990); *see ConocoPhillips v. U.S.*,
501 F.3d 1374, 1382 (Fed. Cir. 2007)(quoting 20A *Moore's Fed. Practice*
§328.20[9] (3d ed. 2007)("an argument or claim mentioned only in passing
or only in a footnote is not adequately raised or preserved for appellate
review")).  Rule 28 mandates no less, requiring a brief to include "the

(continued…)

A.    The Government Waived Its Remand
      Argument Because It Did Not Assert It in the CFC

The government's argument fails at the outset because it did not request

remand in the CFC proceedings.  It is the "general rule" that a "federal appellate

court does not consider an issue not passed upon below."  *Singleton v. Wulff*, 428

U.S. 106, 120 (1976).  "[N]ew arguments will not be decided in the first instance

on appeal."  *Golden Bridge Tech., Inc. v. Nokia*, *Inc.*, 527 F.3d 1318, 1323 (Fed.

Cir. 2008).  This rule has been consistently applied in Wunderlich Act cases:  "It is

well settled that an issue not raised before the Board cannot be raised for the first

time before this court."  *Ace Constr. Co. v. U.S.*, 401 F.2d 816, 823 (Ct. Cl. 1968).

SUFI presented to the CFC a series of claims for review and identified the

damages it requested.  SUFI expressly noted that remand to the Board would be

improper.  (JA3354-55, 3619-20.)  The government knew how to request a remand

when it so desired, but it did so in only one instance, now moot, for part of a single

--------

(continued…)

      appellant's contentions and reasons for them, with citations to the authorities
and parts of the record on which the appellant relies" and "the precise relief
sought."  Fed. R. App. P. 28(9)(a), (10).  Should the Court nevertheless
deem these merits issues sufficiently raised, SUFI relies for response on the
following:  for the lost profits calculation (at 36-37 &n.8), JA3431-36; for
Delta Squad (at 39 &n.9), JA21-23, 3393-402; for German Troops Housing
(at 40), JA34, 3429-30, 3660-63; and for AF Switch (at 42 &n.12), JA30-31,
3468-70, 3679-83.  For AF Switch, the government also waived its
"duplicative" suggestion, as erroneous as it is, by not raising it at the CFC.

claim.[5]  Thus, the government waived its remand argument by not raising it at the

CFC.

The government's argument is, in essence, an exhaustion of administrative

remedies defense.  Such an argument is waived if not raised below, unless the

particular statute dictates otherwise by making exhaustion jurisdictional.  *See Sims*

*v. Apfel*, 530 U.S. 103, 106 n.1 (2000).  The Wunderlich Act is <u>not</u> jurisdictional; it

is "more akin to a non-jurisdictional rule of procedural or substantive law which

can usually be adduced or abandoned as the litigant sees fit."  *WRB Corp. v. U.S.*,

177 Ct. Cl. 909, 916 (1966).

*Briscoe v. U.S.*, 442 F.2d 953 (Ct. Cl. 1971), a Wunderlich Act case,

controls here.  There, the Court ruled that, even though it had raised an issue in its

counterclaim, the government had waived assertion of the issue when it failed to

present it in its cross-motion for summary judgment.  *Id.* at 959.  Here, the

government neither filed a counterclaim requesting remand nor argued for remand

in its cross-motion for judgment.

*Sims* also mandates waiver.  It involved, as here, a three-tiered review

structure, and the question was whether a claimant had waived issues not raised

---

[5]     The government argued that the CFC should remand to the ASBCA for
        clarification of certain findings the Board made as part of its lost profits
        computation based on its damages awards on various claims set aside by the
        CFC.  (JA3597-99, 3751.)

before the agency appeals council (the CFC counterpart).  While the majority found no waiver because the agency proceedings were non-adversarial and no notice of the exhaustion requirement had been provided, all the justices agreed that waiver applies when agency proceedings are adversarial.  530 U.S. at 107-12 (plurality op.), 112-14 (O'Connor, J., concurring), 114-19 (Breyer, J., dissenting). Here, both the Board and CFC proceedings were adversarial, and the government was on notice that procedural issues, if not raised, would be waived.

B.     The Board Has Already Made Findings on a Full
       Record, and So Administrative Remedies Are Exhausted

The government's remand argument also fails because the ASBCA has already taken evidence and made initial factual findings on damages.[6]  This is underscored by the leading case of *U.S. v. Anthony Grace & Sons, Inc.*, 384 U.S. 424 (1966).

In *Anthony Grace*, the ASBCA had improperly dismissed a contractor's appeal, never reaching the merits.  The issue before the Court was "whether the reviewing court or the Board of Contract Appeals should make the original record" on the merits.  *Id.* at 425 (emphasis added).  It found that the Board should make

---

[6]    The only exception is the AF Switch claim, which was granted on the merits initially by the CFC.  For that claim, the damages proof was undisputed, as discussed *infra*.

35

initial fact-finding. *Id.* at 428-29. It also applied this rule to damages findings, holding that, if a Board's no-liability decision were reversed, remand would normally be appropriate to give the Board "an opportunity to consider them first." *Id.* at 430n.6 (emphasis added).

Once the Board has acted on a matter, the Contract's disputes mechanism has been satisfied. The administrative remedy is exhausted, and the CFC is free to act pursuant to its original jurisdiction under the Tucker Act. As the Court of Claims elucidated in *Stein Brothers Manufacturing Co. v. U.S.*, 337 F.2d 861, 864 (Ct. Cl. 1963),

> the Wunderlich Act—unlike the normal statute vesting power in an administrative agency—does not grant the administrative bodies exclusive jurisdiction over the entire subject of the contract; the Act merely makes the administrative findings conclusive (in the absence of arbitrary action, etc.) on those particular matters of fact dealt with by the administrators, without depriving this court of its general jurisdiction over the contract under the Tucker Act.

(Emphasis added.)[7] Thus, when a reviewing court makes its own damages finding on the record after setting aside the board's findings, it is exercising its Tucker Act

---

[7]    While the Court in *Anthony Grace* found that the *Stein Brothers* court took matters one step too far when it ruled that a reviewing court could make initial findings on damages when the board had not, 384 U.S. at 430n.6, the quoted holding is still good law when the board has made initial findings, because the contractor's administrative remedy has been exhausted. *See id.* at 429-30(treating initial board review as an exhaustion requirement).

jurisdiction, which this Court reviews under "clear error" and "abuse of discretion" standards. *See Home Sav.*, 399 F.3d at 1346-47.

In this case, a record has <u>already</u> been developed at the Board, and remand would be a wasteful and prohibited "do-over." It would run directly counter to the Supreme Court's oft-emphasized goals of avoiding "needless duplication of evidentiary hearings" and fostering an expeditious process. *U.S. v. Utah Constr. & Mining Co.*, 384 U.S. 394, 420 (1966)(quoting *U.S. v. Carlo Bianchi & Co.*, 373 U.S. 709, 717 (1963)); *see also S&E Contractors, Inc. v. U.S.*, 406 U.S. 1, 8 (1972). The ASBCA made findings about damages on almost all the challenged claims. This case, then, is analogous on its facts to *S.W. Electronics & Manufacturing Corp. v. U.S.*, 655 F.2d 1078 (Ct. Cl. 1981), and *Briscoe*, rather than *Anthony Grace*. In *S.W. Electronics*, the ASBCA had ruled in the contractor's favor on the merits and made findings on damages but ultimately awarded none. The Court found that the ASBCA had committed legal error in not awarding damages and, instead of remanding to the ASBCA, set damages <u>itself</u> based on the record the board had developed. 655 F.2d at 1088-89. Similarly, in *Briscoe* the Court overturned a damages award of the board and proceeded to set its own awards based on the record. 442 F.2d at 963-64; *see also Nager Electric Co. v. U.S.*, 442 F.2d 936, 952-53 (Ct. Cl. 1971). The government has cited <u>no</u> instance in which this Court or its predecessor has remanded under the Wunderlich Act

when the board has <u>already</u> developed a record and made findings.  As the CFC

held, once the Board's damages findings were found to be infected with error, it

could set damages *de novo*.  (JA6, 32, 34.)

Remand would be inappropriate here for an additional, independent reason.

The Court in *Anthony Grace* and prior cases recognized that the trial court could

act in the first instance if administrative procedures were "inadequate or

unavailable," including when there is evidence "that the Board will not . . . fairly

deal with the merits."  384 U.S. at 429-31.  This case fits in that category.  The

Court of Claims explicated in *Hoel-Steffen Construction Co. v. U.S.*, 684 F.2d 843

(Ct. Cl. 1982), that the Wunderlich Act was passed to overrule the Supreme

Court's eponymous decision, which had held that a court could only act if there

were board fraud, defined as "conscious wrongdoing, an intention to cheat or to be

dishonest."  *Id.* at 850(citing *U.S. v. Wunderlich*, 342 U.S. 98, 100 (1951)).  In

response, Congress codified the "so grossly erroneous as necessarily to imply bad

faith" standard previously articulated by the Court, which did <u>not</u> require fraud or

intentional malice.  *See* 41 U.S.C. § 321 (2006).  The *Wunderlich* dissenters, whose

rationale Congress adopted, explained that this "implied bad faith" standard could

be met by a showing of "overzeal" for the agency, "however innocent."  684 F.2d

at 850-51(citing H.R. Rep. No. 1380, 83d Cong., 2d Sess. 2, *reprinted in* 1954 U.S.

Code Cong. & Ad. News 2191-97(quoting *Wunderlich*, 342 U.S. at 103

(Jackson, J., dissenting))).

The lost profit claim presents good examples of the Board's overzeal.  First,

on its own initiative, the Board constructed an issue as to when SUFI's

performance period ended, holding that it ran from when the Contract was signed,

instead of from when the AF accepted each awarded system as operational.  When

the Contract was signed, SUFI obviously had not even begun the extensive process

of trenching and wiring and otherwise setting up a telephone system on a base, and

the Performance Period clause did not let SUFI stop until 15 years after the AF had

accepted its telephone system as fully operational.  The ASBCA unilaterally

decided the AF did not have to compute lost profits for the entire period of SUFI's

performance.  This obvious misreading of the Contract, not even suggested by the

AF below, served but one purpose—to reduce the AF's damages.

Second, again *sua sponte*, and without explanation, the ASBCA extended

the period used by SUFI to calculate expected annual revenues to reach back 18

months further into performance, even though DCAA had accepted SUFI's 41-

month period and the AF had not contested it.  All things being equal, a longer

sampling period is a better one.  But here, all things were not equal—and the Board

knew it.  By adding another 18 months to the averaging period, the ASBCA

reached back into the period before several bases had been accepted by the AF.

This, despite the Board acknowledging at the outset of its decision that the Contract's performance term was measured "from site acceptance." (JA95-96(¶1).) The only apparent reason for the Board's unsolicited, unilateral "adjustment" was, again, as the CFC held, to "reduce arbitrarily the amount of SUFI's recovery." (JA39.)

The CFC correctly observed that the ASBCA manifested an overzealous attitude to protect the AF, time after time, claim after claim, by taking every opportunity to chop back SUFI's proven damages and refusing to apply legally required presumptions in favor of the innocent party. (JA3.) This was grossly erroneous, especially in the circumstance of the willful breaches committed by the AF, and meets the implied bad faith standard of the Wunderlich Act. Thus, relief for SUFI at the Board is "inadequate or unavailable," and, for this reason as well, remand to the Board would be inappropriate. In such a circumstance, the proper procedure is a *de novo* decision on the administrative record by the CFC. *See Baltimore Contractors, Inc. v. U.S.*, 643 F.2d 729, 733-35 (Ct. Cl. 1981).

C.    Remand on This Record Would Be a Forbidden Formality

The CFC for most claims determined that remand was also unnecessary because the administrative record was uncontroverted or required one finding. (JA6.) The CFC correctly applied that precedent.

1.    The Law Concerning Remand When
the Board Has Not Made Findings

The Supreme Court in *Carlo Bianchi* noted that "there would undoubtedly be situations in which the court would be warranted, on the basis of the administrative record, in granting judgment for the contractor without the need for further administrative action." 373 U.S. at 717. This Court and its predecessor have repeatedly applied this admonition, including in *Maxwell Dynamometer Co. v. U.S.*, 386 F.2d 855, 870 (Ct. Cl. 1967), quoted by the CFC, which held that a reviewing court may make findings, rather than referring a matter to the Board, when the evidence is "undisputed" or if "as a matter of law the Board could have made only one finding . . . ." *Accord Tex. Instruments, Inc. v. U.S.*, 922 F.2d 810, 815 (Fed. Cir. 1990). This covers situations in which a record has been made but the board has made no findings. It fully applies when, like here, the government has not disputed the contractor's evidence at the board.

In *Ordnance Research, Inc. v. U.S.*, 609 F.2d 462, 465 (Ct. Cl. 1979), the Court explained that fact-finding by a reviewing court is not limited to when the record evidence is <u>incontrovertible</u>, but, rather, should be made when the evidence is <u>uncontroverted</u> or <u>undisputed</u>. The Court elaborated that a reviewing court may also make findings contrary to board conclusions and despite disputed evidence when the <u>overwhelming</u> weight of evidence points in one direction. *Id.* Examples applying this rule are legion, including *Vann, Teledyne McCormick-Selph*, and

*Sherwin v. U.S.*, 436 F.2d 992, 1001-08 (Ct. Cl. 1971), in which the Court made multiple findings based on the administrative record on both the merits and damages when the Board had made no corresponding findings. Most recently, this Court in *Tip Top Construction*, applying the Wunderlich Act standard as now incorporated in the CDA, reversed the board's fact-finding because it was based on speculation unsupported in the record and then made its <u>own</u> findings on the unrebutted record evidence. 695 F.3d at 1284-85; *see also Northrop Grumman Corp. v. Goldin*, 136 F.3d 1479, 1484-85 (Fed. Cir. 1998)(making damages findings on board record after reversal under CDA despite government's remand request); *Mech-Con Corp. v. West*, 61 F.3d 883, 887 (Fed. Cir. 1995)(awarding damages on record when agency failed to rebut *prima facie* case at board).

## 2.    The CFC Properly Applied the Rule

The CFC in this case applied this rule consistently and properly. Contrary to the government's conclusory assertion (at 32) that the CFC did not conduct a substantial evidence review, the CFC did just that, setting forth the appropriate standards and carefully analyzing the record and the Board's findings, claim by claim, and noting multiple errors. (JA4-6, 11-39.) Further, with respect to claim after claim, outlined below except for Hallway Phones which was discussed *supra*, the CFC correctly observed that the AF at the ASBCA did <u>not</u> challenge SUFI's computation of its damages or, <u>at most</u>, erroneously alleged that SUFI's proven

42

damages were "speculative."  At the same time, the DCAA for claim after claim

validated SUFI's methodology for computing its damages.  (JA1239-67.)  Thus,

the CFC, as a matter of law, was <u>required</u> to enter judgment for SUFI based on the

amounts SUFI had proven, which was the only competent record evidence.  *See*

*Owens-Corning Fiberglas Corp. v. U.S.*, 419 F.2d 439, 458-60 (Ct. Cl.

1969)(finding board applied wrong legal presumption and making findings in

conformity with correct rule and uncontested evidence).  Moreover, the

government at the CFC was content to put all its eggs in the ASBCA basket—it did

<u>not</u> argue that SUFI's calculations were wrong if the ASBCA was wrong on the

law, and so may not do so for the first time in this Court.  *Golden Bridge*, 527 F.3d

at 1323.

a.    <u>Other Operator Numbers</u>

The AF actively assisted guests to circumvent SUFI's system by setting up

new "direct access" operator numbers and distributing other, on-base, "indirect

access" numbers that could be used to transfer to the operator, including adding

push-button access on the AMC Terminal number.  The number of call minutes

over the direct access numbers was undisputed.  So were the minutes claimed over

the indirect numbers, which were conservatively claimed by (a) using only

numbers that had 70 or more calls of at least 10 minutes, and (b) only counting

calls 10 minutes or more in the calculation, when the record showed the average

legitimate call to last only two minutes.  (JA19-21.)

The AF at the Board and the government at the CFC did not dispute the

accuracy of SUFI's lost revenues calculations, arguing only that it was speculative

that these were not all official calls.  (JA2802, 2976-77.)  Neither the AF nor the

government provided any answer for the literal explosions of usage over these

phones that could only be accounted for by abuse.  (JA19-21, 3408.)  Moreover,

the AF did not object to SUFI's extra work hours, and so it cannot complain in this

Court about their award.  *See Sherwin*, 436 F.2d at 1006-07 (holding in

Wunderlich Act case that government could not contradict on review what it did

not contest at the board).

### b.    Delta Squadron

The two Delta Squad phones were set up for the express purpose of allowing

personal calls to avoid SUFI's system.  Like the hallway and lobby phones of

which they were basically a subset, they were in high demand, with just two

phones to service many guests.  The usage numbers and damage calculations were

undisputed by the AF, with the AF only alleging, like with Hallway Phones, that

SUFI's damages were speculative.  (JA21-23, 2806-07.)  Moreover, the

government before the CFC did not contest SUFI's damages calculations.

(JA3538-42, 3727-28.)

c.    Calling Cards

For several months, the AF forced SUFI to allow guests to use long-distance service other than that which SUFI provided.  The CFC properly held that, as a matter of law, each minute of each such call was improper and a breach of SUFI's Contract.  (JA25.)  Thus, SUFI is entitled to the revenues it would have made from each of them as if the call had been made over the SUFI long-distance network— precisely the manner by which SUFI calculated damages in its claim.  (JA1768-96.)  The AF did not dispute the calculation, and the Board's *sua sponte* offset was erroneous for the reasons stated by the CFC, including by falsely assuming that only one breach was occurring at a time.  (JA23-25.)  The government at the CFC did not contest SUFI's damages calculations.  (JA3545-48, 3702-04.)  Thus, SUFI's proven damages were the only ones permitted by law.

d.    SIMS/LTS Interfaces

SUFI proved the extra work for this claim by detailed time entries by the individuals who performed or directly supervised the work, supported by copious documentary evidence, as affirmed and supplemented at hearing.  The AF at the Board contested only the merits; it did not challenge either the hours or the out-of-pocket expenses as claimed.  (JA2828.)  Thus, SUFI's damages evidence is uncontested, and the CFC properly rejected the Board's arbitrary reduction of it.

45

(JA28.)  The government did not defend at the CFC except on the merits. (JA3554-61, 3763-66.)

### e.    Change of AF Switches

As the CFC observed (JA31), the AF at the Board contested only liability; it did not contest the accuracy of the damages claimed.  (JA2833-34.)  Nor did the government do so in the CFC proceedings.  (JA3572-73, 3767-70.)  Thus, the CFC acted properly by awarding the damages SUFI proved after finding for SUFI on the merits, and the government, as with other claims, waived any right to argue otherwise in this Court.

### f.    Early DSN Abuse

The fact of damage was obvious, and the amount adopted by the CFC was based on a contemporaneous, conservative calculation.  The CFC correctly held that the Board erred by relying on faulty figures to find no damage.  (JA31-32.) While properly deciding the damages *de novo*, the CFC could not have awarded any other amount, because the AF at the Board and the government at the CFC posited none.  (JA2804, 3575-79, 3729-31.)

g.    Prime Knight Lodging

The CFC correctly set aside the Board's discounting of SUFI's damages

because the Board made the false assumption that no other breaches were

occurring simultaneously.  (JA33-34.)  While properly acting *de novo* to set

damages at the amount claimed by SUFI based on another conservative,

contemporaneous calculation, the CFC could have set no other figure, because,

again, the AF and the government proffered none other.  (JA2809, 3580-83, 3721-

23.)

h.    German Troops Housing

The ASBCA, without explanation, failed to award SUFI its lost revenue

damages for this claim.  (JA34.)  DCAA verified the claimed amount (JA1253),

and the AF at the Board (and the government at the CFC) never contested it.

(JA2814-15, 3584-85, 3741-45.)  Thus, for this claim as the others, remand would

be a needless formality, as remand could not afford the AF a "do over" to

supplement the record, and any dispute about SUFI's proven damages has been

waived—not once, but twice.

i.    Lost Profits

Lost profits is a fitting summary for the other claims.  In the Board

proceedings, the DCAA approved SUFI's calculation methodology (JA1257), the

AF did not challenge it (JA2822-23), and the Board adopted it.  (JA160-65.)  The

government in the CFC did not challenge that methodology.  (JA3586.)  The government's suggestion (at 38) that there were disputed facts that prevented the CFC from calculating lost profits is belied by the fact that, after the CFC disclosed to the parties in a draft opinion its rulings on the lost profits and related claims, the parties performed the arithmetic per the unchallenged methodology and <u>the government stipulated to the amount</u> (JA3833, 3871-72), which the CFC used in its finalized opinion and judgment.  (JA38-39.)  Obviously, remand to the Board to perform arithmetic would be unnecessary in this matter that has already been pending for almost a decade.

j.    <u>Rates</u>

The ASBCA committed multiple errors in setting and applying rates to the extra work hours and out-of-pocket damages.  One foundational error was that it did not allow any profit on the labor rate.  <u>The government expressly admits this error</u> (at 43 &n.12).  A second was that the ASBCA failed to provide <u>any</u> contribution for <u>overheads</u>, for either labor or out-of-pocket costs.  This was an obvious error, which the CFC found (JA10-11) and which ruling the government does not appeal.  This error was appropriately accounted for by the CFC.

As the CFC noted, damages are to be awarded at market rates.  (JA10.)  For labor rates, the CFC adopted the priced rates the parties themselves had negotiated for extra work under the Contract, as provided by §4.13.1.  (JA1373.)  Contrary to

48

the government's argument, the extra work involved exactly the type of tasks for which extra work was performed, but, in any event, it obviously all fit the category of work related to the telephone systems provided under the Contract.  The AF also accepted the labor rates in consultant agreements for former SUFI employees upon the turnover of the system, as the government acknowledges (at 44n.14).  (*E.g.*, JA1517-21.)  There was also unrebutted evidence that the negotiated rates were well below market value (JA321-22, 440-440A, 1647 (Siemens' service charge of $213/hr)), and various CO's accepted them as fair and reasonable.  (JA418-19, 671-71A, 711-12.)  Simply put, the record overwhelmingly supported the negotiated, priced rates.

For a rate for overhead and profit on out-of-pocket costs, SUFI and the CFC relied on a rate negotiated and incorporated into the Contract in §3.11.1, *i.e.*, 25% maximum <u>net</u> profit for extra costs.  (JA938.)  Not only was the 10% rate that the Board normally, but inconsistently,[8] adopted significantly lower than what the parties themselves had set, but it provided no overhead contribution.  SUFI is a small, commercial contractor without sophisticated accounting pools or DCAA-approved rates.  In this situation, SUFI adopted the 25% <u>net</u> profit rate upon which

---

[8]     The Board set a 10% profit for most out-of-pocket costs, but it also provided no profit for the Calling Card and some other claims (JA154, 169) and a 25% rate for the consultant cost in two claims.  (JA169.)

the parties had agreed as the combined, <u>gross</u> profit rate for <u>both</u> overhead and net profit. This rate is well within combined rates found reasonable in other cases. *E.g.*, *Veridyne Corp. v. U.S.*, 107 Fed. Cl. 762, 766, 769 (2012)(22% for DCAA overhead only); *Ace Constructors, Inc. v. U.S.*, 70 Fed. Cl. 253, 281 (2006) (gross profit of 27%); *W. Alaska Contractors*, 95-1 BCA ¶27,392 at 13,724 (ASBCA 1994)(39%). The record contained evidence of no other rate, and the CFC acted fully consistently with the record in setting the rate that the parties had themselves negotiated.

## Statement of Cross-Appeal Issues

1.    Is the AF estopped from denying SUFI a promised line fee when SUFI relied on that promise in wiring the base and the AF knew it would renege before SUFI did the work, but did not tell SUFI until after it had performed?

2.    Did SUFI waive an accurate computation of interest on the Hallway Phones claim?

3.    Should SUFI's damages award for the Hallway Phones claim include uncontested corrections found by the Board on substantial evidence?

4.    Did the Contract give SUFI the right to service lodgings the AF added on awarded bases?

Summary of Cross-Appeal Argument

The CFC did not redress all of the AF's willful wrongdoings.  The Kapaun Line Charge claim is a classic "bait-and-switch," but both the Board and the CFC improperly held estoppel was unavailable as a matter of law.  SUFI also brings on cross-appeal three other errors of law, two involving calculation of the Hallway Phones damages and one involving new lodgings.

Cross-Appeal Argument

I.      The Kapaun Line Charge Claim States a Valid Estoppel

General Manager Stephens for SUFI and COTR Sellers and several others for the AF, with the CO's active approval and encouragement, reached an agreement to pay SUFI $1.00 per day per phone as a "line charge" for SUFI's wiring the Kapaun Air Base.  However, after SUFI had performed the work in reliance on the promise that the contractual paperwork was "in process," the AF reneged.  To make matters worse, before SUFI had made any significant investment to wire the base, both AFNAFPO ("Contracting Office" or "Agency") and the COTR (and others) knew that they would renege on the deal, but they did not tell SUFI.  Instead, they misled SUFI, telling it "not to worry" because they were "working on" the confirming paperwork for the line charge, while simultaneously encouraging SUFI to continue the work.

Taking just the facts as found by the ASBCA, its conclusion of law that an estoppel does not lie here is erroneous. However, the Board in its decision does not tell anywhere near the whole story, especially with regard to the role of the Contracting Office and its active encouragement and actual knowledge of the agreements reached in Germany. **In the recitations below, we will bold those undisputed facts left unmentioned by the Board.** Both the Board and CFC erred by misapplying controlling precedent.

A.    The First Estoppel

Kapaun's lodgings house the NCO Academy. The delivery order for Vogelweh, a contiguous base, as issued in June 1996, included Kapaun. (JA135(¶¶180-81), 968, 978, 1001-02.)

Later in 1996, before installation work began, the AF's Lodging Manager informed Stephens that the NCO Academy did not want SUFI's service. (JA355-56, 1446(¶12).) Accordingly, Stephens informed COTR Sellers and AFNAFPO of that direction and that SUFI would not install telephone service at Kapaun when wiring Vogelweh. Neither the COTR nor AFNAFPO countermanded that direction, but AFNAFPO did not prepare a modification to remove Kapaun from the Vogelweh delivery order. (JA135(¶183), 357, 501-02A.)

**On July 11, 1997, after Vogelweh was up and running, Stephens discussed by telephone with CO Jones and Contracting Specialist Guilmenot**

52

the effective deletion of the Kapaun requirements but that the "new lodging manager" wanted it to be wired.  Stephens explained that, if SUFI were to install a telephone system there now, SUFI would require a per-phone, per-day line charge.  CO Jones recorded this conversation in an internal email she sent to two other COs and Guilmenot along with her recommendation that the issue "be worked out between [SUFI] and HQ USAFE."  AFNAFPO did not take the position, either to SUFI or internally, that SUFI was already committed to wire Kapaun under the Vogelweh delivery order.  (JA1484-85.)

A few months later, COTR Sellers and the successor Lodging Manager reapproached Stephens about wiring Kapaun.  New bases could only be added by mutual agreement (JA1372-73(§4.12)), and Stephens informed them that SUFI did not desire to service Kapaun.  **They did not contend that SUFI was already on contract to do so;** instead, they requested Stephens to "come up with a proposal." (JA135(¶185), 359-61.)

CO Jones confirmed she had been "telling the USAFE folks over in Germany to negotiate with SUFI . . . and then to tell [AFNAFPO] in San Antonio what USAFE had agreed to with SUFI to do, and [AFNAFPO] would then put it into a formal modification."  (JA288-89, 909.)  Guilmenot told Stephens the same about the Kapaun installation work specifically.  (JA363-64.)

**Following upon that direction,** Stephens met with COTR Sellers, an NCO Academy representative, and others in early March 1998.  Stephens again offered to service the Kapaun buildings if SUFI received a $1.00 line charge for them, in addition to toll traffic receipts.  The AF attendees agreed and asked Stephens for a pricing proposal to reflect the agreement.  (JA362-64, 1446(¶12).)

Stephens then spoke again with AFNAFPO's Guilmenot about the agreed-upon line fee.  She confirmed that AFNAFPO would approve the line fee if there had been agreement on it in Germany.  (JA363-64, 135(¶186).)

**Under cover of a letter dated March 11, 1998, Stephens sent Guilmenot a proposal for servicing the base, with copy to COTR Sellers, noting, "Please accept this response <u>to your request</u> for pricing for Kapaun AS NCO Academy . . . ."  (Emphasis added.)  SUFI set out the line fee in the proposal. (JA364-66, 1181, 135(¶187).)**

On March 12, 1998, Stephens met with COTR Sellers and multiple others to discuss the technical requirements for the Kapaun installation.  **At that meeting, no one objected to the line fee that SUFI had sent to the Contracting Office the day before,** and the AF attendees pressed SUFI to begin the installation work at once.  **Stephens expressed concern to Sellers about beginning the Kapaun installation prior to receiving the paperwork from AFNAFPO modifying the delivery order to provide for the line fee.  However, the AF attendees told him**

that they would "**make sure that you get . . . the appropriate documentation to cover this.**"  (JA135-36(¶¶188, 189), 366-67, 1045.)

On March 18, 1998, COTR Sellers related to Stephens that the Contracting Office had said no additional delivery order was needed for Kapaun because it had previously been included in the Vogelweh delivery order, which had not been formally rescinded.  **Stephens understood from Sellers that AFNAFPO would issue a modification to insert the line fee into the existing delivery order.  No one in the AF told him to the contrary prior to SUFI beginning the Kapaun installation.  Sellers did not tell Stephens that the line fee proposal had been rejected or that there was any concern about it, and he continued to urge Stephens to begin the Kapaun installation work immediately.**  (JA135-36(¶189), 367-70A, 1182.)

Following this conversation, SUFI began the Kapaun work.  The installation was significantly more expensive for SUFI because it was not done at the same time as Vogelweh.  (JA136(¶190), 360, 371.)

B.     The Second Estoppel

Unbeknownst to SUFI, by early April 1998 the AF had decided not to pay the line charge for Kapaun.  In an internal e-mail of April 9, Sellers disclosed that the "line charge is out. . . .  I've already coordinated this with the Agency," *i.e.*, with AFNAFPO.  (JA426-27, 1269, 1427(¶5), 136(¶191).)

When the promised paperwork was not forthcoming soon after SUFI began the work, Stephens followed up.  He was told again, as in March, "Not to worry," that they "were working on it" and that SUFI would "get it."  (JA136(¶190), 371.)

In early August 1998, when SUFI was doing final testing for the installed system, Guilmenot and Sellers told Stephens, <u>for the first time</u>, that the AF would <u>not</u> pay the line fee.  Stephens accused Guilmenot of a "bait and switch," and, in a September 12 e-mail, notified her that he was resigning from SUFI, partly because of "outright deceit on the part of the government . . . ."  As he contemporaneously confirmed to Sellers, he referred in part to the AF reneging on the Kapaun line fee.  (JA136(¶¶193-95), 371-75, 398, 1189-93, 1490(¶1.f).)

C.    The Law Mandates an Estoppel

This Court in *Mabus v. General Dynamics C4 Systems, Inc.*, 633 F.3d 1356 (Fed. Cir. 2011), set out the three-fold test for estoppel of

> (1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted.

*Id.* at 1359.  This claim meets all these elements, twice over.

First, the AF misled SUFI into believing it would pay a Kapaun line charge and had forgone any "right" to have SUFI wire it under the Vogelweh delivery order,[9] encouraging SUFI to begin work immediately. SUFI incurred substantial expenses based on continuing representations—from both AFNAFPO and the COTR—that the contractual paperwork was forthcoming. All in the AF knew SUFI was acting upon that understanding.

Second, for four months after the COTR and AFNAFPO had reversed course and had decided the "line charge is out," they actively misled SUFI while it substantially completed the installation work. Only when it was too late for SUFI to turn back did AFNAFPO inform SUFI that it would not be modifying the delivery order to add the line fee.

The AF's affirmative misconduct here is even more egregious than that found to justify an estoppel in *American Electronic Laboratories, Inc. v. U.S.*, 774 F.2d 1110 (Fed. Cir. 1985)("*AEL*"). There, this Court estopped the government from relying on a limitation of funds clause when it had reassured the contractor

---

[9]   SUFI contests that any such right actually remained, as the delivery order had been modified by performance. Parties may take actions to modify a contract any time after it is executed, *General Dynamics Corp. v. U.S.*, 558 F.2d 985, 990 (Ct. Cl. 1977), and courts can infer that there was an agreement to modify contract obligations from their conduct. *See id.* (government "implicitly agreed" to modify contract); *Restatement* §§89, 150 (oral promise to modify is binding if party materially changed its position in reliance).

that additional funds would be made available and encouraged it to perform even after knowing that funding was not forthcoming.  *Id.* at 1113-15.  The distinction the CFC relied upon in affirming the Board's denial of SUFI's claim—that the CO in *AEL* had signed a memorandum supporting a funding increase (JA30)—is no distinction at all.  That was an internal memorandum not provided to the contractor, and the Court <u>rejected</u> exactly the argument used (inaccurately) by both the Board and the CFC here—that the contractor could not rely "on the government's conduct because [the contractor's] action preceded any authorization by the CO."  *Id.* at 1114.

This Court in *AEL* also rebuffed the government's attempt to avoid liability because a COTR, rather than a CO, encouraged the contractor to continue to work:

> The statements of the Technical Representative cannot be completely disavowed and repudiated on the ground that he was without authority to speak for the contracting officer.  When an official of the contracting agency is not the contracting officer, but has been sent by the contracting officer for the express purpose of giving guidance in connection with the contract, the contractor is justified in relying upon his representations.

*Id.* at 1115-16 (quoting *Max Drill, Inc. v. U.S.*, 427 F.2d 1233, 1243 (Ct. Cl. 1970)) (citations omitted); *see also Manloading & Mgmt. Assocs., Inc. v. U.S.*, 461 F.2d 1299, 1301-03 (Ct. Cl. 1972)(government estopped by pre-bid statement of CO's representative that funding for follow-on fiscal year would be available and contract would be conformed).  Of course, here SUFI received such

encouragement from <u>both</u> the COTR <u>and</u> the Contracting Office, both <u>before</u> and <u>after</u> making the deal.  AFNAFPO actively encouraged the deal to be struck in Germany and promised to issue the conforming paperwork, thereby providing an express <u>delegation</u> of authority to those who negotiated it, *see Centre Mfg. Co. v. U.S.*, 392 F.2d 229, 235-36 (Ct. Cl. 1968)(CO delegated authority to COTR), and advance approval of the deal.  *See U.S. v. Purcell Envelope Co.*, 249 U.S. 313, 319 (1919)("[F]ormal execution . . . [is] not essential to the consummation of the contract."); *Hoel-Steffen*, 684 F.2d at 848-49(common law and *Restatement* provide for estoppel based on oral representations without executed contract).  By its silence and acceptance of benefits, the CO also <u>ratified</u> the agreement.  *See Ctr. Mfg.*, 392 F.2d at 235-36(ratifying by not countermanding known direction of COTR); *Janowsky v. U.S.*, 133 F.3d 888, 890-92 (Fed. Cir. 1998).

*OAO Corp. v. U.S.*, 17 Cl. Ct. 91 (1989)(Rader, J.), is also directly on point.  The AF there had encouraged the contractor to incur start-up expenses by agreeing that it would do the contractual paperwork later, but then it silently watched the contractor perform the requested services after it had changed its mind and no longer intended to pay for the work.  The court estopped the AF from defending on the ground that it had never expressly put the work on contract.  *Id.* at 104-05.

Here, the AF was not just silent, but <u>actively</u> misrepresented to SUFI that the line charge paperwork was "in process," later reassuring SUFI's Stephens "not [to]

worry," that AFNAFPO was "working on it," and that SUFI would "get it." (JA136(¶190), 371.) This affirmative misconduct was egregious. Both COTR Sellers and AFNAFPO, with whom Sellers had coordinated in reneging on the line charge, had an obligation to inform SUFI of their changed intent, but they did not; they affirmatively misled SUFI instead. *See USA Petroleum Corp. v. U.S.*, 821 F.2d 622, 625 (Fed. Cir. 1987)(estopping government due to its silence while it knew contractor acted in reliance); *Fredericks v. Comm'r of Internal Revenue*, 126 F.3d 433, 442 (3d Cir. 1997)(IRS's decision "to lie doggo, and induce the taxpayer into thinking all was well" equated to "affirmative misconduct").

The AF's actions and inactions induced SUFI to install its phone service at Kapaun for the AF's benefit. The AF cannot now renounce the agreement to pay SUFI the line charge.

II.    The CFC Made Two Hallway Phones Damages Errors

The CFC made two errors concerning the Hallway Phones damages. First, it perpetuated the Board's error in setting an incorrect date from which interest is to run. Second, the CFC did not use SUFI's undisputed corrections to the damages computation.

A.    SUFI Did Not Waive an Accurate Interest Computation

The CFC did not find (and the government did not argue) that the ASBCA had set the accurate date from which interest is to run on the Hallway Phones

60

damages. Instead, the CFC applied the Board's inaccurate date—the unweighted midpoint of SUFI's performance, March 1, 2001—because the CFC said SUFI had offered it to the Board as acceptable. (JA19.) This was an error of law, as SUFI had only presented it as an alternative, but still erroneous, date.

The Board's efforts to set the date from which interest runs on the Hallway Phones claim generated a cascading set of errors. It first erred in *SUFI IX*, stating that interest would run from the date SUFI filed its claim. (JA174.) This was inconsistent with the Partial Settlement Agreement, which specifies that interest runs from the date SUFI suffered harm. (JA11.) SUFI's harm for this claim was front-loaded, because, several years into performance, the AF removed some of the illicit hallway phones. Thus, SUFI computed interest for each phone for its own period of use. (*E.g.*, JA1815, 1817.)

In its August 20, 2009, motion for reconsideration of *SUFI IX*, SUFI pointed out that interest should be calculated (most accurately) as SUFI did in its claim or, to approximately the same effect, by using the weighted midpoint of SUFI's performance, March 1, 2000 (not 2001). SUFI stated,

> As the Board recognized in its reconsideration decision (at 9), interest on SUFI's award is to run from the <u>earlier</u> of the date the damage was suffered or the date SUFI filed its claim. . . . Therefore, to be accurate, the Board should order interest to be calculated . . . as shown in SUFI's damages calculations. . . . At a minimum, interest should run from the approximate [weighted] mid-point of SUFI's performance —March 1, 2000.

61

(JA3196-97.)

In *SUFI X*, the Board erred again.  It admitted its initial error, but then, instead of adopting SUFI's claim methodology or SUFI's proffered <u>weighted</u> midpoint of March 1, <u>2000</u>, it set an <u>unweighted</u>, chronological midpoint of <u>June 15, 2001</u>.  (JA183.)  SUFI moved for reconsideration again, arguing still that the <u>weighted</u> midpoint of SUFI's performance should be used instead of an unweighted midpoint.  SUFI pointed out, however, that the Board had <u>miscalculated even its unweighted midpoint</u>:

> The <u>unweighted</u> midpoint of actual usage of all the hallway and lobby phones is March 1, <u>2001</u> . . . .  <u>Even this calculation greatly understates the interest due</u>.  Because the damages to SUFI from hallway phone abuse was front-loaded with the "unknown" numbers, the <u>weighted</u> midpoint for damages is February 21, 2000, approximately a year earlier than the unweighted average.  <u>SUFI requests that a weighted midpoint of March 1, 2000, be set</u> or, at a minimum, the unweighted midpoint of March 1, 2001.

(JA3245 (emphasis added in part; footnote omitted).)  In *SUFI XI*, the Board again declined to use the <u>weighted</u> midpoint SUFI had requested, but corrected its faulty calculation of the <u>unweighted</u> midpoint from June 15, 2001, to March 1, <u>2001</u>.  (JA187.)

In short, contrary to the CFC's assumption, SUFI <u>never</u> offered the <u>unweighted</u> midpoint as a <u>proper</u> date for the accrual of interest.  Rather, SUFI

consistently asked that the Board apply the <u>weighted</u> midpoint as required by the Partial Settlement Agreement.  SUFI by addressing the various levels of Board error did <u>not</u> waive its right to have interest run from the accurate date.

      B.     The CFC Erred by Not Applying Undisputed
            <u>Corrections to the Hallway Phones Damages</u>

During the Board hearing, SUFI put on <u>undisputed</u> evidence of two corrections to its claim computations:  (a) the hallway phone in Ramstein 303 was installed for a year longer than the original claim specified, and (b) the average usage figure conservatively based on x.4619 was slightly miscalculated.  As found by the Board on the undisputed evidence:

> At trial SUFI introduced evidence to correct the Ramstein Building No. 303 DSN phone start date from October 2000 to October 1999, and corrected the 10,135 average monthly rate to 10,609 min./mo. due to double counting of numbers 110, 112, and 113, and a .6 month gap in the call records for the 12-month period used.

(JA117-18(¶111)(evidentiary citations omitted).)  After the CFC notified the parties that it intended to award damages for the Hallway Phone claim using SUFI's evidence, SUFI pointed out these undisputed corrections to the initial calculations, but the Court declined to apply them.  (JA3818-19, 3881-88.)  In neglecting to take into consideration this substantiated, uncontested fact-finding of the Board, the CFC erred.  *See Carlo Bianchi*, 373 U.S. at 714.

III.   SUFI Was Entitled to Service Added Lodgings

This Court must decide whether the admitted, unrebutted, mutual, multi-year

understanding of the parties that SUFI was entitled to service the new hotels at

Ramstein and Spangdahlem is foreclosed as a matter of law by one phrase of the

Contract, "as requested by the government."  That phrase appears in the

"Expanded Service" clause, SOW §3.11:

> The contractor shall provide expanded services after
> cutover in accordance with the terms of the contract as
> requested by the government.  Expanded services are
> those services necessary to satisfy additional
> requirements over and above those provided at cutover.

(JA1367.)

The Board and the CFC, focusing solely on this one phrase, converted the

Expanded Service clause into an option clause.  But that puts the clause in conflict

with other parts of this non-integrated Contract and with the parties' consistently

expressed understanding that SUFI had an exclusive on all lodging requirements

on awarded bases.  *See Medlin Constr. Grp. Ltd. v. Harvey*, 449 F.3d 1195, 1200

(Fed. Cir. 2006)(criticizing interpretation that focuses on words in isolation, rather

than in context of entire agreement).  As the government admits in its opening brief

(at 4), "the Air Force agreed that a SUFI telephone system (SUFI network) was to

be the exclusive method available to a guest for placing telephone calls at the

lodging."  (Emphasis added.)  The "Expanded Service" clause was not a "stealth"

option clause that undermined that overriding purpose of the Contract.  Reasonably read, it only gave the AF the right to <u>add</u> other lodgings and obligated SUFI to service them.  It did <u>not</u>, expressly or implicitly, give the AF the right to <u>deny</u> new or replacement lodgings to SUFI.

For the first six years of performance, SUFI and the AF <u>shared</u> the understanding that the Contract gave SUFI an <u>exclusive</u> to service <u>all</u> lodgings on the bases it serviced, an understanding that SUFI <u>expressed</u> to the CO <u>prior</u> to award, <u>without contradiction</u>.  But a dispute erupted in September 2002, shortly after the AF had stationed at the bases personnel who instigated other breaches and who were actively hostile to SUFI.  Suddenly, under their pressure, the AF jettisoned its longstanding "<u>assumption that we will be forced to allow SUFI to install their equipment in the new [hotels]</u>" and added this breach to the multiple others it was spawning contemporaneously.  (JA1474(emphasis added), 281-82.)  However, its longstanding assumption about new hotels was embedded in the Contract and expressed pre-award.

This Court has repeatedly noted that the primary function of contract interpretation is to discern the intent of the parties.  *E.g.*, *Burbank v. Bodman*, 464 F.3d 1280, 1284 (Fed. Cir. 2006).  To do so, a contract "must be construed to effectuate its spirit and purpose giving reasonable meaning to <u>all</u> parts of the contract."  *Hercules, Inc. v. U.S.*, 292 F.3d 1378, 1381 (Fed. Cir. 2002)(emphasis

added); *see also Coast Fed. Bank v. U.S.*, 323 F.3d 1035, 1038 (Fed. Cir. 2003).

"[M]eaning can almost never be plain except in a context." *Cruz-Martinez v. DHS*, 410 F.3d 1366, 1371 (Fed. Cir. 2005)(quoting *Restatement* §212 cmt.b).

This Court also recognizes as an "unassailable" principle that "a party that enters without objection into a contract with knowledge of the other party's reasonable interpretation is bound by that reasonable interpretation." *HPI/GSA-3C, LLC v. Perry*, 364 F.3d 1327, 1335 (Fed. Cir. 2004); *see Restatement* §201(2). That party "cannot later claim that it thought something else was meant." *Perry & Wallis, Inc. v. U.S.*, 427 F.2d 722, 725 (Ct. Cl. 1970). This is but an application of the foundational rule of "Whose Meaning Prevails," as *Restatement* §201(1) puts it:

> Where the parties have attached the same meaning to a promise or agreement or a term thereof, it is interpreted in accordance with that meaning.

When read in context of the entire Contract, the "Expanded Service" clause did <u>not</u> unambiguously allow the AF to deny SUFI new lodgings on awarded bases. Moreover, the Contract did <u>not</u> contain an integration clause and was <u>not</u> fully integrated. Thus, review of the parties' intent is not limited to the Contract's four corners, but also includes incorporated documents and other contemporaneous expressions of intent.

The AF's solicitation requested telephone systems "in exchange for toll traffic and a percentage of long distance toll charges recorded by lodging." (JA1378A.)  SUFI in the beginning of its proposal stated its understanding of the Contract's purpose and effect:  "This solicitation" (which included the Expanded Service clause) "is offering the <u>exclusive</u> right to transport long distance traffic . . . in exchange for a complete, modern telecommunications system . . . ." (JA1398(emphasis added).)  The AF in awarding SUFI the Contract stated, "<u>We accept your offer</u> . . . ." (JA1358(emphasis added)), and the Board found that "SUFI's proposal . . . was included in the Contract."  (JA101(¶24).)  In addition, <u>the Contract incorporated SUFI's base-level</u>, not building-level, <u>pricing</u> (JA1362), and the three delivery orders issued with execution of the Contract listed <u>all</u> lodging facilities on each base,[10] as did the later delivery orders for additional bases.  (JA855-60.)

SUFI's Stephens, <u>prior to Contract execution</u>, also discussed SUFI's exclusive to service <u>all</u> lodgings on awarded bases with CO Jones and Specialist Guilmenot:

> <u>We had consistently said [in discussions with the</u>
> <u>contracting personnel prior to their executing this</u>

---

[10]    The one exception was a lodging already under contract with another provider, which SUFI serviced when that preexisting contract expired. (JA1460.)

contract] that it was [an] exclusive right to carry the long distance traffic coming out of there and that . . . we needed to have some kind of safeguards to insure that once we committed to do a base that we got to do the whole base. I mean, they asked for pricing at a base level, not a building level. So, we had stipulated that, you know, we needed to do the entire base, and that's the only way we could provide pricing at a base level.

You know, if they were going to pick and choose on the buildings, then we would have a different cost structure for each building that we installed, and we would have had to provide different pricing for each building. What the contracting office requested was that we provide a permanent price for that base, and our understanding was that included the entire base and all facilities on that base, existing or to be added later.

(JA228(emphasis added).) Jones and Guilmenot both testified, but neither they nor others contradicted this testimony of Stephens. As is especially true with contracts not containing an integration clause, *see David Nassif Associates v. U.S.*, 557 F.2d 249, 256 (Ct. Cl. 1977), such pre-award understandings must be enforced, or "[m]eetings between Government procurement officers and prospective bidders would become a sham." *Sylvania Elec. Prods., Inc. v. U.S.*, 458 F.2d 994, 1008 (Ct. Cl. 1972).

This is the fuller context of the Contract against which the Court must read the sentence in the Expanded Service clause that the Board and CFC decreed "unambiguously" gave the AF the option to deny SUFI the right to service new lodgings: "The contractor shall provide expanded services after cutover in

accordance with the terms of the contract as requested by the government." But even taken in isolation, the AF's reading is not required.

This clause unambiguously committed SUFI to provide expanded service ("the contractor shall provide") and unambiguously gave the AF the discretion to determine its needs in terms of the amount of lodging it provided ("as requested by the government"). But it did <u>not</u> say the AF could <u>withhold</u> new facilities from SUFI. Indeed, SUFI specified in its responsive §3.11 (that was also incorporated in the Contract) that the mutual commitments covered <u>all lodging requirements</u>, including <u>new buildings</u>:

> Expanded service is defined as additional services or features <u>required</u> to support the <u>lodging</u> mission (i.e. addition of <u>new buildings</u>, rooms, and lodging offices).

(JA1369(emphasis added), 1402.)

SOW §3.11 is not a standard option clause, which the AF knew how to write if it had so desired. *See, e.g.*, 48 C.F.R. §52.217-6. Considered by itself and with corresponding §3.11 from SUFI's proposal, it cannot reasonably be read to leave in the AF's discretion anything more than what the "new buildings, rooms, and lodging offices" would be—not to give it the option to choose whether SUFI would service them. Other Contract provisions and contemporaneous expressions of intent cement this understanding.

Moreover, the AF's interpretation that it could add or replace lodgings on a base without giving them to SUFI fails the test that an interpretation must make reasonable business sense. *See U.S. v. Winstar Corp.*, 518 U.S. 839, 863-64 (1996). As the Supreme Court ruled in *Appleby v. Delaney*, 271 U.S. 403, 413 (1926), it is patently unreasonable to interpret a contract to give the government the absolute right to nullify the chief consideration for which the private party made its investment. *See also Stratos Mobile Networks USA, LLC v. U.S.*, 213 F.3d 1375, 1380 (Fed. Cir. 2000)("contract must be read . . . consistently with common sense"). "Bilateral contracts should be applied, if fairly possible, so as not to put one side at the mere will or mercy of the other." *Contra Costa Cty. Flood Control Dist. v. U.S.*, 512 F.2d 1094, 1098 (Ct. Cl. 1975). If the AF could require SUFI to service <u>some</u> new or replacement facilities, even while closing facilities SUFI had already wired at its own expense, with no corresponding obligation to give them <u>all</u> to SUFI, the possibilities for abuse would be obvious. Given the <u>substantial</u> investment required of SUFI in this no-cost contract, that is not a reasonable business risk, and it is not the way the Contract was solicited, bid, discussed, and mutually understood pre-award. *See also ConocoPhillips*, 501 F.3d at 1379(rejecting "one-sided" interpretation that advantaged only one party).

It was also not the way the Contract was performed for the first six years. Pre-dispute performance must be given great, if not controlling, weight. *Pac. Gas*

*& Elec. Co. v. U.S.*, 536 F.3d 1282, 1291 (Fed. Cir. 2008). The AF, by its conduct

and words, repeatedly agreed that, once a delivery order had been issued for a

particular base, SUFI had an exclusive for that base—i.e., SUFI was required to

service all new or expanded lodging facilities, no matter the specific economics of

the incremental service, and the AF was required to provide any new or expanded

facilities requested to SUFI for service. The AF repeatedly demonstrated this by

giving all new lodging rooms and buildings to SUFI. (JA260-60B.) In particular,

beginning in July 2000 and continuing for over two years, the AF involved SUFI in

the planning of telephone systems for the very same new hotels at issue, while

confirming expressly that SUFI would provide the telephone service at them.

(JA244-47, 251-53, 261-63, 267-76, 1455, 1463-64.)

In sum, the only reasonable reading of the Contract, harmonizing the

Expanded Service clauses with all other Contract provisions and the parties' shared

understanding and stated purpose to provide SUFI an exclusive arrangement, is

that the AF retained discretion to decide what its lodging requirements were, but

SUFI had the responsibility and the right ("shall provide") to service them,

including additional "new buildings." SUFI and the CO discussed pre-award that

SUFI retained the exclusive right to service all lodgings on awarded bases, which it

priced in the Contract on a whole-base level, not building-by-building. The AF

cannot now avoid its shared understanding of the Contract and replace it with a one-sided interpretation that advantages only itself.

## Conclusion

For the reasons stated above, the government's appeal should be denied and SUFI's cross-appeal granted in all respects.  This case should be remanded to the CFC for entry of judgment with the corrected computations of damages.

Respectfully submitted,


/s/Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr.
Brian T. McLaughlin

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
(202) 624-2500

Attorneys for SUFI Network Services, Inc.


June 26, 2013

| SSI | ██████ |
| SSBI | SINGLE SCOPE BACKGROUND INVESTIGATION |
| ████ | ██████ |
| SSP | SOURCE SELECTION PLAN |
| ████ | ██████ |
| TO | TASK ORDER |
| ████ | ██████ |
| TOPM | TASK ORDER PROGRAM MANAGER |
| ████ | ██████ |
| WBS | WORK BREAKDOWN STRUCTURE |
| ████ | ██████ |



**SUFI NETWORK SERVICES, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 11–804C.**

United States Court of Federal Claims.

Nov. 8, 2012.

**Background:** Government contractor sued United States, seeking review, under Wunderlich Act, of decision of Armed Services Board of Contract Appeals (ASBCA), awarding contractor only $7,416,751.52 in damages on 28 monetary claims totaling $130,308,071.53 for Air Force's breach of non-appropriated funds contract to provide telephone services in guest lodging rooms on United States Air Force bases in Germany. Parties cross-moved for judgment on administrative record.

**Holdings:** The Court of Federal Claims, Wheeler, J., held that:

(1) damages award of $53,700,352.41 was warranted for hallway and lobby telephones;

(2) damages award of $1,586,863.81 was warranted for other operator numbers patching;

(3) damages award of $1,534,192.40 was warranted for unauthorized telephones in squadron lounge;

(4) damages award of $986,369.13 was warranted for calling card charges;

(5) damages award of $480,626.85 was warranted for extra work due to defects in guest registration system;

(6) Air Force was not equitably estopped from refusing to pay $544,476 line charge claim;

(7) damages award of $213,191.13 was warranted for switches change and call-queuing defect;

(8) damages award of $122,942.50 was warranted for early abuse of contractor's call service;

(9) damages award of $208,547.45 was warranted for lost revenue from air crew lodging;

(10) damages award of $54,780.52 was warranted for lost revenue from housing German troops; and

(11) damages award of $59,876,215.14 in lost profits was warranted.

Motions granted in part and denied in part.

**1. Public Contracts** ⟜364(7)
    **United States** ⟜73.20(7)

Under the Wunderlich Act, the Court of Federal Claims reviews issues of law de novo, but the fact findings by the Armed Services Board of Contract Appeals (ASBCA) are final unless they are arbitrary

or capricious, or not supported by substantial evidence. Wunderlich Act, § 1 et seq., 41 U.S.C.A. § 321 et seq.

### 2. Public Contracts ⚖364(7)
#### United States ⚖73.20(7)

Under the Wunderlich Act, Court of Federal Claims' review of a decision of the Armed Services Board of Contract Appeals (ASBCA) is based upon the record developed before the ASBCA and the ASBCA's opinion. Wunderlich Act, § 1 et seq., 41 U.S.C.A. § 321 et seq.

### 3. Public Contracts ⚖364(7)
#### United States ⚖73.20(7)

The government contractor bears the burden of establishing any legal or factual errors by the Armed Services Board of Contract Appeals (ASBCA).

### 4. Public Contracts ⚖364(7)
#### United States ⚖73.20(7)

Wunderlich Act review employs the same standards used in the Administrative Procedure Act (APA) and other similar statutes. 5 U.S.C.A. § 551 et seq.; Wunderlich Act, § 1 et seq., 41 U.S.C.A. § 321 et seq.

### 5. Public Contracts ⚖364(7)
#### United States ⚖73.20(7)

Court of Federal Claims' review of decisions of the Armed Services Board of Contract Appeals (ASBCA) on questions of law is de novo. Wunderlich Act, § 1 et seq., 41 U.S.C.A. § 321 et seq.

### 6. Public Contracts ⚖364(7)
#### United States ⚖73.20(7)

Issues of contract interpretation are questions of law, and thus the Court of Federal Claims's review of a decision of the Armed Services Board of Contract Appeals (ASBCA) interpreting a contract is unrestrained.

### 7. Public Contracts ⚖364(7)
#### United States ⚖73.20(7)

When a mixed question of law and fact exists, if the law element is predominant, essential, and in all respects crucial, such as an issue that is fundamentally a decision interpreting the contract, Court of Federal Claims owes no deference either to the decision of the Armed Services Board of Contract Appeals (ASBCA) or its rationale.

### 8. Federal Courts ⚖1118

For fact issues, the Court of Federal Claims must apply the substantial evidence and arbitrary and capricious standards to an agency's determinations.

### 9. Public Contracts ⚖364(7)
#### United States ⚖73.20(7)

Evidence is "substantial," as required to uphold a decision of the Armed Services Board of Contract Appeals (ASBCA), if a reasonable mind might accept that evidence as adequate to support the ASBCA's conclusion, and must be more than a mere scintilla.

See publication Words and Phrases for other judicial constructions and definitions.

### 10. Public Contracts ⚖364(7)
#### United States ⚖73.20(7)

A substantial evidence review of a decision of the Armed Services Board of Contract Appeals (ASBCA) includes consideration of not only the body of evidence in support of the ASBCA's view, but also the body of evidence opposed to the ASBCA's view.

### 11. Public Contracts ⚖364(7)
#### United States ⚖73.20(7)

The fact that there is evidence, considered of and by itself, to support the administrative decision of the Armed Services Board of Contract Appeals (ASBCA) is not sufficient, where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial on the record as a whole.

### 12. Federal Courts ⚖1118

In applying the arbitrary and capricious standard, Court of Federal Claims looks to whether an agency examined the relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choices made.

SUFI NETWORK SERVICES, INC. v. U.S.                289
Cite as 108 Fed.Cl. 287 (2012)

**13. Federal Courts ⟐1118**

Under the arbitrary and capricious standard of review, Court of Federal Claims considers whether the agency's decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment.

**14. Federal Courts ⟐1118**

An arbitrary and capricious finding occurs where an agency has entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view.

**15. Federal Courts ⟐1118**

Arbitrary and capricious decisions include the following: (1) when record citations do not support the findings, (2) when the findings misstate testimony, (3) when the findings give no explanation for a determination, (4) when the findings use irrational or unsupported assumptions, (5) when the findings make miscalculations or utilize faulty methodologies, or (6) when the findings are inconsistent or otherwise illogical or unreasonable.

**16. Public Contracts ⟐364(7)**

**United States ⟐73.20(7)**

If the Armed Services Board of Contract Appeals (ASBCA) has logically and rationally considered conflicting evidence, or resolved conflicting testimony through reasoned credibility determinations, the ASBCA's factual findings generally should not be disturbed, since the ASBCA is well suited to decide which evidence is more persuasive.

**17. Federal Courts ⟐1118**

Where an administrative board has failed to make a relevant finding of fact as to which the evidence is undisputed, Court of Federal Claims may make such finding rather than referring the matter to the board; likewise, where the evidence is disputed but it is of such a nature that as a matter of law the board could have made only one finding of fact, the court can also make that finding without sending the matter back to the board for determination of the factual issues.

**18. Damages ⟐23, 189**

In a breach of contract case, damages are recoverable where: (1) the damages were reasonably foreseeable by the breaching party at the time of contracting, (2) the breach is a substantial causal factor in the damages, and (3) the damages are shown with reasonable certainty.

**19. Damages ⟐117**

In a breach of contract case, one way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred.

**20. Damages ⟐6**

In a breach of contract case, the ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision.

**21. Damages ⟐6**

Although absolute exactness is not required for determining damages for a breach of contract, recovery for speculative damages is precluded.

**22. Damages ⟐23**

In the context of expectancy damages for a breach of contract claim, any risk of uncertainty is assumed by the party whose wrongful conduct caused the damage.

**23. Damages ⟐6, 189**

In the context of a jury's award of damages for a breach of contract, even where the defendant by his own wrong has prevented a more precise computation of damages, the jury may not render a verdict based on speculation or guesswork, but may make a just and reasonable estimate of the damages based on relevant data, and render its verdict accordingly; in such circumstances juries are allowed to act on probable and inferential as well as upon direct and positive proof.

**24. Damages ⟐117**

The willfulness of a breach of contract may be taken into account in assessing damages. Restatement (Second) of Contracts § 352 comment.

**25. Contracts ⟷322(1)**

Doubts are generally resolved against the party in breach of the contract. Restatement (Second) of Contracts § 352 comment.

**26. Damages ⟷117**

A party who has, by his breach of contract, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred. Restatement (Second) of Contracts § 352 comment.

**27. Damages ⟷189**

Court of Federal Claims may take into account all the circumstances of the breach of contract, including willfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts. Restatement (Second) of Contracts § 352 comment.

**28. Public Contracts ⟷415(2)**
    **United States ⟷74(10)**

While the government contractor claiming breach of contract has the burden of proving its damages, the government has the burden of proving any setoffs.

**29. Damages ⟷189**

Any offset to a damages award for a breach of contract must be established with reasonable certainty. Restatement (Second) of Contracts § 349.

**30. Public Contracts ⟷416(3)**
    **United States ⟷74(13)**

Government's breach of contract to provide telephone services to Air Force bases required government to reimburse contractor for damages including actual costs plus overhead and profit on contractor's labor rates for extra work performed and 25%, rather than 10%, for overhead recovery on out-of-pocket expenses, since denial of overhead and profit as part of damages would not make contractor whole.

**31. Damages ⟷120(2)**

Breach of contract damages for services should be awarded at their fair market value, not at some unburdened cost rate.

**32. Public Contracts ⟷416(3)**
    **United States ⟷74(13)**

In awarding breach of contract damages to a government contractor, if the innocent party does not recover its allocable overhead, it simply means that some other business activities of the contractor must absorb a disproportionately higher amount of overhead; the same is true for a reasonable profit element.

**33. Public Contracts ⟷416(5)**
    **United States ⟷74(15)**

The denial of profit on labor hours incurred because of a breach does not make the government contractor whole.

**34. Public Contracts ⟷106**
    **United States ⟷60(1)**

Anyone entering into an arrangement with the government takes the risk of having accurately ascertained that he who purports to act for the government stays within the bounds of his authority.

**35. Compromise and Settlement ⟷2**

Settlement agreements are accomplished through contractual action.

**36. Public Contracts ⟷415(2)**
    **United States ⟷74(10)**

The contractor bears the burden of proving a government agent's authority to enter into a binding contract on behalf of the government.

**37. Public Contracts ⟷312**
    **United States ⟷72(3)**

Although contracting officer was present during negotiation of settlement agreement resolving 10 of contractor's 28 monetary claims for government's breach of contract to provide telephone services to Air Force bases and settlement agreement was signed by government's lead negotiator, settlement agreement was unenforceable, under contract providing that no agreement or understanding to modify contract would be binding upon Air Force unless made in writing and signed by contracting officer, where contracting officer who alone had full authorization and approval power for settlement refused to sign settlement agreement.

**38. Public Contracts** ⊙=416(3)
    **United States** ⊙=74(13)

Contractor's damages from Air Force's breach of contract to provide telephone services for guest lodging at Air Force bases were reasonably foreseeable by Air Force at time of contracting, in support of awarding damages for government's breach by failing to remove hallway and lobby defense switched network (DSN) telephones when contractor's telephones became operational, where contract's financial purpose was sharing revenues from outgoing long-distance calls, contractor was to select long-distance carriers, all other methods for such calls were to be blocked, contractor was concerned about impact on revenue if hallway and lobby DSN telephones remained, parties discussed contractor's concern, and contract subsequently required removal of such telephones.

**39. Public Contracts** ⊙=416(3)
    **United States** ⊙=74(13)

Air Force's willful breach of contract to provide telephone services for guest lodging at Air Force bases, by failing to remove hallway and lobby defense switched network (DSN) telephones as required by contract, was substantial causal factor in contractor's revenue damages, as required for contractor's recovery of breach damages, where Air Force repeatedly refused to remove hallway and lobby DSN telephones and actively installed such telephones in some locations, directly causing contractor's lost revenue by giving guests cheaper unauthorized method for placing calls that they would not have had absent Air Force's breach.

**40. Public Contracts** ⊙=416(3)
    **United States** ⊙=74(13)

Contractor's damages from Air Force's willful breach, by failing to remove hallway and lobby defense switched network (DSN) telephones as required by contract to provide telephone services for guest lodging at Air Force bases, were demonstrated with reasonable certainty, as required to award contractor $53,700,352.41 in damages for hallway and lobby DSN telephones, where contractor made fair and reasonable approximation of damages by proffering surrogate telephones, as government had lost DSN call records, and by computing lost revenues from surrogates' conservative comparable data by methodology approved by Defense Contract Audit Agency (DCAA), and Air Force's speculative arguments did not warrant any reduction or setoff.

**41. Damages** ⊙=6

The breaching party bears any risk of uncertainty in calculating damages incurred from the breach.

**42. Public Contracts** ⊙=416(3)
    **United States** ⊙=74(13)

Contractor's damages from Air Force's breach of contract to provide telephone services for guest lodging at Air Force bases, by allowing guests to circumvent contractor's long-distance system via other operator numbers patching, were demonstrated with reasonable certainty, as required to award contractor $1,586,863.81 in damages, where contractor used reasonable and conservative methodology approved by Defense Contract Audit Agency (DCAA) to calculate damages from explosive call data attributable to guests' atypical usage for so-called "morale calls" that in some instances exceeded 15-minute limit by 50 hours and 46 minutes, and more detailed call data could not be supplied by either party.

**43. Public Contracts** ⊙=416(3)
    **United States** ⊙=74(13)

Air Force's breach of contract to provide telephone services for guest lodging at Air Force bases, by refusing to remove defense switched network (DSN) telephones in facility lodging squadron's administrative, maintenance, and transportation personnel, warranted damages award of $1,534,192.40 for unauthorized DSN telephones in lounge area both before and after contractor substituted its own telephones to monitor abuse of 15-minute limit on telephone usage, since Air Force had contractual duty to remove all unauthorized telephones from lounge, including DSN telephones installed by Air Force and DSN telephones installed by contractor.

**44. Public Contracts** ⊙=416(3)
    **United States** ⊙=74(13)

Armed Services Board of Contract Appeals' (ASBCA) method and result in calcu-

lating contractor's damages for Air Force's willful breach of contract to provide telephone services for guest lodging at Air Force bases, by allowing guests to use calling cards of other long-distance carriers, impermissibly eviscerated nearly 80% of contractor's legitimate claim, thus warranting award to contractor of $986.369.13 in damages, where ASBCA impermissibly and without explanation rejected actual call records, which were best evidence of contractor's damages, and instead developed monthly revenue comparison lacking any precision whatsoever.

**45. Public Contracts ⚖️416(3)**
    **United States ⚖️74(13)**

Contractor's extra work and extra out-of-pocket costs due to defects in Air Force's guest registration system and need to interface with another guest registration system warranted award to contractor of $480,626.85 in damages, upon Air Force's breach of contract to provide telephone services for guest lodging at Air Force bases, since neither party argued that contractor was required to provide notice to contracting officer of extra work, and Air Force was not prejudiced by lack of notice, as contracting officer already knew that extra work needed to be performed, and Air Force did not show how notice would have mitigated costs of extra work.

**46. Public Contracts ⚖️287**
    **United States ⚖️70(36)**

When extra work is performed, the contractor does not necessarily need to provide written notice to the contracting officer where the government had actual or constructive notice of the conditions; in other words, once notice is given about one type of differing site conditions, the contractor does not need to provide additional notice every time a "new rock" is discovered.

**47. Public Contracts ⚖️287**
    **United States ⚖️70(36)**

A contractor may recover damages for extra work performed if the government is not prejudiced by the lack of notice of the conditions requiring the extra work; it is the government's burden to show prejudice from the contractor's failure to give notice.

**48. Public Contracts ⚖️287**
    **United States ⚖️70(36)**

Prejudice to the government from lack of notice of extra work to be performed by the contractor is demonstrated by illustrating how the contractor could have mitigated the costs of performing the extra work if it had provided the contracting officer with notice.

**49. Public Contracts ⚖️416(3)**
    **United States ⚖️74(13)**

With a breach of contract action, the key is to put the contractor in as good a position as he would have been in if not for the government's wrongful action.

**50. Estoppel ⚖️52.15**

A claim for equitable estoppel requires: (1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it, (2) reliance upon this conduct, and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted.

**51. Estoppel ⚖️62.1**

A contractor invoking the doctrine of equitable estoppel against the government bears a heavy burden, as a contractor must prove an additional element of affirmative misconduct.

**52. Estoppel ⚖️62.1**

Prior to finding equitable estoppel against the government, the threshold issue of authority must be satisfied, as it is essential that the course of conduct or representations be made by officers or agents of the United States who are acting within the scope of their authority.

**53. Estoppel ⚖️62.5**

Air Force contracting officer's alleged promise to modify delivery order to incorporate contractor's line charge per day per telephone for wiring of air base did not equitably estop Air Force from refusing to pay contractor's $544,476 line charge claim, upon Air Force's breach of telephone services contract that required all modifications to be made in writing and signed by contracting officer, where contracting officer who alleg-

edly made promise lacked authority to modify delivery order to include charge and never signed any document authorizing line charge.

**54. Public Contracts ⚖️416(3)**

   **United States ⚖️74(13)**

   Air Force's replacement of telephone switches at air base lodgings that required contractor to implement interface of its equipment with Air Force's new switches and then remedy resulting call-queuing defect warranted damages award of $213,191.13 to contractor, upon Air Force's breach of contract to provide telephone services for guest lodging at Air Force bases, since contract only required contractor to complete initial interface, and there was strong temporal relationship between switch change and occurrence of call-queuing problem.

**55. Public Contracts ⚖️416(3)**

   **United States ⚖️74(13)**

   Armed Services Board of Contract Appeals' (ASBCA) denial of damages to contractor for Air Force's breach of contract to provide telephone services at guest lodging at air bases, by Air Force's initial circumvention of contractor's long-distance telephone system, was impermissibly based on lack of decline in contractor's monthly averages of revenues, thus warranting award to contractor of $122,942.50 in damages for Air Force's willful breach, since there were multiple other breach factors affecting contractor's monthly revenues.

**56. Public Contracts ⚖️416(3)**

   **United States ⚖️74(13)**

   Court of Federal Claims has a duty to award reasonable damages when a willful breach of a government contract has occurred.

**57. Public Contracts ⚖️364(7)**

   **United States ⚖️73.20(7)**

   Court of Federal Claims owes no deference to a decision of the Armed Services Board of Contract Appeals (ASBCA) on issues of law.

**58. Damages ⚖️208(1)**

   The application of the proper rule of damages for a breach of contract is a question of law, or to the extent it might be regarded as a mixed question of fact and law, the legal portion of the issue predominates.

**59. Public Contracts ⚖️416(3)**

   **United States ⚖️74(13)**

   Air Force's breach of contract to provide telephone services for guest lodging at Air Force bases, by refusing to remove in-room telephones for air crews transitioning on flight status, warranted damages award of $208,547.45 for contractor's lost revenue, where revenues that contractor received per room from other lodging facilities were repressed, and hallway and lobby defense switched network (DSN) telephones that Air Force refused to remove also impacted contractor's revenue.

**60. Public Contracts ⚖️416(3)**

   **United States ⚖️74(13)**

   Air Force's breach of contract to provide telephone services for guest lodging at Air Force bases in Germany, by allowing German troops to stay as long-term guests without issuing personal identification numbers (PIN) so they could not use contractor's telephone system, warranted damages award of $54,780.52 for contractor's lost revenue, since housing German troops at guest lodging was change in description of services to be performed under contract, and contractor's methodology for calculating lost revenue was verified by Defense Contract Audit Agency (DCAA).

**61. Federal Courts ⚖️1118**

   Contract interpretation questions are issues of law, which the Court of Federal Claims may decide de novo.

**62. Public Contracts ⚖️416(5)**

   **United States ⚖️74(15)**

   Contractor's lost profits claim upon Air Force's breach of contract to provide telephone services at Air Force bases extended for 15 years from date of actual completion of installation, inspection, and acceptance of telephone system at each site, rather than from date of award of contract; contract's performance period clause stated that "performance period for each site will commence upon actual completion of installation, inspection and acceptance" by Air Force of system

ordered for that particular site, not to exceed period of 15 years from that date, and clause reflected sound business principle that contractor could not earn any revenue on its investment at each site until telephone system was up and running.

63. **Public Contracts** ⚌416(5)

   **United States** ⚌74(15)

Contractor's lost profits claim upon Air Force's breach of contract to provide telephone services for guest lodging at Air Force bases impermissibly included revenues that contractor would have received if new guest lodging had been brought on line after contractor's performance ended, thus warranting damages award of $59,876,215.14 that excluded new lodging facilities from lost profits calculation, since contract was not requirements contract for air bases at which contractor had already received delivery order, and contract had no clauses entitling contractor to telephone services at new lodging facilities, but rather, gave Air Force right, not obligation, to place new work with contractor.

---

Frederick W. Claybrook, Jr., with whom was Brian T. McLaughlin, Crowell & Moring LLP, Washington, D.C., for Plaintiff.

Douglas T. Hoffman, with whom were Stuart F. Delery, Acting Assistant Attorney General, Jeanne E. Davidson, Director, and Harold D. Lester, Jr., Assistant Director, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, D.C., for Defendant.

*OPINION AND ORDER*

WHEELER, Judge.

[1] This case is before the Court for review of the decision of the Armed Services Board of Contract Appeals ("ASBCA" or "Board") in *SUFI Network Services, Inc.,* ASBCA No. 55306, 09–1 BCA ¶ 34,018 (Nov. 21, 2008) ("SUFI VIII").[1] Our Court normally operates as a trial tribunal, but in this case, involving a non-appropriated fund instrumentality, the Court is performing an appellate function under the review standards of the Wunderlich Act, 41 U.S.C. §§ 321–22. The Contract Disputes Act, 41 U.S.C. § 7101 *et seq.,* does not apply. Under the Wunderlich Act, our Court reviews issues of law *de novo,* but the ASBCA's fact findings are final unless they are arbitrary or capricious, or not supported by substantial evidence. *See, e.g., Vista Scientific Corp. v. United States,* 808 F.2d 50, 51 (Fed.Cir.1986).

The disputes here stem from an April 26, 1996 contract between SUFI Network Services, Inc. ("SUFI") and the Air Force Non–Appropriated Funds Purchasing Office ("AF-NAFPO") to provide telephone service in the guest lodging rooms on U.S. Air Force bases in Germany. Under the contract, SUFI agreed to provide the necessary telephone equipment and system operations at its own expense. In return, SUFI would share the telephone service revenues with the United States. The "financial purpose of the contract" was the sharing of revenues from outgoing long-distance calls by lodging guests. *SUFI Network Servs., Inc.,* ASBCA No. 54503, 04–2 BCA ¶ 32,714 (Aug. 17, 2004) ("SUFI II") at 161,867–68. The parties understood that guests would use long-distance carriers selected by SUFI, and that other methods of long-distance calling would be blocked. *Id.* As amended, the contract would be in place for fifteen years.

The AFNAFPO added lodging facilities to the contract by means of delivery orders. At the time of award, three air bases were covered by the contract: Ramstein (602 guest rooms); Rhein Main (266 guest rooms); and Aviano (53 guest rooms). One month after award, the AFNAFPO added Landstuhl (275 guest rooms), and Vogelweh/Kapaun (361 guest rooms). In July 1998, the AFNAFPO added Spangdahlem/Eifel West (180 guest rooms), and in August 1998, the AFNAFPO added Sembach Annex (563 guest rooms). *SUFI VIII,* at 168,218. Prior to SUFI's contract, with one exception, none of the guest rooms at these air bases had any

---

1. The ASBCA issued eleven decisions in the SUFI matter during a six-year period from April 22, 2004 through April 5, 2010. The Board's lengthy decision on the merits in *SUFI VIII* is the main decision requiring review.

telephone service.[2] The only guest facility telephones were located in the hallways and lobbies.

Many of the ensuing disputes resulted from Air Force actions that frustrated or undermined the use of SUFI's network, and thus prevented the generation of revenues in which SUFI would share. The ASBCA determined that the Air Force materially breached the contract when it directed SUFI in November 2003 to grant access from guest rooms to other long-distance providers. *SUFI II*, at 161,869. The Board concluded that the Air Force's material breach entitled SUFI to stop performance and cancel the contract. *Id.* On August 25, 2004, SUFI notified the contracting officer that it intended to stop performance. Through negotiations and a partial settlement agreement, SUFI stopped work on the contract on May 31, 2005, and the following day, the Air Force assumed ownership and operation of SUFI's telephone system at each base.

On July 1, 2005, SUFI submitted 28 monetary claims to the contracting officer totalling $130,308,071.53 in damages. On January 5, 2006, SUFI appealed to the ASBCA from the deemed denial of its claims, since the contracting officer had failed to issue a final decision. On April 17, 2006, the contracting officer denied SUFI's claims in their entirety except for a small portion of one claim totalling $132,922. *See SUFI Network Servs., Inc.*, ASBCA No. 55306, 06–2 BCA ¶ 33,444 (Nov. 8, 2006) ("SUFI IV") at 165,772. The Board held 23 days of hearing in Falls Church, Virginia and Ramstein Air Base, Germany from February 26, 2007 to May 10, 2007. During the Board proceedings, SUFI amended its claim to more than $163,000,000. In the decision on the merits, the Board granted SUFI partial relief on 21 of 28 claims, but awarded damages of only $3,790,496.65, plus interest. *SUFI VIII*, at

168,291. As a result of SUFI's three motions for reconsideration, the Board ultimately adjusted SUFI's award to $7,416,751.52. *See SUFI Network Servs., Inc.*, ASBCA No. 55306, 10–1 BCA ¶ 34,415 (Apr. 5, 2010) ("SUFI XI") at 169,887.

SUFI filed suit in this Court for review of the Board's decisions on November 30, 2011. SUFI then filed a motion for judgment on the administrative record on January 21, 2012, and the Government filed its cross-motion for judgment on the administrative record on May 24, 2012. The parties later filed reply briefs, and they have submitted an extensive appendix of the Board's proceedings. The Court heard oral argument on September 11, 2012.[3]

The Court finds this case to be very odd. The Air Force committed multiple breaches of contract that were mostly wilful, and the existence of damage to SUFI is clear and certain. Yet, a wide gulf exists between the amount SUFI claimed ($163,000,000) and the amount the Board ultimately awarded ($7,416,751.52). One might say that SUFI's claims must have been vastly inflated, but just as easily one could say that the Board harshly reduced SUFI's damages at every opportunity. Indeed, the Board's *SUFI VIII* decision gives the impression that the Board ruled in every possible way to cut back SUFI's damages. Virtually every Board judgment call went against SUFI and in favor of the Government. In view of the wilfulness of the Air Force breaches, one would expect the outcomes to have been just the opposite, with judgment calls favoring SUFI. Despite these general impressions, the Court must delve into the details of each claim to determine the proper outcome under the law.

The Court's total damages award to SUFI is $118,764,081.34. This amount may seem

---

2. Only the Prime Knight lodging rooms, discussed below, were equipped with telephone service.

3. Given the lengthy history of this case, there are substantial documents comprising the record. The Court has employed the following abbreviations and citations in this opinion: SUFI's Memorandum in Support of its Motion for Judgment on the Administrative Record ("Pl.'s Mem.");

Defendant's Response to Plaintiff's Motion for Judgment Upon the Administrative Record and Defendant's Cross–Motion for Judgment Upon the Administrative Record ("Def.'s Resp."); September 11, 2012 Oral Argument ("Oral Arg. Tr."); Rule 4 File documents ("R4F, vol. ——, tab ——, at ——"); Hearing exhibits ("Ex. ——"); Hearing before the ASBCA ("Witness, Hr'g Tr. ——/——").

generous, but after a full and careful review of the Board's record for each of the individual claims, the Court is persuaded that this contract was completely mismanaged by the Air Force, to the severe detriment of SUFI. In view of the dramatically changing telecommunications environment that existed when the parties executed the contract, this agreement may not have made good business sense at the time. With the advantage of perfect hindsight, there are other business alternatives that might have served the Air Force better. Nevertheless, a contract is a contract, and SUFI relied to its detriment on the Air Force's promises that it would perform as required. The damages award simply reflects the magnitude of the program envisioned by the parties and the disaster that it became following the Air Force's material breaches. The Air Force has only itself to blame for a totally botched program of grand proportions.

*Standard of Review*

The Court's review in this case is governed by the Wunderlich Act, 41 U.S.C. §§ 321–22. Although Congress repealed the Wunderlich Act as part of Public Law No. 111–350, 124 Stat. 3677, 3859 (Jan. 4, 2011), review under the statute is still appropriate because Congress excepted from the repeal "rights and duties that matured, penalties that were incurred, and proceedings that were begun before the date of enactment of this Act." *Id.* at 3855. Since SUFI began these proceedings at the ASBCA long before the repeal of the Wunderlich Act, the Court must apply the Act's review standards here.

[2–4] Under the Wunderlich Act, the Court's review is based upon the record developed before the Board and the Board's opinion. *See Hydromar Corp. of Del. & E. Seaboard Pile Driving, Inc. v. United States,* 25 Cl.Ct. 555, 558 (1992); *Titan Pac. Constr. Corp. v. United States,* 17 Cl.Ct. 630, 634 (1989). Plaintiff SUFI bears the burden of establishing any legal or factual errors by the Board. *See Titan,* 17 Cl.Ct. at 634; *Marley v. United States,* 191 Ct.Cl. 205, 214, 423 F.2d 324, 329 (1970). Wunderlich Act review employs the same standards used in the Administrative Procedures Act and other similar statutes. *United States v. Carlo Bianchi*

& Co., 373 U.S. 709, 715–16, 83 S.Ct. 1409, 10 L.Ed.2d 652 (1963).

[5–7] The Court's review of Board decisions on questions of law is *de novo. Granite Constr. Co. v. United States,* 962 F.2d 998, 1001 (Fed.Cir.1992). Issues of contract interpretation are questions of law, and thus the Court's review is unrestrained. *See Seaboard Lumber Co. v. United States,* 308 F.3d 1283, 1292 (Fed.Cir.2002); *George Hyman Constr. Co. v. United States,* 215 Ct.Cl. 70, 80, 564 F.2d 939, 944 (1977). When a mixed question of law and fact exists, if the law element "is predominant, essential, and in all respects crucial," such as an issue that is "fundamentally a decision interpreting the contract," the Court owes no deference either to the Board's decision or its rationale. *Ray D. Bolander Co. v. United States,* 186 Ct.Cl. 398, 415–16 (1968).

[8, 9] For fact issues, the Court must apply the "substantial evidence" and "arbitrary and capricious" standards. *See Monroe M. Tapper & Assocs. v. United States,* 206 Ct.Cl. 446, 460–61, 514 F.2d 1003, 1009–10 (1975) (noting Supreme Court decisions holding that findings unsupported by substantial evidence are arbitrary and capricious). Evidence is "substantial" if "a reasonable mind might accept [it] as adequate to support [the agency's] conclusion," and must be "more than a mere scintilla." *Consol. Edison Co. v. NLRB,* 305 U.S. 197, 229, 59 S.Ct. 206, 83 L.Ed. 126 (1938); *see Dickinson v. Zurko,* 527 U.S. 150, 162, 119 S.Ct. 1816, 144 L.Ed.2d 143 (1999); *Statistica, Inc. v. Christopher,* 102 F.3d 1577, 1581 (Fed.Cir.1996).

[10, 11] A "substantial evidence" review includes consideration of not only the body of evidence in support of the Board's view, but also "the body of evidence opposed to the Board's view." *Universal Camera Corp. v. NLRB,* 340 U.S. 474, 488, 71 S.Ct. 456, 95 L.Ed. 456 (1951); *see Farnsworth & Chambers Co. v. United States,* 171 Ct.Cl. 30, 37–38, 346 F.2d 577, 582 (1965). "The fact that there is evidence, considered of and by itself, to support the administrative decision is not sufficient where there is opposing evidence so substantial in character as to detract from its weight and render it less than substantial

on the record as a whole." *Titan,* 17 Cl.Ct. at 634; *see Williams v. United States,* 130 Ct.Cl. 435, 440–41, 127 F.Supp. 617, 619 (1955).

[12, 13] In applying the "arbitrary and capricious" standard, the Court looks to whether an agency "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action including a 'rational connection between the facts found and the choice[s] made.'" *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43, 103 S.Ct. 2856, 77 L.Ed.2d 443 (1983) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 9 L.Ed.2d 207 (1962)). The Court considers "whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment." *Id.* (quoting *Bowman Transp., Inc. v. Arkansas–Best Freight Sys., Inc.,* 419 U.S. 281, 285, 95 S.Ct. 438, 42 L.Ed.2d 447 (1974)).

[14] An "arbitrary and capricious" finding occurs where a tribunal has "entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view...." *Id.; see also Morgan v. United States,* 298 U.S. 468, 480, 56 S.Ct. 906, 80 L.Ed. 1288 (1936) ("Facts and circumstances which ought to be considered must not be excluded.").

[15] Decisions have been found arbitrary and capricious in the following instances: (1) when record citations do not support the findings, *see Teledyne Lewisburg v. United States,* 699 F.2d 1336, 1354 n. 58 (Fed.Cir. 1983); (2) when the findings misstate testimony, *see Ordnance Research, Inc. v. United States,* 221 Ct.Cl. 641, 664–66, 609 F.2d 462, 476–77 (1979); (3) when the findings give no explanation for a determination, *see Southern Co. Services, Inc. v. FERC,* 416 F.3d 39, 47 (D.C.Cir.2005); (4) when the findings use irrational or unsupported assumptions, *see OMV Medical, Inc. v. United States,* 219 F.3d 1337, 1344 (Fed.Cir.2000); (5) when the findings make miscalculations or utilize faulty

methodologies, *see id.;* or (6) when the findings are inconsistent or otherwise illogical or unreasonable, *see Missouri Roofing Co. v. United States,* 357 F.Supp. 918, 922 (E.D.Mo. 1973).

[16] On the other hand, if the Board has logically and rationally considered conflicting evidence, or resolved conflicting testimony through reasoned credibility determinations, the Board's factual findings generally should not be disturbed, since the Board is well suited to decide which evidence is more persuasive. *Blount Bros. Corp. v. United States,* 872 F.2d 1003, 1005 (Fed.Cir.1989); *see also Statistica,* 102 F.3d at 1583.

*Remand to the Board*

[17] The Court must address the question of whether there is a need for remand proceedings at the ASBCA. As will become evident from the Court's review of the individual claims below, the Court in many instances reached a different outcome than the Board. The issue is whether the Court must remand to the Board to make further findings, or whether the Court may make its own findings based upon the evidence of record. The U.S. Court of Claims faced this very question in *Maxwell Dynamometer Co. v. United States,* 181 Ct.Cl. 607, 631, 386 F.2d 855, 870 (1967), where in reviewing an administrative decision of the ASBCA, the Court ruled:

> Where an administrative board has failed to make a relevant finding of fact as to which the evidence is undisputed, this court has made such finding rather than referring the matter to the board. Likewise, where the evidence is disputed but it is of such a nature that as a matter of law the Board could have made only one finding of fact, it would seem that this court can make that finding without sending the matter back to the Board for determination of the factual issues; otherwise, litigation would be protracted and unnecessary delay and expense would result simply in order to have the Board formally decide a fact which legally can be decided in only one way. Such an empty ritual has no place in a rational decisionmaking process.

(citations omitted); *see also Sherwin v. United States,* 193 Ct.Cl. 962, 979, 436 F.2d 992, 1002 (1971) (same); *Koppers Co. v. United States,* 186 Ct.Cl. 142, 150, 405 F.2d 554, 559 (1968) (same). In this case, most of the Board's errors involve issues of law that the Court reviews *de novo.* For the few fact questions, the Court can make the necessary corrections to the Board's decision without remanding the case for further findings or proceedings. For some claims, the evidence is undisputed, and for other claims, only one finding could have been made from the record evidence. Therefore, a remand to the Board is not required, and would only cause needless delay to already protracted proceedings that began in 2004. The Court will comment upon this issue in the review of individual claims where applicable.

### *Burden of Proof on Damages*

A recurring problem in this case is to determine how best to apply the damages burden of proof rules to reach a just outcome for both parties. In many of the claims,[4] SUFI contractually was to receive revenue from all of the calls made by guests at a base lodging facility, but the Air Force repeatedly frustrated that objective in allowing guests to make calls by other means. The Air Force even encouraged guests to avoid using SUFI's telephone system and facilitated the practice. The Air Force breached the contract each time it allowed lodging guests to circumvent SUFI's network. SUFI's task in proving damages was to place a value on the calls made by other means that should have been made on SUFI's network. In some circumstances, SUFI has actual call records to calculate its claims, but in others, it had to estimate damages from a limited data base and make reasonable assumptions about telephone usage on non-SUFI telephones. The Air Force, while wilfully allowing these circumstances to occur, defends against SUFI's claims by arguing that not all of the calls made on non-SUFI telephones would have been made on the SUFI telephones. The Air Force's premise is that guests would not have used the more expensive SUFI network

to the same extent as the less expensive or free calls they made through another carrier or system. The Air Force contends that SUFI has the burden of showing as part of its prima facie case what the guest calling patterns would have been absent the Air Force's breach. SUFI argues that it satisfied its burden by showing with reasonable certainty the amount of lost revenue for calls made on non-SUFI telephones, and that the Air Force has the burden to show any offset or reduction, which it failed to do.

The Board struggled with this issue in the decision on the merits (*SUFI VIII*), and in the three decisions on reconsideration (*SUFI IX, X,* and *XI*). Often, the Board used an alternative approach in calculating damages, resulting in a significantly reduced award to SUFI. The Board, however, did not explain the burden of proof rules it was applying.

[18, 19] In a breach of contract case, damages are recoverable where: "(1) the damages were reasonably foreseeable by the breaching party at the time of contracting; (2) the breach is a substantial causal factor in the damages; and (3) the damages are shown with reasonable certainty." *Ind. Mich. Power Co. v. United States,* 422 F.3d 1369, 1373 (Fed.Cir.2005) (citing *Energy Capital Corp. v. United States,* 302 F.3d 1314, 1320 (Fed. Cir.2002)). "One way the law makes the non-breaching party whole is to give him the benefits he expected to receive had the breach not occurred." *Bluebonnet Sav. Bank, FSB v. United States,* 266 F.3d 1348, 1355 (Fed.Cir.2001) (quoting *Glendale Fed. Bank, FSB v. United States,* 239 F.3d 1374, 1380 (Fed.Cir.2001)).

[20, 21] Many courts have noted that "[t]he ascertainment of damages is not an exact science, and where responsibility for damage is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision." *Bluebonnet,* 266 F.3d at 1355 (citing *Elec. & Missile Facilities, Inc. v. United States,* 189 Ct.Cl. 237, 257, 416 F.2d 1345, 1358 (1969)). Although absolute exactness is not required,

---

4. A burden of proof issue exists in the calling card claim, the hallway and lobby DSN telephones claim, the Prime Knight lodging claim, the Delta Squadron claim, the early DSN abuse claim, and the other operator numbers patching claim.

"recovery for speculative damages is precluded." *Ind. Mich.*, 422 F.3d at 1373 (citing *San Carlos Irrigation & Drainage Dist. v. United States*, 111 F.3d 1557, 1563 (Fed.Cir. 1997)).

[22, 23] In the context of expectancy damages, "any risk of uncertainty is assumed by the party whose wrongful conduct caused the damage." *S. Cal. Edison Co. v. United States*, 93 Fed.Cl. 337, 355 (2010) (citing *Energy Capital*, 302 F.3d at 1327). As the Supreme Court observed long ago, in the context of a jury's award of damages:

> In such a case, even where the defendant by his own wrong has prevented a more precise computation, the jury may not render a verdict based on speculation or guesswork. But the jury may make a just and reasonable estimate of the damage based on relevant data, and render its verdict accordingly. In such circumstances "juries are allowed to act on probable and inferential as well as (upon) direct and positive proof." *Story Parchment Co. v. Paterson Parchment Paper Co., supra*, 282 U.S. [555,] 561–564, 51 S.Ct. [248] 250, 251, 75 L.Ed. 544 [ (1931) ]; *Eastman Kodak Co. v. Southern Photo Material [Materials ] Co., supra*, 273 U.S. [at] 377–379, 47 S.Ct. [at] 404, 405, 71 L.Ed. 684. Any other rule would enable the wrongdoer to profit by his wrongdoing at the expense of his victim. It would be an inducement to make wrongdoing so effective and complete in every case as to preclude any recovery, by rendering the measure of damages uncertain.

*Bigelow v. RKO Radio Pictures, Inc.*, 327 U.S. 251, 264, 66 S.Ct. 574, 90 L.Ed. 652 (1946); *see also Locke v. United States*, 151 Ct.Cl. 262, 267, 283 F.2d 521, 524 (1960) ("The defendant who has wrongfully broken a contract should not be permitted to reap advantage from his own wrong by insisting on proof which by reason of his breach is unobtainable.").

[24–27] The Restatement (Second) of Contracts, § 352, notes that a court may take wilfulness of the breach into account in assessing damages:

> Doubts are generally resolved against the party in breach. A party who has, by his breach, forced the injured party to seek compensation in damages should not be allowed to profit from his breach where it is established that a significant loss has occurred. A court may take into account all the circumstances of the breach, including wilfulness, in deciding whether to require a lesser degree of certainty, giving greater discretion to the trier of the facts.

Restatement (Second) of Contracts, § 352 cmt. a (1981).

[28, 29] With regard to the parties' burdens of proof, "[w]hile plaintiff has the burden of proving its damages, the government has the burden of proving any setoffs, here the value of any benefits conferred on plaintiff." *Caroline Hunt Trust Estate v. United States*, 65 Fed.Cl. 271, 315 (2005), *aff'd in part, rev'd in part and remanded*, 470 F.3d 1044 (Fed.Cir.2006); *see also Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 769 (Fed.Cir.1987) ("The burden was on the government to prove the amount [of the claimed offset]."). "Any offset must be established with reasonable certainty." *Caroline Hunt*, 65 Fed.Cl. at 315 (citing *Bausch & Lomb, Inc. v. Bressler*, 977 F.2d 720, 729 (2d Cir.1992); Restatement (Second) of Contracts § 349 (1979); *Am. Capital Corp. v. United States*, 59 Fed.Cl. 563, 584 (2004)).

Applying these damages principles to the case at hand, the Court does not agree with many of the damages determinations of the Board. The Board only needed to assess whether SUFI proved its damages with "reasonable certainty." Frequently, however, in assessing SUFI's lost revenue claims, the Board improperly rejected SUFI's calculations in favor of its own approach which resulted in a much lower damages award to SUFI. The Government's concerns that guests would not have used the more expensive SUFI network to the same extent as the less expensive or free calls they made through another carrier or system involves pure speculation. The Government could have presented evidence to show the alleged effects of these damages reductions, but it did not. The Court declines to eviscerate SUFI's damages claims as the Board did, just because of these speculative and unprov-

en concerns. *See Tip Top Constr., Inc. v. Donahoe*, 695 F.3d 1276, 1284–85 (Fed.Cir. 2012) (Board engaged in impermissible speculation when embracing possible rebuttal points on which the Government had presented no evidence).

The rules of damages governing this case are issues of law, which the Court may apply *de novo*. *See Rite–Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1538, 1544 (Fed.Cir.1995) (explaining that whether lost profits "are legally compensable is a question of law" reviewed *de novo* ); *Tractebel Energy Mktg., Inc. v. AEP Power Mktg., Inc.*, 487 F.3d 89, 109 (2d Cir.2007) ("district court's decision to deny damages for breach of contract" is reviewed *de novo* ). The Court will address the specific deficiencies in the Board's approach under each claim below.

### Labor Rates for Extra Work

Another recurring issue on some of SUFI's claims concerns the labor rate per hour that SUFI should receive for performing extra work required by the Air Force.[5] In granting SUFI's claims for extra work, the Board constructed its own labor rates for SUFI's employees by dividing their base annual salary by 2,080 hours per year. *SUFI VIII*, at 168,219, ¶ 11. The Board did not add anything to these hourly rates to account for overhead or profit. *Id.* In taking this approach, the Board disregarded the fully loaded labor rates negotiated by the parties for changed work. *Id.* SUFI requested the Board to correct this error in its first motion for reconsideration, and the Air Force did not oppose SUFI's position. *SUFI Network Servs., Inc.*, ASBCA No. 55306, 09–2 BCA ¶ 34,201 (Jul. 15, 2009) ("SUFI IX") at 169,-094. The Board did correct an error regarding the hourly rate for one employee (Ms. Cecilia Ansola), and acknowledged that, for extra work in changes claims, SUFI should be entitled to its actual costs plus overhead and profit. *Id.* However, despite the lack of any Air Force opposition, the Board declined to allow any overhead or profit on breach damages. *Id.*

[30, 31] In making its ruling that "[w]e disallow profit on breach damages," *SUFI VIII*, at 168,256, the Board cited *H.H.O. Co. v. United States*, 12 Cl.Ct. 147, 154 n. 1 (1987), and then on reconsideration quoted *Northern Helex Co. v. United States*, 225 Ct.Cl. 194, 203, 634 F.2d 557, 563 (1980), for the proposition that the innocent party is "not to make a profit from the breach." *SUFI IX*, at 169,094. The Court does not construe SUFI's breach claims to be seeking anything more than to be made whole for the labor hours incurred for extra work. Breach damages for services should be awarded at their fair market value, not at some unburdened cost rate. *See Acme Process Equip. Co. v. United States*, 171 Ct.Cl. 324, 359, 347 F.2d 509, 530 (1965) (the reasonable value of a nonbreaching party's services is to be measured by "what he could have got[ten] for them in the market.") *rev'd on other grounds*, 385 U.S. 1032, 87 S.Ct. 738, 17 L.Ed.2d 680 (1967); *Hansen Bancorp, Inc. v. United States*, 367 F.3d 1297, 1314–15 (Fed. Cir.2004) ("The non-breaching party is not limited to recovering the particular value of its services to the defendant; rather, it may recover in restitution the reasonable market value of those services, measured at the time of performance.").

[32, 33] Furthermore, the Court cannot see any logical reason to allow overhead and profit on labor hours incurred for a contract change, but to disallow overhead and profit on the same labor hours incurred because of a breach. A failure to award overhead as part of damages does not make the non-breaching party whole; therefore reimbursement of salary alone is insufficient. If the innocent party does not recover its allocable overhead, it simply means that some other business activities of the contractor must absorb a disproportionately higher amount of overhead. *See Carolina Power & Light Co. v. United States*, 573 F.3d 1271, 1277 (Fed. Cir.2009) (if contractor had not recovered

---

**5.** A labor rate issue exists for extra work allowed by the Board for the hallway and lobby DSN telephones claim, the other operator number patching claim, the Delta Squadron claim, the calling cards claim, the SIMS/LTS interface

claim, the change of Air Force switches claim, the early DSN abuse claim, the Prime Knight lodging claim, and the German troops housing claim.

overhead as part of a contract breach, "other activities would have assumed a disproportionate amount of the total overhead costs") The same is true for a reasonable profit element. All labor of a commercial enterprise is designed to earn a reasonable profit. The denial of profit on labor hours incurred because of a breach does not make the contractor whole. *See Rumsfeld v. Applied Cos., Inc.*, 325 F.3d 1328, 1339 (Fed.Cir.2003) (explaining where the Government breaches a contract and diverts business away from the contractor and does not use the contractor to satisfy a requirements contract, the contractor is entitled to recover lost profits damages); *see also Fifth Third Bank v. United States*, 518 F.3d 1368, 1374 (Fed.Cir. 2008) ("expectancy damages are intended to make a non-breaching party whole" and "expectancy damages include lost profits *but are not* limited to them.") (emphasis added).

The above reasoning also applies to SUFI's claims for out-of-pocket expenses, where SUFI is entitled to recover 25 percent for overhead and profit. The Board denied, or allowed only ten percent (depending on the claim), for overhead recovery on out-of-pocket expenses.

*Interest*

On April 1, 2005, the parties entered into a Partial Settlement Agreement ("PSA"). Ex. B70. Section 4 of the PSA provides that "The Air Force will be liable to pay interest on any amounts paid or recovered by settlement or judgment from the earlier of (i) the [July 1, 2005] date of receipt of the claim or (ii) the date damages are actually incurred, until payment." *Id.; SUFI XI*, at 165,773. The applicable interest rate is the Federal Reserve Board's ("FRB's") monthly Prime Rate. *SUFI VIII*, at 168,225. It is undisputed that SUFI is entitled to interest payments. *SUFI IV*, at 165,777–78; Def.'s Resp. 18.

| | |
|---|---:|
| Count I—Calling Card Claims | $625,000.00 |
| Count II—Front Desk Patching | $180,000.00 |
| Count IV—A & B Bed Switch | $400,000.00 |
| Count XIII—Temporary Shutdowns | $300,000.00 |
| Count XXIII—Security Inspection | $1,200.00 |
| | $564.00 |

*Review of Claims*

In addressing SUFI's contentions, the Court will first review the enforceability of an October 13, 2006 settlement agreement purporting to resolve ten of SUFI's 28 claims. Next, the Court will examine SUFI's claims for recovery of lost revenue and extra work costs, treating them in order from the largest claim to the smallest claim. Last, the Court will review SUFI's two claims for lost profits.

A.  *Settlement Agreement*

On October 12 and 13, 2006, the parties met at Ramstein Air Force Base, Germany to negotiate a settlement of ten of SUFI's 28 claims.[6] Attorneys Rick Claybrook and Brian McLaughlin represented SUFI, while Air Force counsel Peter Gedraitis and Contracting Officer Max Browning represented the Government. Mr. Gedraitis was the lead negotiator for the Government, but he was not a warranted contracting officer. At the beginning of the discussions, Mr. Gedraitis stated that any negotiated agreement at the meeting would be finalized in a contract modification. During the afternoon of October 13, 2006, Messrs. Gedraitis and Claybrook prepared a handwritten document of the matters agreed upon during the negotiations, and each of them signed the document. The contracting officer, Mr. Browning, expressly stated that he would not sign the document. The agreement stated as follows:

Ramstein AB, Germany       13 October 2006

The parties in the Appeal of SUFI Network Services, Inc., ASBCA No. 55306 have agreed to resolve certain claims found in this Appeal. In consideration of the following amounts listed to be paid by the AFNAFI, the Appellant, SUFI, Inc. will withdraw the respective claims from consideration by the ASBCA.

---

6.  The recited facts are taken from the Board's decision, *SUFI VIII*, at 168,219–21.

| Count XXIV—Severance and Shutdown | $193,000.00 |
| Count XXV—Office Lease | $1,083.00 |
| Count XXVI—Extra Transition | $9,000.00 |
| Count XXVII—Spare Parts | $105,000.00 |
| Count XXVIII—Miscellaneous Shutdown | $4,200.00 |
| Totaling | $1,819,047.00 |

The parties have not agreed to the application of interest to any claims and will await a decision from the ASBCA regarding the application of interest to these claims. If the ASBCA determines that interest is applicable to these claims, the NAFI will pay SUFI interest on these claims per the partial settlement agreement. The rate of interest is in dispute.

This document represents the totality of the Parties' agreement on this Appeal; no other issues have been agreed upon by the parties in this settlement negotiation. Attorney fees have not been resolved through this settlement.

s/Pete Gedraitis

Peter F. Gedraitis

For the NAFI

s/Rick Claybrook

Rick Claybrook

For SUFI

Ex. B83.

SUFI argued at the Board, and argues now before the Court, that the settlement agreement is legally binding and enforceable because: (1) the agreement was a completely integrated contract finalizing the settlement of the parties; (2) the Government intended to be bound by the agreement; (3) no contract modification was required to implement the agreement; (4) the government negotiator executed the agreement with full authority from the contracting officer; and (5) the contracting officer approved the agreement. The Board disagreed with all of these contentions. *SUFI VIII*, at 168,221.

[34–36] It is well established that "anyone entering into an arrangement with the Government takes the risk of having accurately ascertained that he who purports to act for the Government stays within the bounds of his authority." *E.g., Flexfab, LLC v. United States*, 424 F.3d 1254, 1260 (Fed. Cir.2005) (quoting *Fed. Crop Ins. Corp. v.*

*Merrill*, 332 U.S. 380, 384, 68 S.Ct. 1, 92 L.Ed. 10 (1947)). Settlement agreements are accomplished through contractual action. *Mil–Spec Contractors, Inc. v. United States*, 835 F.2d 865, 868 (Fed.Cir.1987). The plaintiff bears the burden of proving a government agent's authority to enter into a binding contract on behalf of the Government. *See City of El Centro v. United States*, 922 F.2d 816, 820 (Fed.Cir.1990).

[37] The fundamental problem with SUFI's position is that a warranted contracting officer did not sign the parties' agreement. The Air Force lawyer who did sign the agreement did not possess a contracting officer's warrant. While the contracting officer was present during the negotiations, his failure to sign the agreement is fatal to SUFI's position. The contracting officer's reasons for not signing the agreement may include some or all of the factors noted in the Board decision. *Id.* It may have been that the contracting officer would wait to sign a bilateral contract modification formalizing the parties' agreement. *Id.* It may have been that the contracting officer wanted to include missing terms such as the time of payment, or suitable release language. *Id.* Whatever the reasons, the agreement does not contain the signature of an authorized person.

Here, although Mr. Gedraitis signed the agreement "[f]or the NAFI," Ex. B83 at 1, Mr. Browning alone had "full authorization and approval power for a settlement," Pl.'s Mem. 27. The contract stated that "[n]o agreement or understanding to modify this contract will be binding upon the NAFI unless made in writing and signed by a Contracting Officer." R4F, vol. 1, tab 1, at I–4. The mere fact that Mr. Browning did not voice a specific objection to the agreement does not render the agreement binding on the Government. Pl.'s Mem. 28. Rather, Mr. Browning's presence during the negotia-

tions, coupled with his express refusal to sign the agreement, *SUFI VIII,* at 168,219–20, ¶¶ 13–15, underscores the non-binding nature of the purported settlement agreement for lack of authorization. Under the contract, only a signature by Mr. Browning could render the agreement binding. Thus, without his signature, the agreement is unenforceable.

### B.  *Hallway & Lobby DSN Telephones*

As noted, before the April 26, 1996 contract there were no telephones in the guest lodging rooms of the Air Force bases in Germany, but there were defense switched network ("DSN") telephones in the hallways and lobbies.[7] These DSN telephones were to be used only for official business. A caller wanting to use a DSN telephone would call a local base operator and demonstrate that the call was for official purposes. The operator would issue a control number for the call, and the call would be placed to another DSN operator in the United States or internationally.

In the pre-award events preceding the SUFI contract, SUFI was concerned that it would lose significant call revenue if the hallway and lobby DSN telephones remained. SUFI feared that a caller with a choice of using SUFI's in-room commercial network or the hallway DSN telephones might choose the hallway telephones as a way of circumventing long-distance charges. For example, a caller wanting to connect with a relative in San Antonio, Texas might attempt to have a base operator in Germany connect with a base operator in San Antonio, who would then forward the call to a local San Antonio residence. This call would be considered only a San Antonio local call, not an international long distance call from Germany to San Antonio.

To address this potential problem, in light of SUFI's desire to maximize call revenue under the contract, the parties agreed that the Air Force would remove all hallway and lobby DSN telephones when SUFI's telephones became operational. Callers would then be required to use the SUFI guest room telephones for all calls. The contract also provided, however, that SUFI would not receive revenue for local base level calling. To make an official business call, a caller would place a local call to the base operator in Germany, who would then place the call over the DSN network. The Air Force agreed to monitor official business calls from the base, to be sure that this exception was not being abused.

After contract award in April 1996, the Air Force did not perform as required. Despite repeated demands from SUFI representatives, both orally and in writing, the Air Force refused to remove the hallway and lobby DSN telephones. Although eventually some of the telephones were removed, the Air Force still left many hallway and lobby telephones in place. The Air Force even added hallway and lobby telephones in some locations. The existence of these DSN telephones presented a cheaper alternative for placing calls, and SUFI undeniably lost significant revenue because of the Air Force's refusal to remove the hallway and lobby telephones.

The Air Force's breach of contract in refusing to remove the hallway and lobby telephones can only be regarded as wilful. In testimony explaining why the hallway and lobby telephones were not removed, Air Force witnesses candidly conceded that the hallway and lobby telephones afforded guests cheaper alternatives for making calls worldwide. Wible, Hr'g Tr. 20/143–44; White, Hr'g Tr. 16/22–24, 130–31. The Air Force actively assisted guests in circumventing the SUFI system, and seemingly wanted to enable guests to make free calls instead of using SUFI's telephones in the lodging rooms. Notwithstanding the contract requirements with SUFI, the Air Force simply disregarded the need to remove hallway and lobby telephones.

The Board found that the Air Force had materially breached the contract by failing to

---

7.  The facts relating to this claim are taken from the Board's decision in *SUFI VIII,* at 168,235–41, and from the Board's decisions on reconsideration where the claim is further discussed,

*SUFI IX, SUFI Network Services, Inc.,* ASBCA No. 55306, 10–1 BCA ¶ 34,327 (Dec. 14, 2009) ("SUFI X"), and *SUFI XI.*

remove hallway and lobby DSN telephones, but the Board encountered difficulty in analyzing the available data on damages. The Board at first granted no relief to SUFI for this claim, holding that SUFI "has not sustained its burden of proving that the hallway/lobby DSN phones caused a reduction in its long distance revenues...." *SUFI VIII*, at 168,242. After three decisions on reconsideration, however, the Board ultimately awarded SUFI $1,299,481.93 for this claim. *SUFI XI*, at 169,887.

In the first decision on reconsideration, the Board applied a method of calculation that neither party had advocated, but one that the Board thought established "a reasonable amount for SUFI to recover for this breach." *SUFI IX*, at 169,089. The Board reviewed approximately 173,000 minutes of the 4,274,690 recorded minutes (slightly more than four percent) in calls for 28 hallway and lobby DSN telephones from September 1997 through December 2005. *Id.* The Board determined that thirteen percent of the reviewed minutes "were during other than normal duty hours at the locations called, and therefore more likely than not to have been non-official calls." *Id.* Using this method, the Board arrived at an award to SUFI of $1,159,756.37, incorporating lost revenues and extra work. *Id.* In its final decision on reconsideration, the Board adjusted the lost revenue award to $1,296,723.50, which resulted in a total award of $1,299,481.93 for this claim. *SUFI XI*, at 169,887.

The Court agrees with the Board's liability determination that the Air Force materially breached the contract by failing to remove hallway and lobby DSN telephones. After careful consideration, however, the Court concludes that the Board erred in substituting its own calculation of damages. SUFI presented a prima facie case of damages for this claim, and the Government failed to show any reduction or setoff, instead attempting to minimize the damages through mere speculation.

[38] In establishing its prima facie case for lost revenue, SUFI showed that the "damages were reasonably foreseeable by the breaching party at the time of contracting." *Ind. Mich.*, 422 F.3d at 1373. The

"financial purpose of the contract" between SUFI and the Air Force was the sharing of revenues from outgoing long-distance calls by lodging guests. *SUFI II*, at 161,867–68. SUFI was to select the long-distance carriers, and all other methods for such calls would be blocked. *Id.* Moreover, SUFI was concerned about the negative impact on revenue if the hallway and DSN telephones remained, an issue discussed by the parties and subsequently addressed in the contract. *SUFI VIII*, at 168,241–42. Thus, at the time of contracting, it was reasonably foreseeable that such a breach by the Air Force would result in significant revenue damages to SUFI.

[39] Second, SUFI has shown that the Air Force's breach was a "substantial causal factor" in the revenue damages. *Ind. Mich.*, 422 F.3d at 1373. The Air Force repeatedly refused to remove the hallway and lobby DSN telephones and actively installed such telephones in some locations. *SUFI VIII*, at 168,236–37. This wilful breach was the direct cause of SUFI's lost revenue, as the DSN telephones gave guests a cheaper, unauthorized method for placing calls, Def.'s Resp. 15. If not for the presence of the unauthorized hallway and lobby DSN telephones, guests would have had no other option but to use the SUFI telephones for long-distance calls, thereby increasing SUFI's revenue.

[40] Third, SUFI demonstrated the lost revenue damages caused by the hallway and lobby DSN telephones with "reasonable certainty." *Ind. Mich.*, 422 F.3d at 1373. Under the contract, SUFI was to be the sole provider of any outgoing long-distance calls by lodging guests. *SUFI IX*, at 169,088; Pl.'s Mem. 39. It is undisputed that the hallway and lobby DSN telephones constituted a breach by the Air Force that negatively impacted SUFI's revenue. Hoffman, Oral Arg. Tr. 89. As such, SUFI merely needed to present sufficient evidence for the Court to make a "fair and reasonable approximation" of its damages. *Bluebonnet*, 266 F.3d at 1355.

As SUFI itself points out, the best evidence for determining these damages would

have been the Air Force's own DSN call records from its switches. Pl.'s Mem. 42. The Government has lost these records, Oral Arg. Tr. 85, thereby precluding a precise calculation of damages. SUFI provided alternative methods for determining a fair and reasonable approximation of damages. Pl.'s Mem. 42–43. In particular, SUFI proffered that the Landstuhl lobby telephone (x.4619) functioned in a similar capacity to the hallway and lobby DSN telephones, such that it served as a "surrogate" telephone. *SUFI VIII*, at 168,242; Claybrook, Oral Arg. Tr. 76–80.

SUFI was unable to monitor the usage of the hallway and lobby DSN telephones, but it employed a methodology approved by the Defense Contract Audit Agency ("DCAA") to compute the lost revenues for this claim. *SUFI VIII*, at 168,240, ¶ 112; Appellant's Post Hr'g Br. 200. The basic method was to (1) identify a particular hallway or lobby DSN government telephone in the lodging facilities during some or all of SUFI's performance; (2) determine the date of use for that particular telephone; (3) apply a usage rate of that telephone over the dates of use; and (4) calculate lost revenues by applying the applicable annual long-distance revenue and cost rates to the total usage. Appellant's Post Hr'g Br. 200.

SUFI elected to use the call records from its telephone in the Landstuhl guest lobby as a substitute for the actual call records from the unauthorized hallway DSN telephones. *Id.* at 210. The Landstuhl telephone did not have commercial access, but it had local and long-distance direct-dial DSN access, as well as access to the base operator. *Id.* Based on a twelve-month period, September 2003 through August 2004, SUFI computed an average monthly usage of 10,135 minutes.[8] *Id.;* Ex. 205, tab 4A, at 122. SUFI then used this figure, along with its weighted average long-distance rate and weighted cost average per minute, to compute lost revenue of $53,692,407.91 for both the known and unknown number telephones. *SUFI VIII*, at 168,238–39; Ex. 205, tab 4A, at 122,211.

The Landstuhl telephone data allowed SUFI to calculate a reasonable and conservative estimate of damages in lieu of the Air Force's lost data. Demonstrating the conservative nature of these damages, SUFI also presented data from two Delta Squad telephones as alternative surrogate records. Pl.'s Mem. 42–43. These records yielded a monthly usage of 12,176 minutes, twenty percent more than the Landstuhl data. Ex. 205, tab 4A, at 212. Moreover, calling card access was unblocked during the twelve-month period selected for the Landstuhl telephone. Appellant's Post Hr'g Br. 211. The calling card breach, discussed below, allowed guests to make calling card calls from their rooms instead of from the lobby, thereby depressing the average monthly usage figure from the Landstuhl data. *Id.* at 212. Although the Air Force clearly was in breach, SUFI exercised good faith in utilizing such conservative data.

**[41]** The data from the comparable Landstuhl telephone records, although not an exact representation of the damages sustained from the hallway and lobby telephones, is relevant data that provides a reasonable estimate of the revenue damages. *See Bigelow*, 327 U.S. at 264, 66 S.Ct. 574. As the breaching party, the Government bears any risk of uncertainty in calculating damages incurred from the hallway and lobby DSN telephones. *See S. Cal. Edison Co.*, 93 Fed.Cl. at 355.

Taking into account the wilful nature of the Air Force's breach, the unavailability of precise call records that only the Air Force possessed, and the conservative comparable data from the Landstuhl telephone, the Court finds that SUFI has adequately shown its damages with reasonable certainty. The burden then shifted to the Government to prove any reduction or setoff. *Lisbon Contractors*, 828 F.2d at 769. The Government maintains that SUFI's claimed damages are speculative, as guests would not have made the same amount of calls, or calls of the same duration, on the more expensive SUFI network. Def.'s Resp. 15. The Government argues: "The economic fact that people make

---

**8.** SUFI excluded all local calls and used only long-distance and operator calls in arriving at

this average usage rate. Appellant's Post Hr'g Br. 210.

more (and longer) telephone calls when paying lower rates made SUFI's damages calculation implausible, uncertain, and speculative." *Id.* at 12. The Board agreed, and correspondingly reduced SUFI's damages. *See SUFI IX*, at 169,089 ("Considering the personal cost to the caller of using the SUFI phones, we cannot conclude that all nonofficial calls placed ("free") over the hallway/lobby DSN phones would have been placed, in the absence of those phones, minute-for-minute over the SUFI phones at SUFI's commercial rates.").

The Government cited no authority and presented no evidence for this supposition. Absent any evidence, the Court has no basis to conclude that prospective callers would have used the hallway DSN telephones more than the SUFI telephones, or that calls on the DSN telephones would have been of longer duration than on the SUFI telephones. Counteracting these premises, there were fewer hallway telephones than guest room telephones, there were often waiting times to use the hallway telephones, and there was little privacy on the hallway telephones. Consequently, the Government's arguments, not SUFI's, amount to mere speculation. The Board's use of this unsubstantiated reduction in decreasing SUFI's damages was legal error. *See Tip Top Constr.*, 695 F.3d at 1284–85 (Board made legal error by embracing speculation not supported by the record or any evidence by the Government). The Government failed to establish any offset or reduction of SUFI's damages claim with reasonable certainty. SUFI is also entitled to its extra work damages at the labor rates agreed upon by SUFI and the Air Force, combining overhead and profit, out-of-pocket costs, and claim preparation costs. Accordingly, the Court grants SUFI damages for the hallway and lobby DSN telephones in the amount of $53,700,352.41.

Pursuant to the PSA, SUFI is entitled to interest on these damages at the FRB monthly prime rate. Ex. B70 at 3. The Board used SUFI's proffered time period for accrual in its calculations. *SUFI XI*, at 169,-887. SUFI now argues that the Board erred in its interest computation when it used a chronological average date for the hallway and lobby DSN telephones as opposed to a weighted average date. Pl.'s Mem. 45. The Board rejected SUFI's proposed weighted midpoint as "inconsistent with the unweighted midpoints [it] used in . . . prior decisions." *SUFI XI*, at 169,887. Given that the unweighted midpoint of March 1, 2001 was indeed offered by SUFI as an alternative date for accrual, *id.*, the Court declines to increase the interest accrual period. Accordingly, the Court holds that SUFI is entitled to recover $53,700,352.41, plus interest thereon at the FRB monthly prime rate from March 1, 2001.

## C. *Other Operator Numbers Patching*

Lodging guests at the Air Force bases where SUFI's system was installed looked for ways to make telephone calls from their rooms without incurring the cost of using SUFI's system.[9] This issue first arose in connection with "morale calls," where troops on temporary duty of at least two weeks could make personal calls, usually to the United States, limited to fifteen minutes once every two weeks. SUFI had not addressed the question of morale calls with the Air Force prior to contract award. In October 1998, the Air Force established two DSN telephone numbers for morale calls, which SUFI monitored. SUFI quickly learned that the morale call process was subject to rampant abuse, and although aware of such abuse, the Air Force made no effort to control it. SUFI found morale calls on its records of up to three hours in duration. From January through March 1999, SUFI submitted records showing calls exceeding morale call limits by 3,046.5 minutes, or 50 hours and 46 minutes.

Upon the Air Force's failure to monitor or control morale calls, SUFI blocked the ability to make these calls from guest rooms. SUFI installed lobby telephones for morale calls that Government front desk personnel

---

9. The facts relating to this claim are taken from the Board's decision in *SUFI VIII*, at 168,250–53, and from the Board's decisions on reconsideration where the claim is further discussed, *SUFI IX, SUFI X,* and *SUFI XI.*

were expected to monitor, but apparently did not. With SUFI blocking access to the original base operator numbers from guest rooms, Air Force front-desk personnel then actively assisted guests in circumventing SUFI's system. First, Air Force front-desk personnel encouraged guests to use various "direct access" local DSN numbers that the Air Force set up to reach DSN operators directly, and who would then patch guests through to long-distance access. Second, Air Force frontdesk personnel also provided various indirect access local DSN numbers which guests could dial to be patched to the base operators and then to long-distance access directly. Third, the Air Force made available an indirect access DSN number that reached a call-routing recording on which the Air Force added push-button access to the operators. With the access to a host of local DSN numbers that could be used for patching, the usage levels of these numbers showed an explosive increase. SUFI maintains that the only reason for these dramatic increases was to access the operators for long-distance calling and thereby to circumvent SUFI's network.

In total, there were five direct operator access numbers, 33 indirect operator access numbers, and one Air Mobility Command ("AMC") terminal number with push-button access to the base operator. SUFI prepared its damages claim by analyzing the call records of 33 DSN telephone numbers that guests could use either by direct or indirect access to operators, who would then patch the calls to a long-distance destination. These numbers should have been blocked completely from the guest rooms to require use of SUFI's network, but the Air Force did not honor this requirement. To be conservative in its claim calculation for the indirect access numbers, SUFI limited the damages to telephone lines that experienced at least 70 or more calls per year of ten minutes or more. By using this benchmark, SUFI presumed that calls greater than ten minutes most likely were personal calls, and therefore were long-distance. Any calls less than ten minutes in duration were excluded from

SUFI's claim. The DCAA audited this claim, and approved of SUFI's methodology. *SUFI VIII*, at 168,253, ¶ 168.

The ASBCA found for SUFI on all liability aspects of this claim, but it denied damages to SUFI except for a small part of increased usage on a single access number. SUFI had claimed $1,586,863.81, plus interest, for Operator Numbers Patching, but the Board awarded only $3,004.15. The Board later adjusted this award to include corrected extra work damages and claim preparation costs, totaling $5,341.11. *SUFI IX*, at 169,094. The Board cited an "evidentiary lacuna"[10] in SUFI's proof, because SUFI was able to identify only the first call placed (to a local base operator), and not the next number to which the operator had patched the call for the caller. *SUFI VIII*, at 168,254. The Board granted only the minor claim amount for one number used for morale calls, but denied the remainder because SUFI could not show what portion of the patched calls were local calls. *Id.*

SUFI maintains that the Air Force breached the contract by providing guests with additional direct DSN operator numbers after SUFI had blocked operator numbers being abused by guests. With respect to indirect operator access numbers, SUFI showed that these numbers were given out by Air Force front-desk personnel to allow lodging guests to circumvent SUFI's long-distance system. Having used this reasonable and conservative method to calculate damages, approved by the DCAA, SUFI argues that it satisfied its burden of showing damages with reasonable certainty, and that the Government had the burden of showing the need for some reduction or offset in SUFI's claim.

[42]  The Court concludes that the Board committed legal error in its application of damages burden of proof rules. SUFI employed a reasonable method to calculate its damages, but the Board refused to allow any of it due to an inability to show which calls were patched to long-distance numbers by

---

10.  A "lacuna" is defined as a blank space or a missing part. *Merriam–Webster's Collegiate Dic-* *tionary* 696 (11th ed. 2003).

the operators. As SUFI points out, the explosive call data for the numbers in question show that some atypical usage was occurring, and that the explosive call data was attributable to guests who were making calls to circumvent SUFI's system. The Board was wrong to deny relief due to an absence of more detailed call data that could not be supplied by either party.

To deny SUFI all but $5,341.11 in damages, for lack of information that neither party could supply, works a miscarriage of justice and is not in accordance with law. *See e.g., Bluebonnet*, 266 F.3d at 1355 ("[A]scertainment of damages is not an exact science, and where responsibility for damages is clear, it is not essential that the amount thereof be ascertainable with absolute exactness or mathematical precision."); *Locke*, 151 Ct.Cl. at 267, 283 F.2d at 524 ("Nor does it exonerate the defendant that his misconduct, which has made necessary the inquiry into the question of harm, renders that inquiry difficult.") (citing *Eastman Kodak Co. v. S. Photo Materials Co.*, 273 U.S. 359, 379, 47 S.Ct. 400, 71 L.Ed. 684 (1927)).

For the extra work portion of this claim, the Board denied all but a small portion of Ms. Ansola's time, even though the Board granted liability on the claim in all respects. *SUFI VIII*, at 168,254. The Board provided no explanation for its denial of the extra work claim. This too was legal error. The total amount to be awarded SUFI for this claim is $1,586,863.81, plus interest.

### D. *Delta Squadron*

[43] SUFI began providing telephone service at Sembach AFB, Germany in May 1999.[11] The ground floor of Sembach lodging Building 210 housed the Delta Squadron's administrative, maintenance, and transportation personnel. They worked in an area called the Day Room or lounge. There were five or six DSN telephones in this area to which Delta Squadron personnel had complete access.[12] SUFI requested Air Force personnel to remove these DSN telephones because they were within the confines of the lodging facility, and the contract required their removal. The Air Force at first refused, but eventually removed all but two phones by the end of 1999. In April 2000, SUFI substituted two of its own DSN telephones to monitor telephone usage from the lounge area.

The two telephones substituted by SUFI with DSN access were to be used mainly for troop morale calls. When SUFI complained that many of the calls were exceeding the fifteen minute limit for morale calls, SUFI threatened to remove its lounge area telephones. The Delta Squadron commander told SUFI that if the lounge area telephones were removed, "he would order his troops not to use SUFI's room phones." *SUFI VIII*, at 168,260, ¶ 203. SUFI maintained that the existence of the DSN telephones in the lounge area both before and after it substituted its own telephones was a breach of contract. The Board held, however, that the Air Force only had a duty to remove the government telephones it installed, and not the two SUFI telephones substituted by SUFI in place of the government telephones in order to monitor their usage. *Id.* at 168,262.

SUFI submitted a lost revenue and extra work claim of $1,836,063.41, but the Board at first granted just $108,488 in lost revenue damages, disallowing extra work and out-of-pocket costs. *Id.* at 168,262–63. On reconsideration, the Board adjusted its calculation upward and granted recovery for some of the extra work, out-of-pocket, and claim preparation costs, eventually totalling $184,314.54. *SUFI IX*, at 169,090–91, 94.

---

11. The facts relating to this claim are taken from the Board's decision in *SUFI VIII*, at 168,260–62, and from two of the Board's decisions on reconsideration where the claim is further discussed, *SUFI IX* and *SUFI X*.

12. In its memorandum for judgment on the administrative record, SUFI requests lost revenues for all government DSN telephones in the lounge. Pl.'s Mem. 59. SUFI reduced damages on this claim, however, in its post-hearing brief. *See* Appellant's Post Hr'g Br. 265 ("SUFI's claim is conservative in that it only asks for lost revenue for two DSN phones from the day of its cutover until SUFI installed its two phones, instead of for the full five or six phones that were in place for much of the year.") (citations omitted).

The Board limited SUFI's recovery to the period prior to April 2000, when SUFI substituted two of its own DSN telephones in the Delta Squadron lounge. The Board reasoned that the Air Force was not required to remove the telephones installed by SUFI, and therefore no damages were incurred by SUFI after April 2000. For the period prior to the removal of the government telephones, however, the Board employed its own lower rate, and disallowed most of the extra work claim. *SUFI VIII*, at 168,262–63.

In calculating the lost revenue damages for the pre-April 2000 period, the Board looked to records from the telephones subsequently installed by SUFI. It then "derive[d] the approximate call minutes multiplier by adjusting and extrapolating the minutes claimed for the two phones x.6998 and x.6999 to the two phones DSN 1 and DSN 2." *SUFI VIII*, at 168,263. The Board used this temporally proximate partial year data instead of SUFI's proposed multi-year average of the available call data from June 2000 through December 2004, finding that the partial year data "more accurately reflected the lost revenues." *SUFI IX*, at 169,091. In adopting this methodology, the Board examined the relevant data and articulated its rationale. Accordingly, the Court finds the Board's damages calculation for the government telephones supported by substantial evidence, and therefore not arbitrary and capricious.

The Board previously held that the contract required the Air Force "to remove government-installed DSN phones in Building No. 210's Day Room outside of the administrative area ... on cutover in May 1999." *SUFI VIII*, at 168,262. Despite repeated requests by SUFI that they be removed, two government telephones remained, and in April 2000 SUFI received permission to substitute these telephones with SUFI telephones. Pl.'s Mem. 53. Ms. Ansola testified that the purpose of this substitution was to enable SUFI to "monitor the phones and be able to show what kind of abuse was happening on those two phones." Ansola, Hr'g Tr. 4/178–79.[13] After the installation, SUFI continued to request removal of DSN telephones from the Delta Squad lounge. *SUFI IX*, at 169,090; Ansola, Hr'g Tr. 4/176–77.

It would be manifestly unfair to preclude SUFI from recovering damages after the April 13, 2000 substitution. The contract required the removal of the government's DSN telephones, and the Government refused to remove two telephones which continually were abused. In deciding many of the claims in this case, the Board denied SUFI recovery, citing insufficient proof of damages. Here, SUFI took steps to ensure that its revenue damages were indisputably documented, substituting its own telephones for monitoring purposes. The Board, however, found that this nuance of "SUFI-installed phones," as opposed to "government-installed phones" eviscerated the Air Force's "duty" to remove unauthorized telephones from the lounge. *SUFI VIII*, at 168,262. The Court finds this determination to be inconsistent and illogical, and therefore reverses the Board's decision as arbitrary and capricious. Accordingly, SUFI is entitled to lost revenue damages from April 2000 through May 2005, as well as extra work hours, out-of-pocket costs, and claim preparation costs. The correct award for SUFI's Delta Squadron claim is $1,534,192.40, plus interest.

### E. Calling Cards

On November 5, 2003, well after the beginning of the contract, the contracting officer directed SUFI to allow toll-free calls to lodging guests, which could include the use of calling cards of other long-distance carriers.[14]

---

**13.** The Government confirmed this series of events and rationale behind the substitution in its post-hearing brief:

> 326. On 13 April 2000, SUFI installed two DSN phones with worldwide access in the Delta Squadron orderly room to replace two Government DSN phones. These SUFI phones had the extensions 6998 and 6999. (Ex. B205, tab 8A)
>
> The two SUFI DSN phones were connected to the SUFI telephone switch. SUFI replaced the two Government DSN phones with SUFI phones for the purpose of allowing SUFI to monitor the use of these phones for alleged abuse. (Tr. 4/179; R4, vol. 8, tab 84B at SCL002661)

*See* Resp't's Post Hr'g Br. 89.

**14.** The facts relating to this claim are taken from the Board's decisions in *SUFI I*, *SUFI II*, and *SUFI VIII*, at 168,275–76.

*SUFI II*, at 161,865–66. SUFI objected to this directive, but to no avail. The Board held that the contracting officer's directive constituted a material breach of contract, permitting SUFI to stop performance. *Id.* at 161,869.

For its damages claim, SUFI presented the actual call records over the unblocked calling card numbers of other carriers. This evidence resulted in a claim for lost revenues of $947,752.29.[15] Adding amounts for extra work and out-of-pocket costs, SUFI's calling card claim totalled $986,369.13, plus interest. *SUFI VIII*, at 168,275–76. The Board, however, rejected the evidence of SUFI's actual call records, and instead performed a comparison of (1) SUFI's monthly revenue for all bases from February 2003 through January 2004, before the unblocking of guest room phones took effect, and (2) SUFI's revenues for all bases from mid-February 2004 through August 2004. The Board undertook a similar comparison for September through December 2004, but used the per month average from the pre-breach period as the baseline. *Id.* at 168,276. Using this method, the Board calculated a $24,466.85 difference that it applied for the first six and one half months, and a $7,400.82 difference that it applied for the last four months. *Id.* at ¶ 275. SUFI's total lost revenues under the Board's method was $188,637.80. After adding a small allowance for extra work and out-of-pocket costs, the Board awarded $194,472.98 in calling card damages to SUFI. *Id.* at 168,276. The Board gave no explanation for its rejection of the actual call record evidence furnished by SUFI. The Board later adjusted the extra work award and added claim preparation costs, allowing a total recovery of $205,147.47 for this claim. *SUFI IX*, at 169,094.

As SUFI points out, the method adopted by the Board is far less precise than the actual records of calls placed with other carriers. The Board's method assumes that the only breach SUFI was experiencing in 2004 was the calling card breach, and thus it could be isolated by comparing the total revenues

for the months in question with other months. However, the facts are otherwise. SUFI was experiencing a multitude of other breaches simultaneously, such as the hallway and lobby DSN telephones breach, the other operator numbers patching breach, and several other breaches that ebbed and flowed in their severity. Because of these other breaches, it is impossible to isolate the calling card breach using the Board's methodology. The actual call records provided by SUFI would have been the best evidence of SUFI's calling card damages.

The Government argues that the Board's method was proper because SUFI had failed to account for the fact that guests likely would not have made calls of the same number and duration using the SUFI system as they did using the calling cards. Def.'s Resp. 38. According to the Government, "[t]he economic fact that people make more (and longer) telephone calls when paying lower rates made SUFI's damages calculation implausible, uncertain, and speculative." *Id.* The Government, however, failed to present any evidence to support its theory. When there is no record evidence from the extensive Board proceedings, the Court cannot engage in speculation as to what callers might or might not have done when using calling cards instead of SUFI's system. As the Board observed in one of its earlier decisions, "once calls ... were diverted to other carriers and no revenues are generated for SUFI, such revenues were lost." *SUFI II*, at 161,869; *see also Ace–Fed. Reporters, Inc. v. Barram*, 226 F.3d 1329, 1332–33 (Fed. Cir.2000) ("[E]ach time an agency ... arranged for services covered under the contract from a non-contract source, the government ... breached the contract.").

[44] The Board committed legal error when it rejected the best evidence of SUFI's damages, the actual call records, and instead developed a monthly revenue comparison lacking any precision whatsoever. This claim offers an excellent example of where the Board strained to develop a calculation that eviscerated nearly 80 percent of SUFI's le-

---

**15.** SUFI's lost revenue estimate for the months of September through December 2004, amounting to $35,448.62 in lost revenues, is included in the total lost revenue claim. *SUFI VIII*, at 168,-275–76, ¶ 274.

gitimate claim. The Board's method and result were improper, particularly in circumstances of a wilful breach where the Government's actions created the very difficulty of proving damages of which the Government now complains. *See e.g., Locke*, 151 Ct.Cl. at 267, 283 F.2d at 524; Restatement (Second) of Contracts, § 352 cmt. a.

For SUFI's extra work claim, the Board awarded all of the extra work hours, but it used its own, recalculated hourly rates based upon each person's salary. *SUFI VIII*, at 168,276, 168,291. For the reasons explained under the "Labor Rates for Extra Work" section above, this was legal error, as it did not make SUFI whole for the extra work incurred. The Board should have adopted the hourly rates that included an appropriate mark-up for overhead and profit. Similarly, the Board should have allowed a mark-up on out-of-pocket costs and granted the amount that SUFI claimed. The correct award for SUFI's calling card claim is $986,369.13, plus interest.

### F.  *SIMS/LTS Interfaces*

This item relates to SUFI's claim for extra work and extra out-of-pocket costs due to defects in the Air Force's guest registration system called "SIMS" (Services Information Management System), and SUFI's later need to interface with another guest registration system called "LTS" (Lodging Touch System), which replaced SIMS. SUFI claimed $560,001.85 in damages, plus interest, of which the Board granted $151,614.00, plus interest.[16] The contract called for SUFI to collect data on call account and room status records so that all telephone charges could be included on a guest's bill upon check out.

In *SUFI VIII*, the Board found that SUFI's proposal, included in the contract, required SUFI to:

> [I]nstall a complete turn-key communications system which [would] interface with existing and planned Government equipment at each facility designated in the RFP (4.1) and SUFI's billing system [would] be fully interactive with the Government SIMS system (4.1.8) whose inter-

face was a Type RS–232 GFE Computer Serial Port (*SUFI I*, ex. A1 at C–35, C–43).

168,228, ¶ 51. Both SUFI and Contracting Officer Technical Representative ("COTR") Wayne Sellers believed that under the contract, SUFI was obligated to provide the means for the Air Force to print a single guest folio that included the telephone charges. Pl.'s Resp. 51; Sellers, Hr'g Tr. 3/233 ("Well, the way I read the contract, the one bill was the contractual requirement.").

Initially, SUFI encountered difficulties interfacing with SIMS, first employing GC–DOS computers as a "work around" and eventually replacing those computers with the Tiger billing system in order to meet the Air Force's needs. SUFI also had to train Air Force attendants in using the new system. Disagreements arose concerning the origin of the defects that caused the interface problems. The Air Force maintained that SUFI had to employ the Tiger billing system to correct its own deficiencies, but SUFI contended that the problems were with the SIMS guest registration system. The Board determined that the SIMS registration system was the source of the defects, but it denied relief to SUFI for its failure to provide notice of extra-contractual work under the contract. *SUFI VIII*, at 168,232. The second aspect of this claim, the interaction with the Air Force's new LTS registration system, is acknowledged to be a valid extra work claim. Still, there are damages issues in controversy, as the Board awarded only $154,781.27 in extra work, out-of-pocket costs, and claim preparation costs. *Id.*, at 168,233, 168,291; *SUFI IX*, at 169,094.

[45]  With regard to the "notice" issue, there is record evidence of SUFI notifying the contract specialist, Ms. Charlotte Guilmenot, that it regarded the installation of the Tiger billing system as extra work. The Board at first made a finding of this notice, *SUFI VIII*, at 168,230, ¶ 63, but on reconsideration, the Board "corrected" finding 63 to read "[t]he record contains no proof that SUFI told Ms. Guilmenot about installing the

---

16. The facts relating to this claim are taken from the Board's decision in *SUFI VIII*, at 168,228– 33, and the first reconsideration decision, *SUFI IX*.

Tiger system." *SUFI IX*, at 169,093. Regardless of whether the Board properly credited the testimony of notice, the Court does not see what purpose a "notice" would have served in this instance in the first place. Both parties were aware of the need for the work, and COTR Sellers was authorized to ensure that SUFI performed in accordance with the contract terms and conditions. *SUFI IX*, at 169,093. Mr. Sellers' direction that SUFI should employ the Tiger billing system to accomplish the "one bill contractual requirement," Sellers, Hr'g Tr. 3/233, was therefore within his authorization, and did not constitute an action necessitating notice.

[46] The deficiencies in the Air Force's SIMS system caused SUFI to perform the extra work of installing the GC–DOS computers and Tiger billing system. When extra work is performed, the contractor does not necessarily need to provide written notice to the contracting officer where the government had actual or constructive notice of the conditions. *See Dawco Constr., Inc. v. United States*, 18 Cl.Ct. 682, 693 (1989), *aff'd in part, rev'd in part*, 930 F.2d 872 (1991). Once notice is given about one type of differing site conditions, the contractor does not need to provide additional notice every time a "new rock [is] discovered." *Allied Contractors, Inc. v. United States*, 149 Ct.Cl. 671, 675, 277 F.2d 464, 466 (1960); *Blue Cross & Blue Shield United v. United States*, 71 Fed. Cl. 641, 660–61 (2006) (imputing knowledge to supervisor where the senior employee was the primary point of contact with plaintiff).

[47, 48] The plaintiff may also recover damages if the defendant is not prejudiced by the lack of notice. *Dawco*, 18 Cl.Ct. at 693. It is the defendant's burden to show prejudice from the plaintiff's failure to give notice. *Id.* (citing *G.M. Shupe Inc. v. United States*, 5 Cl.Ct. 662, 727 (1984)). Prejudice is demonstrated by illustrating how the plaintiff could have mitigated the costs of performing the extra work if it had provided the contracting officer with notice. *See Dawco*, 18 Cl.Ct. at 693 (citing *Schnip Bldg. Co. v. United States*, 227 Ct.Cl. 148, 163–65, 645 F.2d 950, 959–60 (1981)).

[49] SUFI had to perform this work so that the interface with the SIMS guest registration system would function properly. Neither party argued that a "notice" issue existed, and the Court does not see one. It was legal error for the Board to deny SUFI's extra work claim on this basis. With a breach of contract action, the key is to put the contractor in as good a position as he would have been in if not for the defendant's wrongful action. *Bennett v. United States*, 178 Ct.Cl. 61, 70, 371 F.2d 859, 864 (1967). By denying SUFI's extra work claim, that objective would not be achieved. *See id.* Moreover, the Government was not prejudiced by the lack of notice because the contracting officer already knew the work needed to be performed and the Government did not show how notice would have mitigated the costs of installing the Tiger billing system. *See Dawco*, 18 Cl.Ct. at 693.

SUFI also contends that the Board erred when it failed to rely upon the best evidence of the cost of GC–DOS computers. The Board used a unit cost of $20,000 for the six computers, based upon a SUFI internal memorandum from September 21, 1998 stating that the computers cost "$20,000 each." *SUFI VIII*, at 168,232, ¶ 74. However, SUFI's witness testified that the correct cost was $22,000 each, from a February 1998 email prepared when he was actually looking at the invoices. Stephens, Tr. 2/77; Ex. A36, B 17. Finally, SUFI questions the Board's failure to award SUFI any of its subcontractor costs due to its finding that "SUFI identified no subcontractor work by name or date." *SUFI VIII*, at 168,232, ¶ 74.

In the Court's view, the proper outcome here is to grant SUFI's damages, except for the $51,500 subcontractor work and the $2,000 increase for each of the six GC–DOS computers. SUFI presented insufficient evidence of invoices or payment records to support these claim items. With the use of fully loaded labor rates and as adjusted by the parties, SUFI's total damages award for SIMS/LTS interfaces is $480,626.85, plus interest.

### G. *Kapaun Line Charge*

SUFI claims a $1.00 per day per phone line charge for wiring the Kapaun and Sem-

bach air bases with a SUFI telephone system. For the Sembach base, the contracting officer issued a delivery order authorizing the $1.00 per day line charge, and SUFI recovered $758,463.00 for that claim. *SUFI VIII*, at 168,259. The Board, however, denied the Kapaun line charge because it was never included in a delivery order or contract modification.[17] SUFI contends that it has a valid equitable estoppel claim against the Air Force to recover the Kapaun line charge.

According to SUFI, it reached an agreement with the Air Force for payment of a $1.00 line charge per day per phone for SUFI's wiring of the Kapaun air base. However, after SUFI performed the work on the promise that the Air Force would modify the delivery order to incorporate the line charge, the Air Force reneged on its promise. SUFI's claim is for $544,476. The Board denied SUFI's claim, because it had not made a case for equitable estoppel. The Board found that the COTR who allegedly made the promise lacked the authority to modify the delivery order to include the charge, that SUFI knew the COTR lacked contracting authority, and that SUFI did not rely detrimentally on the COTR's conduct because it knew there was an existing delivery order covering the Kapaun base. *Id.*

[50–52] A claim for equitable estoppel requires: "(1) misleading conduct, which may include not only statements and actions but silence and inaction, leading another to reasonably infer that rights will not be asserted against it; (2) reliance upon this conduct; and (3) due to this reliance, material prejudice if the delayed assertion of such rights is permitted." *Mabus v. Gen. Dynamics C4 Sys., Inc.*, 633 F.3d 1356, 1359 (Fed.Cir.2011) (citing *Lincoln Logs Ltd. v. Lincoln Pre–Cut Log Homes, Inc.*, 971 F.2d 732, 734 (Fed.Cir. 1992)). A party invoking the doctrine of equitable estoppel against the government "bears a heavy burden," *Conner Brothers Construction Co., Inc. v. United States*, 65 Fed.Cl. 657, 692 (2005) (citing *Heckler v. Community Health Services of Crawford County, Inc.*, 467 U.S. 51, 61, 104 S.Ct. 2218,

81 L.Ed.2d 42 (1984)), as a contractor must prove an additional element of "affirmative misconduct," *Zacharin v. United States*, 213 F.3d 1366, 1371 (Fed.Cir.2000). Prior to finding estoppel against the government, the threshold issue of authority must be satisfied: "it is essential to a holding of estoppel against the United States that the course of conduct or representations be made by officers or agents of the United States who are acting within the scope of their authority." *Emeco Indus., Inc. v. United States*, 202 Ct.Cl. 1006, 1015, 485 F.2d 652, 657 (1973).

[53] Here, this threshold requirement is not met. In early March 1998, SUFI's Mr. Carl Stephens met with COTR Sellers, Mr. John Fortuna, Mr. Perry Kosmatka, and a NonCommissioned Officers Academy representative. *SUFI VIII*, at 168,257. At this meeting, SUFI proposed the condition of the $1.00 per day per room line fee for the Kapaun and Sembach buildings, to which the attendees agreed, and asked Mr. Stephens to submit proposals. *Id.* There was no contracting officer present at this meeting. *Id.* As discussed above in the "Settlement Agreement" section, SUFI bore the risk of ensuring that the government agents stayed within the bounds of their authority. *See Flexfab*, 424 F.3d at 1260. The contract required all modifications to be made in writing and signed by a contracting officer. R4F, vol. 1, tab 1, at I–4. Under the contract and Delivery Order No. 4, SUFI was required to provide service at Kapaun without a line fee. *SUFI VIII*, at 168,257–58. SUFI's argument that this requirement was withdrawn fails because there was never any written modification by the contracting officer to this effect. *Id.* at 168,259; Ex. A 1 § G.3 ("The CO is responsible for issuing any amendment to the Request for Proposal and any modification to the contract(s)."). Thus, SUFI remained contractually obligated to install telephones at Kapaun without a line fee, and COTR Sellers did not have the authority to authorize the $1.00 per day per phone charge.

---

17. The facts relating to this claim are taken from the Board's decision in *SUFI VIII*, at 168,257–

60.

SUFI contends that the Kapaun line charge agreement had the "Contracting Office's approval, encouragement, and knowledge." Pl.'s Mem. 74. Mr. Stephens testified that Ms. Guilmenot, the contracting specialist, informed him that she would approve whatever was agreed to by U.S. Air Force Europe. *SUFI VIII*, at 168,257; Stephens, Hr'g Tr. 1/231–32. SUFI submitted a proposal to the Contracting Office, but no formal modification was ever issued. *SUFI VIII*, at 168,257–58. According to SUFI, at the March 12, 1998 meeting, COTR Sellers urged SUFI to begin installation of the Kapaun LFTS services, thereby confirming the pending modification of the line charge. Pl.'s Mem. 79. In support of its argument that the Government is estopped from denying these charges, SUFI cites persuasive language from *American Electronic Laboratories*:

> The statements of the Technical Representative cannot be completely disavowed and repudiated on the ground that he was without the authority to speak for the contracting officer. When an official of the contracting agency is not the contracting officer, but has been sent by the contracting officer for the express purpose of giving guidance in connection with the contract, the contractor is justified in relying upon his representations.

*Am. Elec. Labs., Inc. v. United States,* 774 F.2d 1110, 1115–16 (Fed.Cir.1985) (quoting *Max Drill, Inc. v. United States,* 192 Ct.Cl. 608, 625, 427 F.2d 1233, 1243 (1970)). The facts of that case, however, are markedly different from the case at bar. In *American Electronic Laboratories,* the court held that the Government was estopped from relying on a Limitation of Funds clause in the contract to the extent of $900,000 because the contracting officer had "determined that the proposed modification would be in the best interests of the government and signed a document authorizing the modification." *Id.* at 1112, 1115–16. Here, regardless of the alleged inducements of Ms. Guilmenot and COTR Sellers, Contracting Officer Janice Jones never signed any document authorizing a Kapaun line charge. *SUFI VIII,* at 168,258. A signed document was required for a delivery order or contract modification, a practice followed by the contracting officer when she issued a delivery order authorizing the line charge for the Sembach base. *SUFI VIII,* at 168,258. Accordingly, the Court agrees with the Board that SUFI has not made a case for equitable estoppel, and denies damages with respect to the Kapaun line charge.

### H. *Change of Air Force Switches*

[54] In April 2000, the Air Force replaced existing Siemens DSN switches at Ramstein and other air base lodgings with a Nortel DSN switch.[18] SUFI's already installed system was compatible with the Siemens DSN switches, and as a result of the replacement, SUFI had to implement the interface of its equipment with these new switches. Under the contract, SUFI was required to install a system that would "interface with existing and planned Government equipment." R4F, vol. 1, tab 1, at C–35. There is no evidence that the Air Force "planned" this equipment replacement. Moreover, Contracting Officer Cedric Henson explained to COTR Claudette "Sam" Adams that SUFI was only responsible for the initial interface: "the clarification was made so that SUFI was responsible for interfacing with w/the [sic] [Property Management System ("PMS")] at the time of each install; however, [it] was not meant to cover developing subsequent interfaces due to Air Force migration to a new PMS." Ex. B34 at 2 (Adams e-mail, quoting CO Henson). Accordingly, SUFI is entitled to recover damages for interfacing with the replacement Air Force switches.

After the change to the Nortel switch at Ramstein, SUFI experienced a "call queuing" problem with the Reservations Center telephone system which SUFI serviced. The Ramstein Reservation Center call queuing system could accommodate up to twenty calls. The incoming calls went through the SUFI switch and then to the automatic call

---

**18.** The facts relating to this claim are taken from the Board's decision in *SUFI VIII,* at 168,263–    65.

distribution ("ACD") center system. The ACD system put the calls in a queue in order of receipt, telling the caller his or her place in the queue, and then releasing the calls in the order received to the available operator. With the new Nortel switch, if a caller decided to hang up after being put in the queue, the call would not release from the queue. When this call reached the head of the line, the call would not release to the operator either, effectively blocking the system. This problem had not existed with the prior Siemens switch.

SUFI's employees investigated this problem extensively, and finally resolved the problem. SUFI purchased and installed a new ACD system, and upgraded the Ramstein switch to work with the new ACD system. SUFI did not encounter this problem at other air bases where the Air Force replaced the Siemens switch with the Nortel switch.

The Board denied SUFI's claim, finding that SUFI "did not carry its burden of proof that respondent's new Nortel DSN switch caused the malfunction in SUFI's system and hence SUFI's extra work and purchased equipment." *SUFI VIII*, at 168,265. The Court finds this ruling to be arbitrary, capricious, and not supported by substantial evidence. SUFI presented compelling testimony explaining that the new Nortel switch did not provide a satisfactory "hang up" tone to SUFI's equipment. As a result, when callers hung up the telephone after being placed in the queue, SUFI's equipment did not know to hang up the line. Congalton, Hr'g Tr. 12/64–67, 88–93; Smith, Hr'g Tr. 13/52–53; R4F, vol. 11, tab 95A, at 3133 (Broyles 4/14/00 entry); R4F, vol. 13, tab 99A, at 4,298–313.

The Board essentially made the above findings, *SUFI VIII*, at 168,264, ¶¶ 215–16, but apparently rejected SUFI's claim because a similar problem had not been encountered at any of the other bases where the switches had been changed. Any inference from this fact is overcome by the strong temporal relationship between the Nortel switch change and the occurrence of the call queuing problem. The Air Force offered no evidence to rebut SUFI's analysis of the problem, and indeed there is nothing in the record to establish any alternate cause. The Air Force did not contest the amount of SUFI's damages for this claim, and accordingly, the Court will grant SUFI's claim in full, $213,191.13 plus interest, for the change in Air Force switches, incorporating damages both for interfacing with the replacement Air Force switches and the call queuing problem.

## I. *Early DSN Abuse*

On May 23, 1997, early in contract performance, SUFI added DSN call service to the Ramstein guest rooms, limited to the local area.[19] Almost immediately, SUFI noticed a significant reduction in long distance call revenues and an increased pattern of calls to the DSN information operator. SUFI suspected that the DSN operators were patching long distance calls to circumvent the cost of using the SUFI network, and promptly notified the contracting officer. After the Air Force refused to monitor the calls to DSN operators, SUFI blocked access to three DSN operator numbers (0, 112, and 113) and SUFI's long distance revenues returned to the previous levels. If a guest encountered a blocked DSN operator number, the front desk staff provided a different DSN number to circumvent SUFI's commercial network. SUFI again notified the contracting officer, and blocked access from the guest rooms to these additional DSN numbers.

SUFI claimed damages of $75,000 for lost revenue from May through July 1997, plus extra work, out-of-pockets costs, and interest. The Board found that SUFI's factual assertions were true, but did not award any damages because SUFI's monthly revenues for the months in question did not show a decline as SUFI alleged. The Board determined through averaging monthly revenues that SUFI received $37,377 per month from May through July 1997, which was $6,372 higher than the average for January through

---

**19.** The facts relating to this claim are taken from the Board's decision in *SUFI VIII*, at 168,233–    35.

May 1997 ($31,005 per month). *SUFI VIII*, at 168,234, ¶ 84. The Board did not address the extra work or out-of-pocket cost claims.

SUFI asserted through its witness, Mr. Stephens, that the $75,000 claim is conservative because it includes only DSN calls of 30 minutes or more. SUFI presented evidence of one to four hour calls or more on the DSN lines. *SUFI VIII*, at 168,233, ¶ 77. Indeed, one guest room had logged five-hour telephone calls for ten consecutive days. *Id.* at 168,234, ¶ 83. The call records from 1997 no longer exist, but Mr. Stephens referred to those records when he prepared the $75,000 claim for lost revenues. Stephens, Hr'g Tr. 1/170–71; Ex. A36 ¶ 5.

[55, 56] The Board is correct that the 1997 Ramstein monthly averages of revenues do not support a finding of significant revenue loss due to DSN abuse. Once again, however, the use of monthly averages in this case does not tell a complete or reliable story. There were multiple other breach factors affecting SUFI's monthly revenues, and it is incorrect to rely upon the monthly averages as if this breach were the only one in play. In contradiction of the Board's conclusion, the fact of damage to SUFI is clear, and the Air Force's breach was wilful. The Board erred in relying on suspect monthly revenue averages to the exclusion of other compelling evidence. The Court has a duty to award reasonable damages when a wilful breach has occurred. *See Bluebonnet*, 266 F.3d at 1357–58 (using "jury verdict" method to compute reasonable damages when there was clear proof of injury); *Locke*, 151 Ct.Cl. at 267, 283 F.2d at 524 (approximate amounts may be used "if a reasonable basis of computation is afforded" because the breaching party "should not be permitted to reap advantage" from lack of proof which his breach made unobtainable).

[57, 58] The Court owes no deference to the Board's decision on issues of law. The application of the proper rule of damages is a question of law, or to the extent it might be regarded as a mixed question of fact and law,

the legal portion of the issue predominates. *Ray D. Bolander Co.*, 186 Ct.Cl. at 415–16. With the discretion to decide this claim *de novo*, the Court will grant SUFI its damages in full for the early DSN abuse, $122,942.50, plus interest.

### J. *Prime Knight Lodging*

[59] The Prime Knight lodging facilities at Ramstein air base Building Nos. 538 and 540–42 were intended for air crews transitioning on flight status.[20] Their overnight stays were relatively brief. During a pre-award survey held in February 1996, SUFI's Mr. Stephens observed DSN telephones in each of the Prime Knight guest rooms he entered. The Prime Knight Lodging Manager, Mr. Fred Roberts, falsely stated that these were intercom telephones allowing the front desk clerk to call the rooms with flight information and changes. In fact, these DSN telephones provided Class A worldwide service. These were the only guest quarters that had in-room telephones prior to SUFI's contract.

There is no dispute that the contract required the Air Force to remove these DSN telephones from the Prime Knight guest rooms as of the date of cutover to SUFI's system. Yet Mr. Roberts, and others within the Air Force, refused to remove the DSN telephones throughout 1997. While the contracting officer knew that the Prime Knight DSN telephones had to be removed, the Air Force brass in Germany stubbornly thought these flight crew personnel should have free telephone service. Pearson, Hr'g Tr. 3/13–14. The Air Force finally removed the DSN telephones shortly after September 30, 1998. The Government concedes that it committed a breach of contract in failing to remove the DSN telephones from January 1997 through September 1998.

SUFI claimed $208,547.45 in lost revenue, extra work, and out-of-pocket costs for this item, but the Board awarded only $128,942.83. One of the differences is in the calculation of lost revenue. SUFI's Mr. Stephens estimated a loss of approximately

---

**20.** The facts relating to this claim are taken from the Board's decision in *SUFI VIII*, at 168,242–   45.

$18,000 in revenue per month, causing a total net loss of $188,260.20 for December 1996 through September 1998. Oral Arg. Tr. 108–09. SUFI no longer possesses the call records on which the lost revenue estimate was based. The Board, however, awarded $121,542.08, or approximately $70,000 less, based upon a comparison of Prime Knight revenues per room for the breach period ($667.05), and the revenues received per room from other Ramstein lodging facilities ($1,357.63). This difference, $690.58, times the 176 Prime Knight rooms, yields a total of $121,542.08.

The revenues received per room from other Ramstein lodging facilities were themselves repressed. All of them were subject to the existence of hallway and lobby DSN telephones that were also impacting SUFI's revenue. The allowance of SUFI's lost revenue claim, $188,260.20, yields a per room lost revenue of $1,069.60, only $379.02 higher than the Board's calculation of lost revenue per room ($1,069.60 less $690.58). Because of the Board's failure to consider the effects of the hallway and lobby DSN telephones on the other Ramstein lodging rooms, the Court finds that the higher award is more reasonable. Again, the Court gives weight to the wilful breach of contract, more so here than for any other claim, in reaching this result. The extra work and out-of-pocket costs for this claim also are granted, and claim preparation costs adjusted accordingly. Since the application of the proper damages rule is a question of law, which the Court reviews *de novo*, the Court has the necessary discretion to reach its own result. Accordingly, the Court grants SUFI's claim in full, $208,547.45, plus interest, for the Prime Knight Lodgings.

### K. *German Troops Housing*

[60] At the Sembach air base, the Air Force through Lodging Manager David White decided to house a group of German troops at Building 212, using this building as a barracks rather than for transient lodging.[21] These troops were assigned to guard

Air Force bases in Germany. They were long-term guests who stayed at Sembach Building 212 for six to eight week periods. The commander of the German troops requested Building 212 front desk personnel not to issue PIN numbers to the German troops. The use of PIN numbers would have been necessary to access the SUFI telephones, so without PIN numbers, the German troops could not use SUFI's system, and thus SUFI received no revenue. From March 2003 through May 2005, a few PIN numbers were issued, and occasionally, someone other than German troop personnel would stay in a room. The Board found that the housing of German troops at Sembach Building 212 was a change in the description of services to be performed under the contract's Changes clause. *SUFI VIII*, at 168,-270.

SUFI claimed damages of $49,909.02 for lost revenue, plus extra work and interest. The Board awarded only $1,042.88 for some of the extra work, and did not grant SUFI any lost revenue. *SUFI IX*, 169,094–95. With claim preparation costs, the total award from the Board was $1,696.20. *Id.* However, the Board did not address or explain the reasons for denying the lost revenue claim. The Board's failure to address the lost revenue claim in any respect was clear error.

SUFI calculated its lost revenue claim by comparing the amounts received during the months of occupancy by the German troops against the prior average monthly revenue received for lodging in Building 212. Smith, Hr'g Tr. 13/31; Myers, Hr'g Tr. 14/91–92; Ex. B205, tab 12A, at 385, 387–89. The DCAA took "no exception" to the lost revenue computation and "verified the contractor's methodology." R4F, vol. 9, tab 88A, at 2820, 2822–24; R4 Supp., vol. 1, tab 108, at 14; Ex. B205, tab 12A, at 385. The Air Force did not contest the amount calculated.

The Court grants SUFI the full amount of this claim, $54,780.52, plus interest.

---

21. The facts relating to this claim are taken from the Board's decision in *SUFI VIII*, at 168,269–

71.

L.  *Lost Profits*

SUFI submitted a lost profits claim to recover the expected revenue, less estimated costs of performance, that SUFI would have received if the contract had continued to completion. SUFI's lost profits claim totalled $65,980,144.35, of which the Board allowed $636,497 in its original decision. *SUFI VIII,* at 168,284 (claim), 168,287 (decision). After three motions for reconsideration, the Board adjusted SUFI's lost profits award to $2,646,116. *SUFI XI,* at 169,887. There are two significant issues that must be addressed in considering SUFI's lost profits claim: (1) the length of the contract; and (2) whether SUFI's telephone service would have been used at new lodging facilities to be opened at the bases assigned to SUFI's contract.

1.  *Length of the Contract*

[61]  The parties dispute whether SUFI's contract, as amended, was to last for fifteen years from the date of contract award, or for fifteen years after the acceptance of a functioning telephone system at each air base. The Board *sua sponte* measured the fifteen year period from the date of award, but SUFI relies on its analysis of pertinent contract provisions to argue otherwise. Contract interpretation questions are issues of law, which the Court may decide *de novo. Seaboard Lumber,* 308 F.3d at 1292; *George Hyman Constr.,* 215 Ct.Cl. at 80, 564 F.2d at 944.

[62]  The "Performance Period" clause, found at section H.29 of the contract, states as follows:

> The performance period *for each site* will commence upon *actual completion of installation, inspection and acceptance* by the ordering NAFI for the system ordered for that particular site and shall not exceed a period of 10 years from that date.

R4F, vol. 1, tab 1, § H.29 at H–5 (emphasis added). Modification 8 ("Mod 8") of the contract, dated March 24, 2000, changed the "10" year period to "15" years, but left all other language unchanged. R4F, vol. 1, tab 11. The Board relied on section F.4 of the contract, entitled "Term of Contract," which states that "The term of this contract will be for 120 months (ten years). All percentages

shall remain firm and fixed for this period." R4F, vol. 1, tab 1, § F.4 at F–4. Modification 8 also changed section F.4 to read "180 months (15 years)." *Id.* In its first reconsideration decision, the Board explained that it used April 25, 2011 as the end date for the unperformed years "because Mod 8 so specified for the expiration of the 15–year *contract term." SUFI IX,* at 169,092 (emphasis in original). The Board reasoned that this interpretation was consistent with section H.29, which states that the performance period for each site "shall not exceed a period of 15 years." *Id.*

SUFI also relies upon the "Option to Buy Equipment" clause, section H.27 of the contract, as amended by Mod 8, which states as follows:

> Upon completion of the performance period of each site (15 years), and prior to removal of any contractor owned equipment, the Government shall have the option to buy existing equipment at fair market value . . . .

R4F, vol. 1, tab 11 (Mod. 8), § H.27 at H–5 (emphasis added).

Considering each of the cited contract clauses, SUFI's interpretation is the most reasonable, and the one that gives meaning to all of the provisions. SUFI maintains that section F.4, "Term of Contract," sets the period under which new delivery orders could be placed adding bases and lodging facilities to the scope of work. If section F.4 were controlling in setting a firm limit on the fifteen-year term, such an interpretation would render sections H.27 and H.29 meaningless and superfluous. Under the Board's interpretation giving preference to section F.4, there would be no reason to have other provisions addressing a performance period *for each site.* The only way to give meaning to all of the provisions is to hold that sections H.27 and H.29 establish fifteen-year terms on a site-by-site basis, measured from the date of "actual completion of installation, inspection and acceptance" of the telephone system at each site. Interpreted in this way, there is no ambiguity in the contract, and all clauses are given effect. *See Arizona v. United States,* 216 Ct.Cl. 221, 235–36, 575 F.2d 855, 863 (1978) ("[A]n interpretation

which gives a reasonable meaning to all parts will be preferred to one which leaves a portion of it useless, inexplicable, inoperative, void, insignificant, meaningless, superfluous, or achieves a weird and whimsical result.")

Moreover, as SUFI points out, the contract procedure for adding lodging at new bases was for the Government to issue delivery orders. The parties expected that some bases would be added well after the initial contract award date, such as occurred for Spangdahlem (August 31, 1998), and Sembach (November 30, 1998). R4F, vol. 1, tabs 19, 20. If the Performance Period clause did not provide for a new start date for each base, there would be little or no incentive to add bases as the contract end date neared. The Performance Period clause also reflects the sound business principle that SUFI could not earn any revenue on its investment at a base until the telephone system was up and running.

Accordingly, SUFI's lost profits claim should extend for fifteen years from the date of actual completion of installation, inspection, and acceptance of the telephone system at each site.

### 2. *Whether New Guest Lodging Facilities Are Within SUFI's Contract*

[63] SUFI included in its lost profits claim revenues that it would have received if new guest lodging facilities at Ramstein and Spangdahlem had been brought on line after SUFI's performance ended in May 2005. SUFI included the room counts for these facilities in the lost revenues, 104 rooms for Spangdahlem (to be opened in April 2007), and 355 rooms for Ramstein (to be opened in September 2007). *SUFI VIII*, at 168,283, ¶ 322. SUFI contends that the parties' agreement operated like a requirements contract for bases where SUFI already had received a delivery order. If, for example, SUFI had received a delivery order for Ramstein in 1996, as it did, SUFI asserts that the Government was required to award the telephone services work to SUFI for all other new lodging facilities opened at Ramstein. The Government disagrees with SUFI's position, maintaining that the Air Force had the right, but not the duty, to order telephone services from SUFI for new lodging facilities.

SUFI also argues that if not for the Air Force's material breach, SUFI would have serviced the new hotel at Spangdahlem, pointing to the Air Force's use of SUFI equipment to service the hotel.

Central to the analysis of this issue is the "Expanded Service" clause of the contract. The "Statement of Work" in the AFNAF-PO's solicitation stated:

> The contractor shall provide expanded services after cut over in accordance with the terms of the contract as requested by the government. Expanded services are those services necessary to satisfy additional requirements over and above those provided at cut over.

Ex. A2 § 3.11 at C–27. SUFI requested clarification of this provision in its initial proposal. The Air Force explained that the expanded service requirement related only to lodging facilities for which SUFI would receive additional revenues. Ex. A2 § 3.11 at C27; Ex. A4 at sec. II, pg. 8; Ex. A6 at 2 (Q & A 7).

In its final proposal, SUFI rewrote the "Expanded Service" provision to conform to the Air Force's clarification. The "Expanded Services" clause, as incorporated in the contract, stated as follows:

> [SUFI] is fully committed to providing the best Customer Service available. Our goal is to develop a mutually rewarding long term relationship through our commitment to your satisfaction. Expanded service is defined as additional services or features required to support the lodging mission (i.e. addition of new buildings, rooms, and lodging offices).

Ex. A1 at A–2, § 3.11 at C–29.

The Board ruled in *SUFI II* that the Air Force was not required to allow SUFI to service new or replacement lodging facilities on bases where SUFI already had received a delivery order. *SUFI II*, at 161,868. The Board noted that the contract is an indefinite quantity type of contract, and that AFNAF-PO had the duty to order only "minimum" quantity of services "designated in the schedule." *Id.* The AFNAFPO complied with this requirement by ordering "one system per base" for Aviano, Rhein Main, and Ramstein

air bases. *Id.* SUFI moved for reconsideration, but the Board reaffirmed its ruling. *SUFI Network Servs. Inc.*, ASBCA No. 54503, 04–2 BCA ¶ 32,788 (Nov. 1, 2004) ("SUFI III") at 162,194–95.

Following these rulings, the Air Force moved for partial summary judgment on SUFI's request that the rooms for the new Ramstein and Spangdahlem lodgings be included in the lost profits computation. The Board denied this motion, finding that whether the Air Force "would have ordered telephone services at new facilities at Ramstein and Spangdahlem but for the CO's material breach of the contract" was in factual dispute. *SUFI IV*, at 165,780. In *SUFI VIII*, after considering the evidence presented at the hearing, the Board found that the chance of Air Force officials ordering SUFI's services at those new facilities "was essentially zero." *SUFI VIII*, at 168,285.

SUFI relies upon a variety of hearing testimony to show the parties' understanding both before and during the contract performance period. However, the Court's resort to parol evidence would only be helpful if there existed some contract ambiguity requiring interpretation. *See Barron Bancshares, Inc. v. United States*, 366 F.3d 1360, 1375–76 (Fed.Cir.2004) (discussing that the parol evidence rule prohibits external evidence to interpret unambiguous contract terms) (citations omitted). The Court does not see any ambiguity in the "Expanded Services" provisions or in any other pertinent contract clause. The fact remains that this contract was not a requirements contract, and there was no clause giving SUFI any entitlement to telephone services at new lodging facilities. The Government had the right, but not the obligation, to place this work with SUFI. The mere fact that the Air Force used SUFI equipment (which it then owned) to service the Spangdahlem hotel after SUFI stopped performance is not sufficient evidence to show that SUFI would have serviced the hotel if not for the Air Force's breach.

The Court agrees with the Board's ruling to exclude new lodging facilities from SUFI's lost profits calculation.

### 3.   *Other Lost Profit Matters*

The parties agree that the lost profits calculation is dependent upon the outcome of the other SUFI claims. After considering the Court's additional damages awarded to SUFI, the lost profits claim is increased to $59,876,215.14. In making this adjustment, the Court has used the January 2002 through May 2005 revenue averaging period proposed by SUFI. Neither the DCAA nor the Air Force challenged the use of this averaging period. The only effect of the Board's use of a different period, beginning in July 2000 (*SUFI VIII*, at 168,285, ¶ A), is to reduce arbitrarily the amount of SUFI's recovery. The Board offered no reason for this change to the averaging period.

### M.   *General Lack of Cooperation*

SUFI sets forth a "General Lack of Cooperation" claim to provide an alternative measure of relief for lost profits. Pl.'s Mem. 109–10. As the Court has accepted much of SUFI's lost profits methodology, the issue of whether SUFI should recover under an alternative method of calculation is moot.

### N.   *Summary of Damages*

The following chart summarizes the damages awards allowed by the Court and by the Board regarding SUFI's claims appealed to the Court, excluding interest:

| Claim Description | Court Award | ASBCA Award |
|---|---|---|
| Hallway & Lobby DSN Telephones | $53,700,352.41 | $1,299,481.93 |
| Other Operator Numbers Patching | $1,586,863.81 | $5,341.11 |
| Delta Squadron | $1,534,192.40 | $184,314.54 |
| Calling Cards | $986,369.13 | $205,147.47 |
| SIMS/LTS Interface | $480,626.85 | $154,781.27 |
| Kapaun Line Charge | $0.00 | $0.00 |

AAA PHARMACY, INC. v. U.S.          **321**
Cite as 108 Fed.Cl. 321 (2012)

| | | |
|---|---|---|
| Change of Air Force Switches | $213,191.13 | $0.00 |
| Early DSN Abuse | $122,942.50 | $0.00 |
| Prime Knight Lodging | $208,547.45 | $128,942.83 |
| German Troops Housing | $54,780.52 | $1,696.20 |
| Lost Profits | $59,876,215.14 | $2,646,116.00 |
| **TOTAL** | **$118,764,081.34** | **$4,625,821.35** |

*Conclusion*

Based upon the foregoing review of SUFI's claims, the Court concludes that SUFI should recover $118,764,081.34 in damages. The total amount awarded by the Board for the same claims is $4,625,821.35. Thus, the total net award by the Court is $114,138,259.99, plus interest. The Court directs the Clerk to enter judgment for SUFI in that amount. This result leaves undisturbed SUFI's claims that were not appealed to the Court, for which SUFI has received $2,790,930.17. Pursuant to Rule 54(d), the Court awards reasonable costs to SUFI.

IT IS SO ORDERED.



**AAA PHARMACY, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 11–877C.**

United States Court of Federal Claims.

Nov. 20, 2012.

**Background:** Pharmacy that had served as supplier to Medicare beneficiaries of durable medical equipment, prosthetic devices, prosthetics, orthotics, and other supplies (DMEPOS) sued United States to recover damages for loss of its business that allegedly resulted from revocation of its Medicare billing privileges and undue delay in adjudication of its administrative claim and restoration of its privileges, asserting claims for alleged taking, due process violation, and breach of implied-in-fact contract. Government moved to dismiss for lack of subject matter jurisdiction.

**Holdings:** The Court of Federal Claims, Williams, J., held that:

(1) government's alleged failure to comply with Medicare regulations did not give rise to implied-in-fact contract, and

(2) Tucker Act jurisdiction existed over takings claim.

Motion granted in part.

See also 2008 WL 5070958.

**1. Federal Courts ⟜1113**
    Plaintiff bears the burden of establishing subject matter jurisdiction.

**2. Federal Courts ⟜1111**
    When deciding a motion to dismiss for lack of subject matter jurisdiction, Court of Federal Claims assumes all factual allegations to be true and construes all reasonable inferences in plaintiff's favor. RCFC, Rule 12(b)(1), 28 U.S.C.A.

**3. United States ⟜125(3)**
    United States, as sovereign, is immune from suit save as it consents to be sued.

**4. United States ⟜125(5)**
    Waiver of United States's sovereign immunity cannot be implied, but must be unequivocally expressed.

**5. Federal Courts ⟜1072**
    Unless Congress consents to suit, there is no jurisdiction in Court of Federal Claims to entertain suits against the United States.

**6. United States ⟜125(5)**
    Tucker Act provides a waiver of sovereign immunity enabling a plaintiff to sue the

<u>CERTIFICATE OF SERVICE</u>

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure, I certify that I have this 26th day of June 2013 electronically filed and filed by hand the foregoing with the Clerk of the Court for the U.S. Court of Appeals for the Federal Circuit by using the appellate CM/EDCF system.  I certify that all participants in the case are registered CM/EDCF users and that service will be accomplished by the CM/EDCF system, as well as by hand upon the following individual:

Douglas T. Hoffman
Trial Attorney
Civil Division, Commercial Litigation Branch
United States Department of Justice
1100 L Street, N.W., Room 12036
Washington, D.C.  20005

   /s/ Frederick W. Claybrook, Jr.
Frederick W. Claybrook, Jr.

CERTIFICATE OF COMPLIANCE

I, Frederick W. Claybrook, Jr., certify that the foregoing Brief for SUFI Network Services, Inc., complies with the type-volume limitation of Federal Rule of Appellate Procedure 28.1(e)(2)(B) and contains 16,441 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

I further certify that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6).  The brief has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point.

 /s/ Frederick W. Claybrook, Jr.    
Frederick W. Claybrook, Jr.

Crowell & Moring LLP
1001 Pennsylvania Avenue, N.W.
Washington, D.C.  20004-2595
Tel:  (202) 624-2695
Fax:  (202) 628-5116

June 26, 2013